**E-FILED**
Wednesday, 19 March, 2008  03:40:25 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

CARLINVILLE SOUTHERN BAPTIST
CHURCH, an Illinois Religious
Corporation,

      Plaintiff,

v.

CITY OF CARLINVILLE, ILLINOIS, a
municipal corporation,  and the CITY OF
CARLINVILLE  PLANNING/ZONING
COMMISSION, a municipal body,

      Defendant.

Hon. Jeanne E. Scott
Magistrate Judge Charles H. Evans
Case No. 3:08-cv-3074

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**
**OR IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

Index of Authorities .................................................................................................. iii

Controlling Authority ................................................................................................. v

Concise Statement of the Issues Presented ............................................................... v

I.      Introduction ................................................................................................... 1

II.     Standard of Review ........................................................................................ 2

III.    Statement of Facts .......................................................................................... 3

IV.     Legal Arguments ............................................................................................ 4

        A.      Plaintiff has a Strong Likelihood of Success on its RLUIPA and
                First Amendment Claims .................................................................... 4
                1.  The RLUIPA Claims ................................................................... 4
                    a.  Carlinville has Violated the Equal Terms Section of RLUIPA .......... 7
                    b.  The City has Violated the Substantial Burden Section of RLUIPA .......... 9
                2.  Carlinville has Violated the First Amendment Rights of the Church .......... 10

        B.      The Church has no Adequate Remedy at Law and will Suffer Irreparable
                Harm if Injunctive Relief is not Granted .......................................... 11

        C.      Greater Harm will Result to the Church than to Defendants ................ 13

        D.      The Issuance of a TRO, or alternatively a Preliminary Injunction,
                Benefits the Public Interest ............................................................... 14

V.      Conclusion ................................................................................................... 14

# INDEX OF AUTHORITIES

## Cases

*AM Gen. Corp. v. Daimler-Chrysler Corp.,* 311 F.3d 796, 804 (7th Cir. 2002) ........................... 6

*Anshe Chesed Congregation v. Bruggemeier*, 115 N.E.2d 65, 69 (Ohio App. 1953) ................... 7

*Association of Community Organizations for Reform Now v. City of Dearborn*,
696 F. Supp. 268, 271 (E.D. Mich. 1988).................................................................... 3, 11

*Church of Jesus Christ of Latter-Day Saints v. Jefferson County*, 741 F. Supp. 1522,
1526 n.7 (N.D. Ala. 1990) ...................................................................................... 7

*Citizens for a Better Environment v. City of Park Ridge*, 567 F.2d 689 (7th Cir. 1975)............. 12

*City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc.*,
749 N.E.2d 916, 929 (Ill. 2001) ............................................................................... 9

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203,
1230 (C.D. Cal. 2002)................................................................................... v, 11, 12

*Darryl v. Coler,* 801 F.2d 893, 898 (7th Cir. 1986)....................................................... 14

*Digrugilliers v. Consolidated City of Indianapolis,* 506 F.3d 612, 618 (7th Cir. 2007) ............. 13

*Diocese of Rochester v. Planning Bd.*, 136 N.E.2d 827, 836 (N.Y. 1956)................................... 7

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ........................................................... 10, 12

*Elsinore Christian Center v. City of Lake Elsinore.* 291 F. Supp. 2d 1083 (C.D. Cal. 2003)... 7, 8

*Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872
(1990)............................................................................................................... 5

*Englewood v. Apostolic Christian Church*, 362 P.2d 172, 177 (Colo. 1961) (McWilliams, J.,
concurring)........................................................................................................ 7

*Goodman v. Illinois Dept. of Financial and Professional Regulation,* 430 F.3d 432 (7th Cir.
2005),(affirming Scott, J.)......................................................................................... 2

*Greentree at Murray Hill Condo. v. Good Shepherd Episcopal Church*, 550 N.Y.S.2d 981,
989 (N.Y. Sup. Ct. 1989) ........................................................................................ 7

*Grossbaum v. Indianapolis-Marion Cty Bldg. Authority,* 63 F.3d 581, 585 (7th Cir. 1995) ........ 2

*Jacobi v. Zoning Bd. of Adjustment*, 196 A.2d 742, 745 (Pa. 1964)....................................... 7

*Kelly v. Enbridge (U.S.) Inc.*, Not Reported in F. Supp. 2d, 2007 WL 3085989
(C.D. Ill. 2007) (Scott, J.) ...................................................................................... 2

*Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 568 (6th Cir. 1982)............................... 14

*New York Times Co. v. United States*, 403 U.S. 713 (1971)............................................. 2, 10, 12

*Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989)..................................................... 2, 10, 11

*Roland Machinery Co. v. Dresser Indust., Inc.,* 749 F.2d 380 (7th Cir. 1984) ............................ 12

*Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*,
396 F.3d 895 (7th Cir. 2005) (Posner, J.) ......................................................... v, 6, 9, 10

*Vietnamese Buddhism Study Temple in America v. City of Garden Grove*,
460 F. Supp. 2d 1165, 1172 (S.D. Cal. 2006)......................................................... 7, 11, 12, 13

*Vinewood Christian Fellowship of Evanston, Inc. v. City of Evanston*,
250 F. Supp. 2d 961 (N.D. Ill. 2003) .................................................................. v, 3, 6

## Statutes

291 F. Supp. 2d at 1093 .......................................................................................... 7, 8

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb .......................................... 4

**Other Authorities**

146 Cong. Rec. at S 7775; H.R. Rep. 106-219 ............................................................ 5

3 K. Young, Anderson's American Law of Zoning § 21.13, at 743 (4th ed. 1996) ........................ 9

Hatch-Kennedy Statement, 146 Cong. Rec. S. 7774, at *7775) ...................................... 7

Report of the House Committee on the Judiciary (House Rep. 106-219) (July 1, 1999)............... 9

**Rules**

Fed. R. Civ. Pro 65 (b) ................................................................................ 2

Fed. R. Civ. Pro. 65 (a) ............................................................................... 2

**CONTROLLING AUTHORITY**

Plaintiff relies upon the Religious Land Use and Institutionalized Persons Act, 42 USC 2000cc, ("RLUIPA") and *Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) (Posner, J.), *Vinewood Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F. Supp. 2d 961 (N.D. Ill. 2003); *Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F. Supp 2d 1203 (C.D. Cal. 2002); and *Vietnamese Buddhism Study Temple in America vs. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal. 2006), as well as the First Amendment to the United States Constitution and *Elrod v. Burns,* 427 U.S. 347, 373 (1974) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

**CONCISE STATEMENT OF THE ISSUES PRESENTED**

Should this Honorable Court grant Plaintiff's Motion for a Temporary Restraining Order, or in the alternative, a Preliminary Injunction in order to prevent Defendants from violating Plaintiffs' civil rights under the First Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc (" RLUIPA")

*Plaintiff answers: Yes*

## INTRODUCTION

Plaintiff, Carlinville Southern Baptist Church, is a Christian Church that purchased a building, originally used as a Wal-Mart retail center in the City of Carlinville, Illinois. The property is zoned C-1, a commercial district. The Church applied to rezone the property to the R designation to allow a religious use as of right. At the time of the application, the City allowed a similar assembly use, an "Auditorium," as of right in the C-1 zone.

The Carlinville Planning/Zoning Commission recommended denial of the rezoning to the City Council. The Church notified the City that if the City Council denied the rezoning, it would violate the equal terms component of RLUIPA. Undeterred, the City Council amended its Zoning Ordinance to make an "Auditorium" use in the C-1 zoning district a special use, requiring a permit from the City. It then affirmed the Planning Commission's denial of rezoning. Subsequent to the denial of the rezoning, the City publicly announced on television, in a newspaper article and at a Chamber of Commerce event that the sole reason for denying the rezoning was that the City would lose tax revenue if the property was used for any religious purpose. Thereafter, the City publicly announced that it would seek injunctive relief to preclude the Church from using its property for any religious use, regardless of whether the use was permitted in the C-1 district.

Carlinville Southern Baptist Church now moves for a Temporary Restraining Order, or in the alternative, a Preliminary Injunction to preclude the City of Carlinville from interfering with the lawful uses of the building under the C-1 zoning designation, and requests that this Court grant it injunctive relief to allow it to use the building for all of its intended religious uses.

It is clear based on the exhibits appended to this brief that the Church has a "strong" likelihood of success on the merits. By denying the rezoning based on the loss of tax revenue,

which is at the heart of its decision, threatening litigation and demanding that the Church sell the property to it, the City has otherwise denied the Church its right to use its property for religious purposes in violation of the federal Religious Land Use and Institutionalized Persons Act. Further, the issuance of injunctive relief will cause no harm to others and the public interest will be served by issuance of a preliminary injunction as members of the Church will have a building in which to worship.  Accordingly, Plaintiff respectfully requests this Honorable Court to enter an Order restraining Defendants' egregious and unconstitutional behavior that has prevented the Church from using its property to further its religious mission.

## STANDARD OF REVIEW

To secure a Temporary Restraining Order under Fed. R. Civ. Pro 65 (b), or preliminary injunctive relief under Fed. R. Civ. Pro. 65 (a), Plaintiff Carlinville Southern Baptist Church must show: (1) a likelihood of prevailing on the merits, (2) an inadequate remedy at law, and (3) irreparable harm if the preliminary relief is denied. *Kelly v. Enbridge (U.S.) Inc.*, Not Reported in F. Supp. 2d, 2007 WL 3085989 (C.D. Ill. 2007) (Scott, J.) (citing *Grossbaum v. Indianapolis-Marion Cty Bldg. Authority,* 63 F.3d 581, 585 (7th Cir. 1995). *See also Goodman v. Illinois Dept. of Financial and Professional Regulation,* 430 F.3d 432 (7th Cir. 2005),(affirming Scott, J.).

Further, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns,* 427 U.S. 347, 373 (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989) (citing *Elrod* for the conclusion that "the Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."); *Association of Community*

*Organizations for Reform Now v. City of Dearborn*, 696 F. Supp. 268, 271 (E.D. Mich. 1988) (same).

Injunctive relief is available to a religious entity under the Religious Land Use and Institutionalized Persons Act, when the Court makes a finding that a religious entity meets the injunctive factors established by the Court. *See Vinewood Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F. Supp. 2d 961 (N.D. Ill. 2003); *Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F. Supp 2d 1203 (C.D. Cal. 2002); and *Vietnamese Buddhism Study Temple in America v. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal. 2006).

## STATEMENT OF FACTS

Carlinville Southern Baptist Church incorporates by reference the verified complaint with the attached exhibits, attached as **Exhibit A** hereto**,** and affidavit of Pastor Tim Rhodus, attached as **Exhibit B**, as the statement of facts for purposes of this Memorandum of Law. For    purposes of the Church's motion for a temporary injunction, or in the alternative a preliminary injunction, there are a few relevant facts the Church wishes to point out.

- On December 13, 2007, Pastor Tim Rhodus applied to the City of Carlinville to rezone the property from C-1 commercial to R to allow the use of the property for religious purposes.

- Churches are only a permitted use as of right under the R zoning designation.

- The Carlinville Planning/Zoning Commission recommended denial of the rezoning application. The City Council voted to deny rezoning.

- The City has publicly stated that on three separate occasions that the sole reason for denying the rezoning is the loss of a tax basis with a religious use on the property.

3

- Prior to the City denying rezoning, the Zoning Ordinance permitted as of right an auditorium use in the C-1 district. The auditorium use is defined and is similar to a Church assembly use

- The City of Carlinville was notified by the Church's attorney that Zoning Ordinance violated the provisions of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc b(2)(b), including the equal terms provision.

- In response to the notification, the City of Carlinville *amended* its Zoning Ordinance and deleted "Auditoriums" as a permitted use in the C-1 district. The City now allows auditoriums and non commercial clubs and lodges as special uses in the C-1 zoning district. The City also amended the permitted and special use schedule to include Churches as a special use in the A (agricultural) district

- The amendment however, is for naught as there is no available land within the City of Carlinville zoned "R" or "A" that is reasonably suitable for Carlinville Southern Baptist Church to build or use for religious purposes.

- After denying the rezoning request, the City of Carlinville, through its Mayor, requested that the Church sell the premises to the City and the Church refused to sell.

- Thereafter, the City began a public campaign to pressure the Church to abandon its property by threatening state-court zoning enforcement proceedings and threatening to seek an injunction that would deny the Church from use of its building for *any* religious purpose, regardless of whether the use was permitted in a C-1 zoning district.

## LEGAL ARGUMENTS

### A. Plaintiff has a Strong Likelihood of Success on its RLUIPA and First Amendment Claims.

#### 1. The RLUIPA Claims.

The Religious Land Use and Institutionalized Persons Act ("RLUIPA" or "the Act"), which became law on September 22, 2000, was Congress' response to the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), where the Court ruled that Congress, in enacting the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq*., exceeded its enforcement power under Section 5 of the Fourteenth Amendment by

"contradict[ing] vital principles necessary to maintain separation of powers and the federal balance." *City of Boerne*, 521 U.S. at 536. RLUIPA is Congress' second attempt to address the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). After the *Smith* decision, religious and civil liberties groups across the political divide united in their opposition to that decision. Into this fray stepped Congress, who then enacted RFRA in an attempt to restore the "compelling state interest" test to all government actions that impose a substantial burden on religious exercise. In response to the *City of Boerne* decision that struck down RFRA, as applied to States and their political subdivisions, Congress then enacted RLUIPA. 146 Cong. Rec. at S 7775; H.R. Rep. 106-219.

Congress provided four separate causes of action under RLUIPA. They are:

*1. Substantial Burden*. Congress provided that "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates the imposition of the burden on that person, assembly or institution is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest. This section applies in any case in which the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved. 42 U.S.C. §§ 2000cc (a)(1) and  (2)(c).

*2. Equal Terms.* No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution. 42 U.S.C. § 2000cc (b)(1).

*3. Nondiscrimination.* No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination. 42 U.S.C. § 2000cc (b)(2).

*4. Exclusions and Limits.* No government shall impose or implement a land use regulation that (a) totally excludes religious assemblies from a jurisdiction; or (b) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction. 42 U.S.C. §§ 2000cc (b)(3)(A) and (B).

Congress also provided for:

- A broad interpretation of the Act as RLUIPA should be interpreted "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of RLUIPA and the Constitution." 42 U.S.C. § 2000cc-3(g).

- A definition of "religious exercise" as "any exercise of religion whether or not compelled by, or central to, a system of religious belief" 42 U.S.C. § 2000cc-5(7)(A).

- The "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7)(B).

- A definition of a "land use regulation" as: "a zoning or land marking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5).

Under this last definition, a government entity or agency implements a land use regulation when it acts pursuant to a zoning law that limits the manner in which a claimant may develop or use property in which the claimant has an interest. *See Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) (Posner, J.). Congress further provided for injunctive relief as a remedy for violation of RLUIPA, which is permitted at the outset of a case when the Court makes a finding that a religious entity meets the injunctive factors established by the Court. *See Vinewood Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F. Supp. 2d 961 (N.D. Ill. 2003); *Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F. Supp. 2d 1203 (C.D. Cal. 2002); *Vietnamese Buddhism Study Temple in America v. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal. 2006).[1]

---

[1] The Church need not demonstrate a high likelihood of success on the merits; rather, it must demonstrate only a "negligible" change of success. *AM Gen. Corp. v. Daimler-Chrysler Corp.,* 311 F.3d 796, 804 (7th Cir. 2002). The Seventh Circuit employs a "sliding scale" approach in deciding whether to grant or deny injunctive relief. *Id.* Thus, even a plaintiff with a less than fifty percent change of prevailing may merit an injunction when the balance of harms would weigh heavily in plaintiff's favor. Here, the Church has not just a negligible chance of success, but a strong likelihood of prevailing on its claims against Defendants.

### a. Carlinville has Violated the Equal Terms Section of RLUIPA.

In an attempt to use a church's shield as its sword, the City used the Church's tax-exempt status as a method of placing it on less than equal terms with nonreligious assemblies. The City's claimed interest in preserving property values cannot be used to justify a complete exclusion of a religious institution from the City's jurisdiction. *Vietnamese Buddhism Study Temple*, 460 F. Supp. 2d at 1174-75.[2] This same issue was discussed in *Elsinore Christian Center v. City of Lake Elsinore.* 291 F. Supp. 2d 1083 (C.D. Cal. 2003) (holding City's denial of church's application for a CUP violated RLUIPA, but RLUIPA exceeds Congress' power), *rev'd on other grounds,* 197 Fed. Appx. 718 (9th Cir. 2006) (holding RLUIPA is not unconstitutional). In *Elsinore,* the City denied a church's conditional use permit. The Court found that "the maintenance of property tax revenue is a potentially pretextual basis for decision-making that appears to have been a specific target of RLUIPA."[3] The court went on to hold:

> The Act's drafters were concerned that where, as here, a church is required to seek a permit, "[t]he zoning board [does] not have to give a specific reason [for denying the permit]. They can say it is not in the general welfare, or they can say you are taking property off the tax rolls." Indeed, if a city's interest in maintaining property tax levels constituted a compelling governmental interest, the most significant provision of RLUIPA would be largely moot, as a decision to deny a religious assembly use of land would almost always be justifiable on that basis. (citations omitted)

---

[2] *See e.g. Church of Jesus Christ of Latter-Day Saints v. Jefferson County*, 741 F. Supp. 1522, 1526 n.7 (N.D. Ala. 1990); *Greentree at Murray Hill Condo. v. Good Shepherd Episcopal Church*, 550 N.Y.S.2d 981, 989 (N.Y. Sup. Ct. 1989) (holding that speculative fears of diminution of property values do not qualify as injury, let alone irreparable harm); *Englewood v. Apostolic Christian Church*, 362 P.2d 172, 177 (Colo. 1961) (McWilliams, J., concurring) ("The possible depressive effect on property values by the erection of a church in a residential zone is not in itself sufficient ground for denying a permit for construction of a church.") *Diocese of Rochester v. Planning Bd*., 136 N.E.2d 827, 836 (N.Y. 1956) ("[I]t cannot seriously be argued that the decision of respondents denying this permit because of a loss of tax revenue is in furtherance of the general welfare."); *Anshe Chesed Congregation v. Bruggemeier*, 115 N.E.2d 65, 69 (Ohio App. 1953) ("No municipal corporation can justly refuse a permit to build a church only because the property will no longer be subject to taxation."); *Jacobi v. Zoning Bd. of Adjustment*, 196 A.2d 742, 745 (Pa. 1964) ("So universal is the belief that religious . . . institutions should be exempt from taxation that it would be odd indeed if we were to disapprove an action of the zoning authorities consistent with such belief and label it adverse to the general welfare.").

[3] 291 F. Supp. 2d at 1093 (citing Report of the House Committee on the Judiciary (House Rep. 106-219) (July 1, 1999), at text accompanying n. 79 (cited in Hatch-Kennedy Statement, 146 Cong. Rec. S. 7774, at *7775)).

*Elsinore,* 291 F. Supp. 2d at 1093.

Similarly, in *Vietnamese Buddhism Study Temple,* the primary concerns raised in the City Planning Commission's denial of the Temple's applications were increased traffic, increased on-street parking, and loss of revenue. The court found that "[t]hese three concerns simply do not justify facially unequal treatment between a church and a private club." *Id.* at 1174. The court reasoned:

> [I]f a tax exempt non-profit private organization decides to purchase property in the office professional zone, the City would suffer the same loss of revenue as it would if a religious association operated the property as a church. The City has not shown that a church or religious assembly would have a demonstrably different impact on the office professional zone than would a private club or lodge. This strongly suggests that the zoning ordinance impermissibly pursues Garden Grove's interests only against conduct motivated by religious belief.

*Id.* at 1175. The court preliminarily enjoined the city from enforcing those provisions of the zoning ordinance against the Temple. *Id.*

In the instant case, the City's violation of the equal terms provision is further evidence by the substantial similarity between the Church's religious use and certain special uses in the C-1 district. The zoning ordinance excludes religious uses from that district, while auditoriums and non commercial clubs and lodges are all permitted as special uses. In considering the RLUIPA bill, the House of Representatives considered this precise issue and concluded that RLUIPA was needed because:

> Significantly, non-religious assemblies [have not been required to] follow the same rules . . . [U]ses such as *banquet halls*, *clubs*, community centers, *funeral parlors*, fraternal organizations, *health clubs*, *gyms*, *places of amusement*, *recreation centers*, *lodges*, *libraries*, *museums*, municipal buildings, *meeting halls*, and *theaters* are often permitted as of right in zones where churches require a special use permit, or permitted on special use permit where churches are wholly excluded.

Report of the House Committee on the Judiciary (House Rep. 106-219) (July 1, 1999).

Further, there is nothing of record in this case which would indicate that Carlinville Southern Baptist Church's use of its property as a church would have any adverse effects on surrounding properties above and beyond those that would inherently be associated with any church located in the area, and "[b]ecause special uses, as such, are considered compatible with other uses in the zoning district in which they are included, it is generally held that an application for a special use permit may not be denied on the ground that the use is not in harmony with the surrounding neighborhood."[4] The use of the property as a Church is substantially similar to the non-religious assembly uses allowed as special uses under the C-1 zoning designation, and therefore no less compatible with the other uses allowed in the C-1 area. Accordingly, since the Ordinance, on its face and as applied to Carlinville Southern Baptist Church, violates the equal terms provision of RLUIPA, the City's denial of the permit application cannot be upheld and its actions must be enjoined.

### b. The City has Violated the Substantial Burden Section of RLUIPA.

In *Sts. Constantine, supra,* a case very similar to the instant claim, Judge Posner held that *the denial of a rezoning petition to construct a Church violated RLUIPA*. In that case, the Greek Orthodox Church acquired a 40-acre tract in a section of New Berlin zoned residential, planning on building a church that would replace its existing church in the nearby city that it had outgrown due to its growing congregation. Finding that the actions of the City, in denying a request to rezone the property, amounted to a violation of the substantial burden portion of RLUIPA, the Court held:

> If a land-use decision, in this case the denial of a zoning variance, imposes a substantial burden on religious exercise (the statute defines "religious exercise" to include the "use, building, or conversion of real property for the purpose of religious exercise," 42 U.S.C. § 2000cc-5(7)(B), the decision maker cannot justify

---

[4] *City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc.,* 749 N.E.2d 916, 929 (Ill. 2001) (citing 3 K. Young, Anderson's American Law of Zoning § 21.13, at 743 (4th ed. 1996)).

it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision. The burden here was substantial.

*Sts. Constantine*, 396 F.3d at 900-01.  Application of the *Sts. Constantine* decision compels a finding that the City of Carlinville violated RLUIPA through its denial of rezoning.  The City's admitted reasons for its decision was the loss of real property and sales tax if the property was rezoned from commercial to religious. The Church has now been threatened with being prevented from using the property for any reason whatsoever.  The C-1 zoning district allows retail and service uses, day care centers, office uses, eating and drinking places, and storage facilities as of right, but the City is threatening to prevent the Church from using the property for those permitted uses as well.  In addition, there is no greater burden than not allowing the Church to use its building for worship simply because it does not generate tax revenue for the City. *See Cottonwood Christian Center*, 218 F. Supp. 2d at 1228 (concluding that city's denial of property owner's conditional use permit application for construction of a church violated RLUIPA as revenue could be generated without preventing tax-free religious land uses.) The present inability to use the property as a religious use is clearly a "substantial burden" on the free exercise of religion as the Church cannot use its property for any religious reason.

### 2. Carlinville has Violated the First Amendment Rights of the Church.

Carlinville Southern Baptist Church has shown that it will suffer clear irreparable injury if the Church is barred from practicing its religion on the property. As of this moment, it cannot use the property for any reason whatsoever, even those uses permitted in the C-1 district.  Every day the Church is forced to delay fulfillment of its religious mission is a day that the congregation is denied the First Amendment rights of freedom of speech, freedom of association, and free exercise of religion.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (citing

*New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989) (citing *Elrod* for the conclusion that "the Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."); *Association of Community Organizations for Reform Now v. City of Dearborn*, 696 F. Supp. 268, 271 (E.D. Mich. 1988) (same).

Simply put, Carlinville Southern Baptist Church and its congregation have been completely denied their right to practice their faith in the manner of their choosing. Denying a congregation the ability to meet together for religious services on its own property constitutes "clear irreparable injury." *Vietnamese Buddhism Study Temple*, 460 F. Supp. 2d at 1172. The injury caused by the City is "especially burdensome" because it is placed on not just one individual, but many other worshippers. *Id.* at 1173. And while the financial hardship accompanying the land use denial is also a basis for finding irreparable harm, i*d.,* the uniqueness of the property is even more so, in that "every piece of property is unique and thus damages are an insufficient remedy to the denial of property rights." *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1230 (C.D. Cal. 2002).

Here, the outright denial of rezoning to the Church - hindering the congregation's ability to further its religious mission by bringing expanded services to the City of Carlinville - constitutes irreparable harm. Thus a preliminary injunction is proper.

**B.      The Church has no Adequate Remedy at Law and will Suffer Irreparable Harm if Injunctive Relief is not Granted.**

Carlinville Southern Baptist Church has shown that it will suffer clear irreparable injury if the Church is barred from using its building for any use whatsoever including its proposed use – corporate worship. Every day the Church is forced to deny religious services to its

11

congregation is a day that the congregation is denied the First Amendment rights of freedom of speech, freedom of association, and free exercise of religion. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also Citizens for a Better Environment v. City of Park Ridge,* 567 F.2d 689 (7th Cir. 1975) ("If there were a violation of First Amendment rights we would presume irreparable harm."). That the Church is without an adequate remedy at law is beyond dispute, as damages are simply an inadequate means to compensate for the loss of religious freedoms. *See Roland Machinery Co. v. Dresser Indust., Inc.,* 749 F.2d 380 (7th Cir. 1984) (concluding plaintiffs have no adequate remedy at law where the "nature of the plaintiff's loss may make damages very difficult to calculate.").

As stated previously, the City's actions have denied the Carlinville Southern Baptist Church and its members the right to practice their faith as they feel compelled to practice. The City's zoning ordinance and its application to the Church restrict not only the Church's ability to use its lawfully possessed property, but also the Church's ability to carry out its religious mission. This restriction on the Church's religious practice constitutes immediate and irreparable harm to the Church. Further, the Church has made commitments with teams of volunteers to provide the labor necessary to renovate the building and prepare it for use as a worship site as well as for uses consistent with the limitations of the C-1 zoning designation. Should the City be allowed to prevent the Church from making any use of or changes to the building, it will be forced to break its commitments to these volunteers.

C.    *Greater Harm will Result to the Church than to Defendants.*

In striking the balance of irreparable harms, the harm to the Church outweighs any potential hardship to the City if an injunction is granted.  As shown above, the harm to the Church involves the most fundamental constitutional rights of the Church's congregants.  The Church has been denied a place to worship and carry out its ministry, solely because the use as a location for holding "regularly scheduled worship services" is forbidden within the C-1 district. The Church's intended use of the property is consistent and harmonious with the variety of uses in the area, thus allowing the Church to enter its property will not cause harm to anyone including other users of land in its vicinity.  Aside from the pretextual reasons it has relied on to deny the use, the City cannot articulate a legitimate reason to support the position that congregants worshipping on the property will negatively impact the neighborhood.  *See Digrugilliers v. Consolidated City of Indianapolis,* 506 F.3d 612, 618 (7th Cir. 2007) (entitling a church to preliminary injunctive relief when the city violated the equal terms provision of RLUIPA).

This injunction will have no effect on the City's authority with respect to all other landowners and all other parcels of land in Carlinville.  The City is only required to make the limited accommodations necessary to allow the Church and its congregation to engage in some meaningful religious activity on the property.  The impact of the injunction on the City's police power is minimal, particularly in comparison to the seriousness of the harm the Church and its congregants suffer through the denial of their First Amendment rights.  The balance of hardships thus clearly tips in favor of the Church.  *See Vietnamese Buddhism Study Temple*, 460 F. Supp. 2d at 1173.

**D.    The Issuance of a TRO, or Alternatively a Preliminary Injunction, Benefits the Public Interest**

Here, the public interest is decidedly in favor of granting the injunction.  By passing RLUIPA, "Congress conclusively determined the national public policy that religious land uses are to be guarded from interference by local governments to the maximum extent permitted by the Constitution."  *Cottonwood Christian Center*, 218 F. Supp. 2d at 1231 (commenting RLUIPA alone can establish that the public interest is strongly in favor of granting the injunction).  The City's Ordinance, and its action thereunder, violate the substantial burden and equal terms provisions of RLUIPA, and "it is in the public interest not to perpetuate the unconstitutional application of a statute."  *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 568 (6th Cir. 1982).  Finally, the public interest will be served as members of the Church will be able to expand their worship and ministry and provide services to the Carlinville community.  *See Darryl v. Coler,* 801 F.2d 893, 898 (7th Cir. 1986) (finding that the "public interest" requirement takes on special important in constitutional cases where the outcome will undoubtedly affect countless persons).

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiff, Carlinville Southern Baptist Church,

requests that the Court issue a Temporary Restraining Order, or in the alternative, a Preliminary

Injunction.

**CARLINVILLE SOUTHERN BAPTIST CHURCH, an Illinois Religious Corporation**, Plaintiff

By:    /s/ David A. Herman
        One of its Attorneys

*Lead Counsel*
Daniel P. Dalton (P 44056) (Admission Pending)
TOMKIW DALTON, plc
Attorney for Plaintiff
321 Williams Street
Royal Oak, MI  48067
(248) 591-7000
ddalton@tomkiwdalton.com

*Local Counsel*
David A. Herman      (6211060)
David O. Edwards     (6229192)
Amanda M. Lundeen (6290095)
GIFFIN, WINNING, COHEN & BODEWES, P.C.
Attorneys for Plaintiff
One West Old State Capitol Plaza, Suite 600
Springfield, IL  62701
(217) 525-1571
dherman@giffinwinning.com
davidoedwards@giffinwinning.com
alundeen@giffinwinning.com

Dated: March 19, 2008

## <u>LOCAL RULE 7.1(B)(2) CERTIFICATION AS TO TYPE VOLUME LIMITATION</u>

I, David A. Herman, counsel for the Plaintiff in the above-entitled action, certify that, based on the word count of the word processing system used to prepare the document, the foregoing Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order or in the Alternative, a Preliminary Injunction contains 5,839 words and 30,284 characters (without spaces) and, therefore, complies with the type volume limitations set forth in Local Rule 7.1(B)(2).

<u>/s/ David A. Herman</u>
**David A. Herman**

**E-FILED**
Wednesday, 19 March, 2008  03:41:03 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

CARLINVILLE SOUTHERN BAPTIST
CHURCH, an Illinois Religious Corporation,

      Plaintiff,

v.

CITY OF CARLINVILLE, ILLINOIS, a
municipal corporation,  and the CITY OF
CARLINVILLE  PLANNING/ZONING
COMMISSION, a municipal body,

      Defendant.

JURY DEMAND
Hon.
Case No.

---

### Verified Complaint for Declaratory and Injunctive Relief

NOW COMES the Plaintiff, CARLINVILLE SOUTHERN BAPTIST CHURCH, and for its Complaint against Defendant, CITY OF CARLINVILLE, ILLINOIS, and the CITY OF CARLINVILLE PLANNING/ZONING COMMISSION (collectively referred to as the "City"), states as follows:

### Introduction

1.    This is an action for declaratory judgment, temporary restraining order, preliminary and permanent injunction, and damages arising from the City's violation of federal and state Constitutional and statutory rights. Carlinville Southern Baptist Church (the "Church") alleges that the City's zoning ordinance, both on its face and as applied to the Church, violates its First Amendment rights to the free exercise of religion and freedom of speech and assembly; its Fourteenth Amendment rights to due process and equal protection under the law; its parallel rights under the Illinois Constitution, the Religious Land Use and the Institutionalized Persons


EXHIBIT
A

Act of 2000, 42 USC § 2000cc (the "Act") and the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15.

## Parties

2.     The Church is a congregation of Christians that assemble weekly to worship God and engage in other worship supporting activities customarily associated with churches.   The Church is registered, under the Illinois Religious Corporation Act, 815 ILCS 110/0.01 et seq., as a religious corporation pursuant to an "Affidavit of Religious Organization" recorded with the Macoupin County Recorder of Deeds on March 23, 1983. (*A copy of the Affidavit of Religious Organization is attached as **Exhibit 1** and made a part hereof.*)

3.     The City is a municipal corporation organized under the Constitution and Laws of the State of Illinois and a political sub-division thereof and its subordinate governmental entity. The City is empowered by the State of Illinois to regulate and restrict the use of land and structures within the City's geographical jurisdiction, and effectuates this authority through implementation and enforcement of the City's zoning ordinances.

## Jurisdiction and Venue

4.     This Court has subject matter jurisdiction over this case pursuant to 28 USC § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution; under 28 USC § 1343(a)(3), in that it is brought to redress deprivations under color of state law, of rights, privileges and immunities secured by the United States Constitution; under 28 USC § 1343(a)(4), in that it seeks to recover equitable relief under acts of Congress, specifically 42 USC § 1983 and 42 USC § 2000cc, which provide causes of actions for the protection of civil and constitutional rights, injunctive remedies and damages; and under 28 § 2201(a), to secure declaratory injunctive relief under 28 USC § 2202; and under 42 USC §

1988, to secure reasonable attorney fees as part of the case.  Plaintiff includes a request for a speedy decision and advancement on this Court's calendar under Fed. R. Civ. Pro. 57 and 28 USC § 2201. This Court has supplemental jurisdiction pursuant to 28. U.S.C. § 1367(a) over the state law claims asserted herein as those claims form part of the same case or controversy as the federal questions asserted herein.

5.      The venue in this action is proper within the Central District pursuant to 28 USC § 1391(b), in that (i) Defendant is situated within this judicial district, (ii) Plaintiff, Carlinville Southern Baptist Church resides within this judicial district, and (iii) all of the claims asserted by Plaintiff Carlinville Southern Baptist Church arose within this judicial district.

### Factual Allegations

*The Church*

6.      The Church is a congregation of Christians that is a member church of the Illinois Baptist State Association, which is affiliated with the Southern Baptist Convention, which appeals exclusively to the scriptures of the Holy Bible for its authority and means of governance. It is a religious body formed for the promotion of the message of the Christian gospel, instruction and righteous conduct, fellowship of its members and outreach to the community.

7.      The Church sincerely believes that the foregoing ministries are duties owed to God by Christians and by the Church corporately.

8.      In accordance with its beliefs, the Church regularly assembles on Sunday mornings and Wednesday evenings to worship publicly Almighty God.  The Church conducts said religious services and activities in pursuit of is mission and responsibilities as a church.  The Church finds 380 to 450 persons in regular attendance at its Sunday morning worship services.

9.      The Church currently holds its worship services and generally operates out of a building owned by the Church outside the city limits of the City.

3

10.    Since 2000, the Church has experienced steady and substantial growth in membership and in participation in its ministries and programs such that continued operation of the Church and all of its programs at its existing site has become impracticable.

11.    To accommodate its growing membership and in furtherance of and to facilitate the foregoing purposes, on or about January 28, 2008 the Church purchased property located at 1030 West Main Street, Carlinville, Illinois (the "premises"). The premises were formally home to a Wal-Mart retail store.

12.    The Church desires and intends to occupy and use the premises for the primary purpose of gathering corporately to engage in the public worship of God, including the public preaching of doctrines of the Christian faith. The Church also intends to use the premises for other activities that pertain to its primary purpose, including classes of bible instruction, fellowship gatherings, administrative functions, and various ministries of outreach to the community.

### *The City's Denial of the Church's Application for Rezoning*

13.    On or about September 13, 2005, the Church executed a contract for purchase of the premises, with an indefinite closing date to be set at the discretion of Wal-Mart.

14.    The premises are currently zoned under the C-1 Neighborhood Commercial zoning designation, which does not allow for use as a church.

15.    On December 13, 2007, Pastor Tim Rhodus, the senior pastor and agent for the Church, applied to the City for re-zoning of the property from the C-1 commercial zoning designation to the R zoning designation to allow the use of the property for religious purposes. (*A copy of the Application for Rezoning of Property is attached as **Exhibit 2** and made a part hereof.*)

4

16.    The adjacent land uses are as follows: to the North is undeveloped agricultural land; to the East is retail/office center, single family residential developments, a bank, and a trucking facility; to the South is a vacant restaurant, single family residential developments and the Carlinville High School, and to the West is an assisted living facility and undeveloped land. (*A copy of the premises and land description is attached as **Exhibit 3** and made a part hereof.*)

17.    The City neither had an internal planning department nor an outside professional consultant review the application to rezone the premises prior to the City's Planning/Zoning Commission holding a public hearing and making an advisory report to the City Council on the rezoning application.

18.    The City's Planning/Zoning Commission held a public hearing on January 16, 2008 and recommended denial of the rezoning, concluding that (a) the existing uses of the premises in the vicinity of the property were all commercial, (b) the zoning district classification to the east, south and west were all commercial, (c) the suitability of the property to remain in retail use "seemed excellent" (d) the area was stable in terms of development and, most importantly, (e) the City would lose potential sales tax revenues and real estate taxes. (*A copy of the City of Carlinville Planning/Zoning Commission Advisory Report/Finding of Fact is attached as **Exhibit 4** and made a part hereof.*)

19.    On February 4, 2008, at its regularly scheduled meeting, the City Council voted unanimously to deny the application for rezoning. (*A copy of the unverified transcript of the City Council meeting of February 4, 2008, is attached as **Exhibit 5** and made a part hereof.*)

20.    At the meeting, Carlinville Mayor, Robert Schwab indicated that the reason for the denial was to attempt to maintain potential tax revenues.

21.     Subsequent to the decision, the City has publicly said that the sole reason for denying the rezoning is the loss of potential tax revenues that would result from religious use of the property. See *Exhibits 11-12,* and discussion below in paragraphs 28-33.

22.     The Church desires to occupy and use the premises as a church, and to do so immediately.

### The Zoning Ordinance

23.     The City regulates the use of land within its geographical jurisdiction pursuant to the City's zoning ordinance which is part of the City Code. (The zoning ordinance referred to herein as the "Zoning Ordinance" or "Ordinance") (*A copy of the City of Carlinville Zoning Ordinance is attached as **Exhibit 6** and made a part hereof.*)

24.     The City's zoning ordinance allows for churches as permitted uses as of right only under the R zoning designation. At the time of the Church's application for rezoning, churches were not allowed as special uses under any zoning designation.

25.     The C-1 zoning designation allows for office uses, day care centers, retail and service uses, funeral homes, eating and drinking establishments, filling stations, mini-warehouses and public utility buildings as of right.

26.     Prior to January 16, 2008, the schedule of permitted zoning uses allowed for assembly uses similar to a Church in a C-1 zoning district, such as auditoriums, retail and service uses, day care center, and eating and drinking places as of right. (*A copy of the City of Carlinville Schedule 40-3-19: permitted uses, accessory uses and special uses, is attached as **Exhibit 7** and made a part hereof.*)

6

27.    The zoning ordinance defines the term "Auditorium" as "A room, hall or *building made a part of a church*, theater, school, recreation building or other building assigned to the gathering of people." (***Exhibit 6, Section 40-2-2, pg 1004, emphasis added.***)

28.    In a letter dated January 4, 2008 to the City, through the City Attorney, the Church notified the City of the incongruity of the uses permitted by the Zoning Ordinance and that the ordinance violated the Religious Land Use and Institutionalized Persons Act, 42 USC 2000cc. (***Exhibit 8,*** letter from David Edwards to City of Carlinville, City Attorney, January 4, 2008)

29.    On or about January 21, 2008, after the City's Planning/Zoning Commission issued its recommendation to deny rezoning, and before February 4, 2008, when the City Council met to vote on the rezoning request, the City *amended* its schedule of permitted uses, accessory uses and special uses, for the C-1 zoning designation by deleting "Auditoriums" as a permitted use under the C-1 designation. The City now allows auditoriums, non commercial clubs and lodges as a special use under the C-1 zoning designation. (*A copy of the City of Carlinville Amended Schedule 40-3-19: permitted uses, accessory uses and special uses, is attached as **Exhibit 9** and made a part hereof.*)

30.    The City further provided in the amended "use" schedule that churches are permitted with special use approval in the A (agricultural) district. (*Id.*)

31.    There is no available land within the City that is reasonably suitable for the Church to build or use for religious purposes.

**The Cities Public Relations Campaign to Drive the Church out of Carlinville**

32.    On or about January 20, 2008, after denying the Church's rezoning request, the City, through its Mayor, requested that the Church sell the premises to the City. (*A copy of the*

*demand letter from the Mayor of Carlinville to the Church is attached as **Exhibit 10** and made a part hereof.*)

33.     The Church has refused to sell the property to the City.

34.     According to the March 4, 2008 edition of an area newspaper, ***The Telegraph***, the City plans to file an injunction in state Court to preclude the Church from using its building for any religious purpose. ("The city will file an injunction against the Carlinville Southern Baptist Church to prevent it from opening a religious center in the old Wal-Mart building.") (*A copy of **The Telegraph** newspaper article of March 4, 2008, is attached as **Exhibit 11** and made a part hereof.*)

35.     Similar statements were made in other local newspapers the week of March 4, 2008.

36.     The Mayor of the City further acknowledged in a television interview that the sole reason for the denial of the rezoning was the potential loss of real property tax and sales tax if the premises were converted to a church.

37.     On March 13, 2008, the Mayor of Carlinville confirmed that the reason for the City denying rezoning is the loss of tax revenue when he addressed the Carlinville Chamber of Commerce. According to the minutes of the meeting, the Mayor informed the Chamber members that "the City is against the Church moving into their new building simply because of economics." The Mayor further asked for "written support of whatever [the Chamber of Commerce] can provide as a board or individuals" to deny the Church to move into its building. (*A copy of the Minutes of the Chamber of Commerce meeting of March 13, 2008, is attached as **Exhibit 12** and made a part hereof.*)

38.    Under the current provisions of the Zoning Ordinance, certain uses, including office uses, daycare centers and eating and drinking establishments, such as banquet halls, are permitted uses under the C-1 zoning designation and, therefore, such uses of the premises are proper.

39.    There exists no building code in the City, nor is there any requirement that a property owner obtain a building permit before making internal renovations to a building.

40.    The Carlinville Zoning Administrator has informed Church representatives that the City cannot prevent the Church from remodeling and undertaking construction of the interior of the property.

41.    The City has threatened to take action to prevent the Church from undertaking any work or renovation within the premises and to prevent any religious use of the property, regardless of whether such use might otherwise be consistent with the permitted uses of the C-1 zoning designation.

42.    The City's attempt to prevent even lawful uses of construction on the property is based solely on the religious nature of the Church and its mission.

43.    The Church has a contingent of contractors and volunteers ready to commence work on the building, but cannot do so with the threatened zoning enforcement action.

44.    If the Church is not permitted to use its building, and begin work on interior renovations, it will loose the volunteer construction crews, which, will result in a substantial increased development cost of the premises.

## COUNT I
### *Violation of the Rights to Freedom of Speech and Assembly as Guaranteed by the First Amendment to the United States Constitution (42 USC §1983)*

45. Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 44 as if fully rewritten herein.

46. All acts alleged herein of the City, its officers, agents, servants, employees, or persons acting at its behest or direction, were done and are continuing to be done under the color and pretence of state law. Said acts include the enactment, implementation and enforcement of the Zoning Ordinance, as well as any additional ordinances, regulations, customs, policies and usages of the City.

47. In circumstances in which religious and non-religious assembly uses are operationally similar (from the perspective of the proper purposes and objectives of government zoning authority), the City's Zoning Ordinance nonetheless treats differently religious and non-religious assemblies.

48. The Zoning Ordinance differentiates religious uses from other uses by means of analysis of the content of the speech of those who would use the property for assembling and assigns discriminatory burdens to those users whose speech is religious.

49. The City's discriminatory treatment of religious land uses constitutes a content based and viewpoint based restriction on speech.

50. The content and viewpoint based restrictions of the Zoning Ordinance are not supported by a compelling governmental interest and are not narrowly tailored to accomplish the compelling governmental interest.

51.    The Zoning Ordinance's regulation of religious uses is not a legitimate time, place, or manner regulation, as it does not serve a significant government interest, and does not leave open ample alternative channels for communication.

52.    The Zoning Ordinance, to the extent it requires Plaintiff to obtain special dispensation from the City to use land for assembly and for religious purposes and affords the City unfettered discretion to decide whether to allow religious speech and does not contain in that process the procedural safeguards necessary for a speech-related permit scheme, constitutes a prior restraint on Plaintiff's speech in violation of the First Amendment to the United States Constitution.

53.    By discriminating against churches and religious land uses, the City has violated and continues to violate Plaintiff's right to the freedom of speech under the First Amendment.

54.    The Zoning Ordinance, to the extent it imposes discriminatory burdens on those who seek to assemble for religious exercise and speech violates Plaintiff's right to assemble and associate for the purpose of engaging in activities protected by the First Amendment.

55.    As a direct result of the City's violation of Plaintiff's First Amendment rights to the freedom of speech and assembly as alleged above, Plaintiff is suffering irreparable harm for which there is no adequate remedy at law.

56.    As a direct result of the City's violation of Plaintiff's First Amendment rights to the freedom of speech and assembly, as noted above, Plaintiff has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

## COUNT II
### *Violation of the Right to Free Exercise of Religion Guaranteed by the First Amendment to the United States Constitution (42 USC § 1983)*

57.    Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 56 as if fully rewritten herein.

58.    The terms and operation of the Zoning Ordinance burden the exercise of religion and are not neutral or of general application.

59.    As the text and application of the Zoning Ordinance imposes substantial burdens on the religious exercise of the Church and religious assemblies in general and discriminates against religious uses by permitting operationally similar non-religious assemblies to be free of such burdens, the City hereby has unjustifiably violated the Church's right to the free exercise of religion.

60.    The City's substantial burden on and discrimination against religious exercise established by the City's Zoning Ordinance is not justified by or narrowly tailored to further any compelling governmental interest.

61.    As a direct result of the City's violation of the Plaintiff's right to the free exercise of religion, as alleged above, Plaintiff is suffering irreparable harm for which there is no adequate remedy at law.

62.    As a direct result of the City's violation of Plaintiff's First Amendment right to the free exercise of religion, as alleged above, Plaintiff has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

12

## COUNT III
### *Violation of the Right to Equal Protection under the law and Due Process Guaranteed by the Fourteenth Amendment to the United States Constitution (42 USC § 1983)*

63.     Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 62 as if fully rewritten herein.

64.     The Zoning Ordinance, to the extent it discriminates against certain types of land uses based solely on the religious content of the speech and exercise of those assembling on the property, violates Plaintiff's right to the Equal Protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

65.     The Zoning Ordinance contains provisions which are unconstitutionally vague, in that those provisions are not defined sufficiently, such as to allow persons of ordinary intelligence to understand the proper meaning of their terms, nor to preclude arbitrary and discriminatory enforcement of their provisions, thereby violating Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution.

66.     The terms of the zoning ordinance and their application in violation of the Church's Equal Protection and Due Process rights are not supported by or narrowly tailored to further any compelling governmental interest.

67.     As a direct result of the City's violation of the Plaintiff's Fourteenth Amendment rights, the equal protection of the law and due process as alleged above, Plaintiff is suffering irreparable harm for which there is no adequate remedy of law.

68.     As a direct result of the City's violation of the Plaintiff's Fourteenth Amendment rights to equal protection of the law and due process, as alleged hereinabove, Plaintiff has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

## COUNT IV
### *Violation of the Religious Land Use and Institutionalized Persons Act, 42 USC § 2000cc(a)*

69.     Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 68 as if fully rewritten herein.

70.     The Zoning Ordinance is a land use regulation or system of land use regulations under which the City makes, or has in place, formal or informal procedures or practices that permit it to make individualized assessments of the proposed uses for property in its jurisdiction.

71.     The intended future use of the premises for the purpose of Plaintiff's religious exercise is itself religious exercise by Plaintiff.

72.     The text of the Zoning Ordinance can feasibly operate to keep Plaintiff from establishing a church in any district in the City.

73.     The City's implementation of the land use regulations contained in the Zoning Ordinance as alleged above imposes a substantial burden on the religious exercise of Plaintiff.

74.     The substantial burden imposed on religious exercise is not in furtherance of a compelling governmental interest and is not the least restrictive means of furthering any compelling governmental interest.

75.     Accordingly, the City has violated Plaintiff's rights recognized under federal statute in the Religious Land Use and Institutionalized Persons Act, 42 USC § 2000cc(a) (hereinafter referred to as "the Act").

76.     As a direct result of the City's violation of Plaintiff's rights 42 USC § 2000cc(a) of the Act, as alleged above, Plaintiff is suffering irreparable harm for which there is no adequate remedy at law.

77.    Furthermore, as a direct result of the City's violation of Plaintiff's rights under 42 USC § 2000cc(a) of the Act as alleged above, Plaintiff has suffered and is entitled to recover punitive, compensatory and nominal damages, costs and attorney fees.

## COUNT V
### *Violation of the Religious Land Use and Institutionalized Persons Act, 42 USC § 2000cc(b)*

78.    Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 77 as if fully rewritten herein.

79.    Plaintiff desires and intends to engage in religious assembly on the premises and has purchased the premises for that purpose.

80.    The City, by means of maintaining the existence and enforcement of the Zoning Ordinance has imposed and continues to implement land use regulation in a manner that treats religious assemblies or institutions, including Plaintiff, on less than equal terms with non-religious assemblies or institutions.

81.    The City, by means of maintaining the existence and enforcement of the Zoning Ordinance has imposed and continues to implement a land use regulation that discriminates against assemblies or institutions, including Plaintiff's, on the basis of religion.

82.    The City, by means of maintaining the existence and enforcement of the Zoning Ordinance requiring religious assemblies desiring to locate in the City to obtain special dispensation from the City (in the form of a special use permit or rezoning of property), has totally excluded religious assemblies from or, alternatively, has unreasonably limited religious assemblies within, its jurisdiction.

83.    Accordingly, the City has violated the Plaintiff's rights recognized under federal law as contained in 42 USC § 2000cc(b)(1) (equal terms), (b)(2) (non discrimination) and (b)(3) (unreasonable limitation or exclusion) of the Act.

84. As a direct result of the City's violation of Plaintiff's rights under 42 USC § 2000cc(b) of the Act, as alleged above, Plaintiff is suffering irreparable harm for which there is no adequate remedy at law.

85. Furthermore, as a direct result of the City's violation of Plaintiff's rights under 42 USC § 2000cc(b) of the Act, as alleged above, Plaintiff has suffered and is entitled to recover punitive, compensatory and nominal damages, costs and attorney fees.

## COUNT VI
### *Violation of the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15*

86. Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 85 as if fully rewritten herein.

87. The Zoning Ordinance is a land use regulation or system of land use regulations under which the City makes, or has in place, formal or informal procedures or practices that permit it to make individualized assessments of the proposed uses for property in its jurisdiction.

88. The intended future use of the premises for the purpose of Plaintiff's religious exercise is itself religious exercise by Plaintiff.

89. The text of the Zoning Ordinance can feasibly operate to keep Plaintiff from establishing a church in any district in the City.

90. The City's implementation of the land use regulations contained in the Zoning Ordinance as alleged above imposes a substantial burden on the religious exercise of Plaintiff.

91. The substantial burden imposed on religious exercise is not in furtherance of a compelling governmental interest and is not the least restrictive means of furthering any compelling governmental interest.

92. Accordingly, the City has violated Plaintiff's rights recognized under in the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15.

16

93.    The City, by means of maintaining the existence and enforcement of the Zoning Ordinance has imposed and continues to implement land use regulation in a manner that treats religious assemblies or institutions, including Plaintiff, on less than equal terms with non-religious assemblies or institutions.

94.    The City, by means of maintaining the existence and enforcement of the Zoning Ordinance has imposed and continues to implement a land use regulation that discriminates against assemblies or institutions, including Plaintiff's, on the basis of religion.

95.    The City, by means of maintaining the existence and enforcement of the Zoning Ordinance requiring religious assemblies desiring to locate in the City to obtain special dispensation from the City (in the form of a special use permit), has totally excluded religious assemblies from or, alternatively, has unreasonably limited religious assemblies within, its jurisdiction.

96.    Accordingly, the City has violated the Plaintiff's rights recognized under state law as contained in 775 ILCS 35/15.

97.    As a direct result of the City's violation of Plaintiff's rights under 775 ILCS 35/15, as alleged above, Plaintiff is suffering irreparable harm for which there is no adequate remedy at law.

98.    Furthermore, as a direct result of the City's violation of Plaintiff's rights under 775 ILCS 35/15 as alleged above, Plaintiff has suffered and is entitled to recover punitive, compensatory and nominal damages, costs and attorney fees.

## COUNT VII
### Mandamus and Superintending Control

99.    Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 98 as if fully rewritten herein.

100.   That under its own ordinances, state and federal law, and the United States and Illinois Constitutions, the Defendant has a clear legal duty to approve Plaintiff's request for rezoning of Plaintiff's property to permit its use as a church as of right.

101.   The Defendant lacks the ability to act within the confines of the law, is out of control and is willfully disobeying the law. By failing to approve the proposed use, Defendant has caused Plaintiff damages and continues to cause Plaintiff damages.

102.   Defendant's breach of duty has caused Plaintiff irreparable injury, and threatens Plaintiff with future irreparable injury for which there is no adequate remedy at law.

103.   In this case an actual controversy exists based on the foregoing allegations and this Court is otherwise empowered to render declaratory judgments as requested herein pursuant to Fed. R. Civ. Pro. 65.

104.   This Court is also empowered to render mandamus and secure superintending control over Defendant as requested herein.

105.   Defendant and its agents, employees and/or those acting in concert with, or under Defendant's authority, supervision and control, acting under the color of an ordinance, custom, policy or other law, deprived Plaintiff of its constitutional rights.

106.   Defendant's arbitrary, discriminatory and confiscatory actions taken against Plaintiff has caused and will cause Plaintiff substantial damages and harm, as it unreasonably interferes with Plaintiff's intended development and use of the property.

### COUNT VIII
*Defendants' Violations of the Plaintiff's Rights under the Illinois Constitution*

107.   Plaintiff, Carlinville Southern Baptist Church, restates the allegations in paragraphs 1 through 106 as if fully rewritten herein.

108.    There has been an abuse of process and deprivation of rights secured by the Illinois Constitution by the Defendant, under the color of state law which has deprived the Plaintiff of its rights under Article I, Section 2 of the Illinois Constitution (*Due Process and Equal Protection*), Article I, Section 3, *(Religious Freedom)*, Article I, Section 4 *(Free Speech)*, and Article I, Section 5 *(Free Assembly)*, as described above and in one or more of the following particulars:

    a.  That the Defendants have wrongfully prohibited a lawful, protected and legitimate use of the Plaintiff's property, without any record showing that such prohibition has any real, material and substantial relationship to the public health, safety, morals or the general welfare of the community; and/or

    b.  That Defendant's actions, under color of law, wrongfully and immediately harms Plaintiff as a direct result of the constitutional violations; and/or

    c.  That Defendant has wrongfully developed, administered, and operated its ordinances by wrongfully implying an unconstitutional process of inquiry into the religious character and activities of the Plaintiff's use, all by actions under color of state law; and/or

    d.  That Defendant has acted contrary to the law, including, but not limited to, the concepts set forth in the Illinois Constitution, by wrongfully and substantially burdening the Plaintiff's exercise of religion, free speech and assembly rights and equal protection and due process rights without any record of material fact by the Defendant of a compelling governmental interest in any record showing that Defendant's actions are the least restrictive means of furthering a defined and otherwise compelling statement of interest; and/or

    e.  That all of the acts of the Defendant, its officers, agents, servants, employees or persons acting at their behest or direction, were done and continue to be done under the color and pretense of state law, including ordinances, regulations, customs, policies and usages of the Defendant; and/or

    f.  That the Plaintiff has no adequate or speedy remedy at law to correct or redress the deprivations of its federal and state rights by the Defendant; and/or

    g.  That unless and until the enforcement of the Defendant's decisions are enjoined, the Plaintiff will suffer, and continues to suffer, irreparable and immediate injury to their federal and state rights as otherwise guaranteed under the constitutions, including the fear of enforcement and prosecution; and/or

h.  That the actions of the Defendant has been ill-motivated and administered with callous disregard for Plaintiff's protected rights as set forth herein; and/or

i.  That Defendant has no compelling or overriding interest in regulating the content and viewpoint of otherwise lawful, private speech and exercise of religion.

### Relief Requested

WHEREFORE, Plaintiff prays for a judgment against Defendant and that this Honorable Court:

a.  Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

b.  Pursuant to 28 USC § 2201, declare the aforementioned provisions of the Zoning Ordinance, and to the extent such provisions are not severable, the entire Zoning Ordinance, to be in violation of the First and Fourteenth Amendments to the United States Constitution and the Act, and further declare that Plaintiff is permitted as of right to use the premises as a church in the C-1 business district where the premises is located;

c.  Pursuant to 28 USC § 2202, Fed. R. Civ. Pro. 64, 42 USC § 1983, 42 USC § 2000cc-4 and 775 ILCS 35/15.42 (i) permanently enjoin Defendant from enforcing the Zoning Ordinance to the extent that it substantially burdens use of property for religious purposes and (ii) preliminary and permanently enjoin Defendant from enforcing Sections 40-9-7 through 40-9-12 of the Zoning Ordinance to prevent Plaintiff from using the premises as a church and to process and issue all building, occupancy and business permits and grant all other rights and privileges to Plaintiff to use the premises as a "church."

d.  Pursuant to 28 USC § 2202, Fed. R. Civ. Pro. 65, 42 USC § 1983, 42 USC § 1988, 42 USC § 2000cc-4 and 775 ILCS 35/15, award Plaintiff exemplary, compensatory and nominal damages.

e.  Pursuant to 42 USC § 1988, 42 USC § 2000cc-4(d), Fed. R. Civ. Pro. 54(d), 775 ILCS 35/15 and other applicable law, award Plaintiff its reasonable attorney fees, costs; and

f.  Grant such other and further relief as the Court deems equitable, just and proper.

## Demand for Trial by Jury

The Plaintiffs herein demand a trial by jury in this cause of action.

Respectfully submitted,

**CARLINVILLE SOUTHERN BAPTIST CHURCH, an Illinois Religious Corporation,** Plaintiff

By:___ /s/ David A. Herman_____
One of its Attorneys

*Lead Counsel*
Daniel P. Dalton (P 44056) (Admission Pending)
TOMKIW DALTON, plc
Attorney for Plaintiff
321 Williams Street
Royal Oak, MI  48067
(248) 591-7000
ddalton@tomkiwdalton.com

*Local Counsel*
David A. Herman     (6211060)
David O. Edwards     (6229192)
Amanda M. Lundeen (6290095)
GIFFIN, WINNING, COHEN & BODEWES, P.C.
Attorneys for Plaintiff
One West Old State Capitol Plaza, Suite 600
Springfield, IL  62701
(217) 525-1571
dherman@giffinwinning.com
davidoedwards@giffinwinning.com
alundeen@giffinwinning.com

**Verification**

Pursuant to 28 USC § 1746, I Timothy Rhodus, declare under penalty of perjury that the foregoing is true and correct and that I have personal knowledge of the allegations contained therein.

Executed this 18th day of March, 2008.

Carlinville Southern Baptist Church

/s/ Timothy Rhodus
Its:   Senior Pastor

*Lead Counsel*
Daniel P. Dalton (P 44056) (Admission Pending)
TOMKIW DALTON, plc
Attorney for Plaintiff
321 Williams Street
Royal Oak, MI  48067
(248) 591-7000
ddalton@tomkiwdalton.com

*Local Counsel*
David A. Herman     (6211060)
David O. Edwards     (6229192)
Amanda M. Lundeen (6290095)
GIFFIN, WINNING, COHEN & BODEWES, P.C.
Attorneys for Plaintiff
One West Old State Capitol Plaza, Suite 600
Springfield, IL  62701
(217) 525-1571
dherman@giffinwinning.com
davidoedwards@giffinwinning.com
alundeen@giffinwinning.com

Dated: March 18, 2008

**E-FILED**
Wednesday, 19 March, 2008  03:41:52 PM
Clerk, U.S. District Court, ILCD

## AFFIDAVIT OF RELIGIOUS ORGANIZATION

STATE OF ILLINOIS   )
                    )  SS
COUNTY OF MACOUPIN  )

I, __Phillip Gerald Harms__ , do solemnly swear or affirm that a meeting of the members of the Carlinville Southern Baptist Church, held at Carlinville; in the County of Macoupin, and State of Illinois, on the __10th__ day of __January__ , A.D. 19 _82_ , for that purpose, the following persons were elected trustees: __Marvin P. Carty, Dean Dixon, Larry Harms, and Mark Olroyd__

according to the rules and usages of such church. Said church adopted as its corporate name the Carlinville Southern Baptist Church, and at said meeting this affiant acted as chairman.

*Phillip G. Harms*

SUBSCRIBED AND SWORN to before me this __3rd__ day of __November__ , A.D. 19 _82_ .

*Philip J. Wyss*

NOTARY PUBLIC

An affidavit of Religious Organization was filed on March 23, 1983, Book 903, page 131 of the records of the Recorder's Office, Macoupin County, Illinois pursuant to the Illinois Religious Coroporation Act.

---

**EXHIBIT**

1

## Application for Rezoning of Property

Application Date 12-12-07

**Name & Address of Applicant**
CARLINVILLE SOUTHERN BAPTIST CHURCH
19453 HURRICANE DR.
CARLINVILLE, IL 62626
PASTOR: TIM RHODUS 217 415-3366 (CELL#)

Telephone 217 854-2837

**Name & Address of Owner**
**(if not Applicant)**

Subdivision WELTON & OTHERS            Lot No. PART OF: 3, 4, 9, 10
OLD WAL-MART BUILDING
Lot Size 5.15 ACRES (+,-)            5.15 ACRES.

## Classification Property is currently Zoned

Agricultural & Open Land ☐            Neighborhood Commercial ☑

Single Family Residential ☐            General Commercial ☐

Multi-Family ☐            Industrial ☐

Mobile Home Park ☐            City Parks ☐

Governmental, Educational ☐
& Religion

## Proposed Classification of Property

Agricultural & Open Land ☐            Neighborhood Commercial ☐

Single Family Residential ☐            General Commercial ☐

Multi-Family ☐            Industrial ☐

Mobile Home Park ☐            City Parks ☐

Governmental, Educational ☑
& Religion

**EXHIBIT**
tabbies
2

Reason for rezoning of property.

"CARLINVILLE SOUTHERN BAPTIST CHURCH PRESENTLY LOCATED AT 19453 HURRICANE DRIVE CARLINVILLE, ILLINOIS HAS EXECUTED A CONTRACT FOR PURCHASE OF THE PROPERTY LOCATED AT 1030 WEST MAIN STREET CARLINVILLE, ILLINOIS WITH THE INTENT OF RELOCATING ITS CHURCH AND ASSOCIATED SERVICES TO SAID PROPERTY. THEREFORE, IT IS REQUESTED THAT SAID PROPERTY BE RECLASSIFIED FROM C-1, NEIGHBORHOOD COMMERCIAL TO R, GOVERNMENTAL, EDUCATIONAL, AND RELIGION CONDITIONED UPON CLOSING AND TRANSFER OF TITLE OF SAID PROPERTY TO CARLINVILLE SOUTHERN BAPTIST CHURCH"

Signature of Applicant   _Tim Rhodus on behalf of Carlinville Southern_

Date   12/12/07

Recieved:   _Beth Soon_
Zoning Administrator

Date   Dec. 13, 2007

Date set for Public Hearing   _____

**For Office Use:**

$50.00 fee paid   Dec. 13, 2007   #5910

Approved by Zoning Commission   Date _____

Denied by Zoning Commission   Date Jan 16, 2008

JIM FENTON - MOTION TO DENY REZONING
JODIE PADGETT 2ND
NANCY JAYNE MAGUIRE NO
ALL OTHERS APPROVED - MOTION DENIED

Approved by City Council   Date _____

Denied by City Council   Date Feb. 4, 2008

LEA HUDSON MADE MOTION TO
UPHOLD ZONING COMMISSION'S
DECISION TO DENY RE-ZONING
REQUEST
RANDY OBER 2ND
ALL APPROVED - MOTION TO DENY
RE-ZONE PASSED UNANIMOUSLY





**The City of Carlinville, IL
Planning/Zoning Commission**
*will hold a*

# PUBLIC HEARING

*to consider the*

# REZONING

of property located in the Welton & Others' Subdivision,
part of lots 3, 4, 9 & 10, commonly known as the old

# WAL-MART

building, 1030 W. Main Street,
on January 16, 2008 at 7:00 p.m. in the Council room at City Hall,
550 N. Broad St., Carlinville, IL 62626.

*The old WAL-MART building and property is currently zoned as Neighborhood
Commercial. Carlinville Southern Baptist Church is requesting to have parts
of Lots 3, 4, 9 & 10 rezoned as Rehabilitation, Religion, Education for the
purpose of holding religious services.*

DEMOCRAT.                                THURSDAY, DECEMBER 27, 2007

Exhibit A

LEGAL DESCRIPTION

Part of Lots 9 and 10 in Welton's and Others Subdivision of part of the West Half of the Northeast Quarter of Section 29, and parts of Lots 3 and 4 in Welton's and Others Subdivision of part of the West Half of the Southeast Quarter of Section 29, all in Township 10 North, Range 7 West of the Third Principal Meridian, Macoupin County, Illinois, described more particularly as follows:

Starting at the Southeast corner of said Lot 3; thence with the East line thereof, North 161.00 feet to the point of beginning; thence leaving said East line South 89 degrees 27 minutes West 279.63 feet; thence South 161.00 feet to the South line of said Lot 3; thence with said South line and the South line of said Lot 4 South 89 degrees 27 minutes West 130.37 feet; thence leaving South line of said Lot 4 North 548.50 feet; thence North 89 degrees 27 minutes East 80.00 feet; thence North 122.50 feet; thence South 89 degrees 27 minutes West 30.00 feet; thence North 171.00 feet thence North 89 degrees 27 minutes East 360.00 feet to the East line of said Lot 10; thence with said East line and the East line of said Lot 3 South 681.00 feet to the point of beginning.

EXCEPTING the following described real estate:

Part of Lot 3 in Welton's and Others Subdivision of part of the West Half of the Southeast Quarter of Section 29, Township 10 North, Range 7 West of the Third Principal Meridian, Macoupin County, Illinois, described as follows:

Beginning at the Southeast corner of a tract of land recorded in Book 446, Page 272 in the Macoupin County, Illinois, Recorder of Deeds Office, said point being on the East line of Lot 3 in Welton's and Others Subdivision, also being the West right-of-way line of McCasland Street; thence North 00 degrees 11 minutes 19 seconds West along the East line of Lot 3 in Welton's and Others Subdivision, also being the West right-of-way line of McCasland Street 121.837 meters (399.72 feet); thence South 05 degrees 01 minutes 42 seconds West 24.652 meters (80.88 feet); thence South 00 degrees 11 minutes 19 seconds East 97.309 meters (319.25 feet) to the Grantor's South Property line; thence North 89 degrees 13 minutes 49 seconds East 2.23 9 meters (7.35 feet) to the point of beginning. Situated in Macoupin County, Illinois.

5

EXHIBIT

3

# CARLINVILLE PLANNING/ZONING COMMISSION

## Advisory Report/Findings of Fact

## January 16, 2008

## Carlinville Southern Baptist Church

### Public Hearing to Rezone part of Lots 3,4,9 &10

### Welton & Other's Subdivision

### Commonly known as the old Wal-Mart building

Section 40-10-12 of the City of Carlinville Zoning Code states that the Planning Commission shall not recommend the adoption of any amendment unless they find that such amendment is in the public interest and not merely for the benefit of the party proposing it. It should also be noted that under Section 40-1-1 of the Zoning Code, it is stated that one of the purposes of the code is "To conserve and increase the value of taxable property throughout the City". With that in mind, the Planning/Zoning Commission denied Carlinville Southern Baptist Church's request to rezone. The following are the Planning Commission's findings:

1. The existing uses of the properties in the vicinity of the former Wal-Mart are clearly of the Neighborhood Commercial types (restaurant, retail, banking, and health services).

2. The District Classification is Neighborhood Commercial to the east, southeast, and west, with agricultural land that is outside of City limits to the north of the proposed rezoned area.

3. The suitability of this property to remain retail seems excellent since the petitioner did not provide any compelling evidence to the contrary. In fact, supporting documents provided by the petitioner to the Planning/Zoning Commission showed that retail businesses are allowed to move into former Wal-Mart locations with restrictions being that the businesses cannot occupy more than 50,000 square feet and they cannot be pharmacies, groceries, wholesale club



EXHIBIT
4

operations or discount department stores. Independent research done by the Planning/Zoning Commission shows that <u>Tractor Supply Company</u>, <u>Big Lots</u>, <u>Sears</u>, <u>JCPenney</u> and <u>Dollar General</u> are leasing space in former <u>Wal-Mart</u> stores in Illinois, Missouri, Wisconsin and Kentucky. Closer to home, one has to look no further than Litchfield to see that <u>Tractor Supply Company</u>, <u>Sears</u>, and <u>Gliks</u> are doing business in the former <u>Wal-Mart</u> building. Not only has the City of Carlinville already spent the money to provide the infrastructure to make this a marketable retail location, but there are also developers who have shown a strong desire to locate in the old <u>Wal-Mart</u> building. If this property were to be rezoned as Religion, Rehabilitation, Education, the City would lose not only potential sales tax revenues, but also real estate taxes. It should further be noted that there are major land owners in the immediate vicinity who have expressed a strong desire to keep this area zoned Neighborhood Commercial.

4. The vicinity in question has remained fairly stable since the inception of the Zoning Code. Health care services in the area were expanded shortly before the Zoning Code was adopted. The Bank and Trust Company built a new building that opened in September 2003, and the Village at Morse Farms opened a new Assisted Living facility that opened in July 2006. Therefore, the Planning/Zoning Commission feels that the trend in development in this area has been a steady process to make this a viable, marketable area for future growth for our City.

Respectfully submitted,

*Beth Toon*

Beth Toon, Zoning Administrator

On behalf of the Planning/Zoning Commission

Unverified Transcript of
CARLINVILLE CITY COUNCIL – FEBRUARY 4, 2008

[Pledge of Allegiance, Roll Call, Last month minutes, opening remarks and various business, old business, new business.]

Next and last item is the appeal by the Carlinville Southern Baptist Church. Dave, want to start?

David Edwards: Good evening. My name is David Edwards and I'm from Giffin, Winning in Springfield and attorney Amanda Lundeen is here with me. We're here on behalf of the Carlinville Southern Baptist Church regarding rezoning issues on the former Wal-Mart building. And I think a lot of you were at the Planning Commission Hearing, so we're not really going to, or try not to repeat things that were said at that hearing, but just try to do our best to answer some questions and go over some issues we think are important with regard to the law.

We have some handouts. We tried to summarize the issues as best we could to be efficient with everyone's time. We have a couple of handouts as we go through our presentation. The first one we have is sort of a question/answer format with some questions that we thought may be in some people's minds or they're questions that we may have heard since the Planning Commission Hearing.

I think our goal here tonight is just to give you some cold hard facts about the property and the closing on the property and also some of the real issues that we see related to the church's use of the property. So we are not going to try to make any emotional pleas or talk about motives or anything like that. I mean, certainly, there's strong opinions by both sides in this case, but our goal here is just to give you some facts and go over things that we think we need to go over. We're more than happy to answer questions as we go through [indistinguishable] if you like. The handouts, I'm just going to go through one by one. The first question is "Does the church own the building?" And the answer is "Yes, there was a closing on the property January 28. So the church has the keys to the building, has the deed to the property, and we actually have some copies of the deed, the signed deed, we'll go ahead and hand those out. I know there were some questions on the Planning Commission about whether we had standing to come before the City and request zoning and so we want to clarify that because the church does actually now own the property. There seemed to be some odd things that went on as we, as the closing was approaching and Wal-Mart was actually I guess, taken aback at some of the attempts that were made by different parties to have it stop the closing, to get Wal-Mart to cancel the contract. But Wal-Mart stood by the commitment they had made to the church. The financing came through, and so the church is the owner of the property. We also wanted to clarify the commitment and the church's [ ] that were voted on. Back in September 2005, the church voted to buy the building. It was around that time when the contract was signed. At that time, none of the church members voted against it, so everybody . . . - there may have been someone who abstained, but everyone who voted, voted with that. There was another vote more recently on the last few weeks I suppose it was, and the church clarifies that they were going to see this through and utilize the property for the



EXHIBIT
5

church purposes.  And to that end, issue number 3 of the questionings, "Will the church sell the property if the City refuses to rezone.  According to the church body vote, they will not do that.  Essentially, the church is committed to either using it for their church ministry purposes or having it sit empty.  I don't tell you that as a threat, I'm just reporting that is what the church voted they will do because they are that committed to following the plan they have in place to use this property.

There are also some questions regarding the timeline and why the church didn't request rezoning earlier.  I guess I would just point out that the Planning Commission set the date for the hearing and we certainly didn't request or demand that a decision be made prior to the closing.  Even though the closing was coming up, and certainly the Planning Commission and also the City Council were certainly free to take the time to make that decision on this.  As we look at the zoning ordinance there doesn't appear to be any timeline that applies to ask for rezoning at any particular time.  I guess I would also go back to the question that we had at the Planning Commission about do you actually own the property.  So it seems like if we had come to you or come to the Planning Commission months ago we may have gotten even more questions about whether we have standing to actually proceed with asking for rezoning.  And also, a little bit more about the timeline.  We had some contact, a letter to the city attorney back in November to meet about discussing any issues.  In December, in mid-December, there was a meeting with some of the city officials and at that point the petition was filed to rezone , asking that the property be rezoned.

There was some discussion and questions at the Planning Commission about whether there had been offers or people contacting the church regarding purchase of the property.  I just wanted to clarify that the church has not received any direct offers from any retail business to purchase the property.  There's, I suppose the most direct offer was in October of 2007.  Jim Hudson contacted the church to try to discuss the possibility of putting Tractor Supply Company, but it was our understanding that Tractor Supply Company did not want to pursue the building if the church was planning to use that.  And the only other direct contact that the church had was from Jeff Kuhar from Aspen Realty who asked on behalf of some unnamed potential purchasers.  So the church hadn't received any offers whatsoever to purchase the building and nobody has called and said I will give you $XXX if you give us the building.

No. 7, in regards to the Litchfield Walmart, I think there has been some discussion and questions about, you know, "look at Litchfield, they've put some businesses in that old Wal-Mart building and can't we do the same thing here?"  And so, we checked into that - we had some contact with Wal-Mart realty and what we found, and actually was just clarified today in an email from Wal-Mart, the Litchfield Wal-Mart was not owned by Wal-Mart.  It was leased, leased by, leased by Wal-Mart.  And so, the lease was terminated early based on Wal-Mart's request.  So the site was redeveloped.  With regard to this local building here in Carlinville, back at the time, or I should say prior to the time that the church signed a contract to the building, it was on the market for 6 months and, according to what Wal-Mart told us, they had marketed it to, in the way that they normally do, which is aggressively seeking developers and those that, that might be

interested in the property. They certainly are doing this all over the country with various Wal-Marts and so the realtors that are doing that are very, I guess, experienced and very good at what they are doing, so they made every effort to try to find a developer for that property and they were not able to find anybody and at that time the church signed the contract to purchase the property. Also, in our just reviewing other Wal-Marts and how they've been treated, we discovered that, you know, as we sit here tonight there's multiple Wal-Marts within a not very long drive from here – there's Jacksonville, Jerseyville, Bloomington, Lincoln, also Vandalia and Salem all have empty Walmart buildings that they're, that they're trying to fill.

We wanted to just make some brief responses to things the Planning Commission said in their findings of facts and at this point [        ] turn it over to Amanda Lundeen [     ] talk about that.

Amanda Lundeen: You guys know that we're here to appeal the decision or the recommendation of the Planning Commission and ask that the City Council approve rezoning of the property and we just wanted to see take the chance to respond very briefly to the findings of fact of the Planning Commission. You know that they, under the zoning ordinance, they're obligated to look at the trend of development in the area, the uses and zoning in the surrounding vicinity and [      ]. Some of the things we sort of brought up at the Planning Commission, again . . .the Planning Commission pointed out that the trend of development in the area is very stable. But the only [      ] developments that the Planning Commission mentioned in their findings of fact were the Village at Morse Farms, which is an assisted living facility, and a [   ] bank. There is no clear trend of retail development in the area, it looks like a mixed use type of area. And in fact that assisted living facility would, would be something you would find in an R district. And like I said, the Planning Commission's findings themselves pointed out that the area is pretty stable.

Looking at the uses and zoning in the vicinity the Planning Commission found that [   ] surrounding zoning neighborhood commercial and while the immediately adjacent properties are all neighborhood commercial, the Planning Commission didn't point out that on the west [   ] of the actual Wal-Mart building that is actually undeveloped property . If you look just a little. [                                  ]. If you look at the vicinity as a whole instead of just that immediate [  ] property, again that's a pretty mixed use area. The church [  ] would be a good fit in that area [          ]. Keep that in mind [   ] wholly a retail area, which seemed to be a focus during the discussion at the Planning Commission hearing. So we just wanted to ask that you consider these factors [      ].

David Edwards: We wanted to touch on some of the legal issues as well, because that's what we, you know, why our clients contacted us. And I think that the issue is what the law says about what cities can and can't do in regard to zoning for religious use and churches that are trying to get rezoning and so I'd ask you for a minute to maybe just kind of step back and [  ] sort of think through the issues of how the zoning scheme is set up and the impact that that has potentially on churches. In this case we're talking about the old Wal-

Mart building, but even if we weren't, these are some important issues I think [  ] just kind of take into account. This issue could come up with future churches and future religious use. I think it comes down to how much regulation of churches is it proper for a City to have. For the [  ] of Carlinville, how much would they like the City Council to weigh in on what churches can do or can't do. Certainly, I'm assuming that most people wouldn't want the City to regulate when a church could hold a [  ] worship service - whether it be the day or the time, [  ] for the City to do or how it was supposed to be done - what type of worship service be done or how long the sermon should be or all those kinds of things, certainly, you know we would all think that's improper. But then the other issue you have is where can a church hold its worship services. Is it proper for a city to determine well this piece of property is good for a church and you can have worship services here, but not at this one, and well you want to put it here, but we don't want it here, why don't you come over to this other property, that's where we'd rather have you.

Certainly, there's the law, law that impacts those types of things, of course the US constitution, the first amendment which discusses the establishment of religion and [   ] provision for free exercise of religion, and really as I look at this its not really an intent issue, its not that certain people are sitting here [ ] discriminate [ ] against the church, but I can point out, its just the zoning scheme and the way its set up kind of results in that, that sort of thing. And the big issue that I would, the way I would summarize I suppose, is the scheme the way its set up is basically telling churches you're not welcome in the City of Carlinville. If a new church wants to come to town, there is essentially nowhere they can go in town without getting [  ] permission from the City to get rezoning or a special use [   ] special use permit. Again, this isn't talking about motives or feelings or intentions or anything like that, it's just what the ordinance says, ordinances say. There's the R classification and so if a church wants to come to the City of Carlinville, they have to either come to the City to get permission to rezone or special use or, I suppose, they could go and try to buy property that is already zoned with R, which is a church that is already there. Well what if there is no churches that are interested in selling their property? Okay, well, that, also, that R classification is also schools, hospitals, nursing homes, those types of things. [  ] Schools and hospitals certainly aren't for sale very often. Nursing homes, you know, probably not very often either.

And not only new churches, but let's think about, let's say an existing church that was in the city wanted to either relocate or expand. If they're going to expand beyond their current property, basically, which is R, they're going to have come in and get a use permit or have it rezoned. And so I mean so I go back to my initial question: How much is it proper for the City Council to have to weigh in on those types of things about where they want churches, where they don't want, where they don't want churches. And these kinds of things you can probably guess have come up in other cities around the country. [ ] isn't the first church to have this kind need come up and so Congress passed a law that dealt with these sort of things to sort of set some guidelines that churches couldn't be unreasonably restricted [  ] where they can go. I'm going to turn it over to Amanda to address some of these issues about what federal law provides.

Amanda Lundeen:  I, in reading these            even an unintentional discrimination            in
     particular, he said that        impose        really focused on status quo.    Special use
     in agriculture. Even there, special use        the other consideration we should
     mention            but looking at all of the standards,            I think in this case,
     but looking at all of the standards,        also explains        I just wanted to make sure
     you understood the church's position and had a chance to weigh that into the decision.

David Edwards:  I don't really think there is anything more we have to add at this point.  We are
     certainly glad to answer any questions or            especially helpful to your decision.

(Mayor)  Does any council member have a question for Dave or Amanda?

(Man)  Well, I think that at this time would you read or give us the reasons of rejecting this that
     the Zoning Commission came up with?

(2nd Man)  Everybody got a copy of that.

(Zoning Administrator)  Would you like me to re-read it?  I mean, obviously, we're read it and
     know the facts.

(Mayor)  Make sure presentation is to what the Planning Commission decided and the reasons·
     for it.  And there is something, there's some documentation.

(Zoning Administrator)  It was discussed.

(Mayor)  It was discussed.  The findings of the Planning Commission, I think you have a copy, a
     lot of people are familiar with those.  You can discuss those, but you can discuss any
     other things that went into it as well.

(Different Man)  A lot of people

(Man)  You can discuss those, but you can't discuss any other things that went into it.

(Different Man)

[Discussion, not able to hear]

(Zoning Administrator)  Okay.  Well,            I need to speak with the            I have
     advisers in court.  It starts off with our Section 40.1012, the City Zoning Code states that
     the Planning Commission shall not recommend or adopt any amendment unless they find
     that such amendment is in the public interest and not merely for the benefit of the parties
     _____.  Could you speak to that?  They brought up the point that if the mission of this
     church weren't for the good of the community, then they didn't know what was.
     However, it isn't the mission of the church that the Planning Commission is objecting to.
     It's just this piece of property where the church is and has asked to have rezoned.  We
     have – you know, they spoke to the fact that there are no areas within Carlinville that are

appropriate for churches. However, we just annexed 16 acres of land that's zoned R. We also have a huge hospital that is going to be up for grabs one of these days as well. So there are other areas, you know, that a church can locate to. Then they spoke to conserving the value, the textbook value of property ____. So because of that, and because of this piece of property that is prime retail, and it's zoned for retail and is appropriate for retail, the Planning Commission just couldn't agree to rezoning it. They talk about the trend of development. As I wrote this, I thought, you know, it's probably seems ironic that I would say that it is a trend of development. Carlinville is a small town and grows in tiny increments. So that there is new development in this area is a trend for Carlinville. It is not Springfield where things just grow; where things are happening. This is a small area. We have a bank, we have Sullivans has developed that, H&H has developed that property out there. We view it as a trend for Carlinville and we want to keep it going that way. I have the original plans of the old Wal-Mart when they came to the council years ago and requested to build their facility and in that plan all along the west side, they have a plan for development along there. It never did happen because of family issues within the Wal-Mart family, but that west side property is zoned and has been platted and could be developed so easily into a nice strip mall. Now to piggyback off of this property to the west, we have a restaurant sitting there that would be wonderful to have a new restaurant in town. The whole area is set up for retail and revenue-producing property. We did some independent looking within the site committee at different Wal-Mart properties and I did mention the Litchfield property, but at the meeting, at the hearing, we discussed other properties in Wisconsin, and Michigan, and where else, Jodi?

Jodi:     Missouri, Hot Springs.

(Zoning Administrator)  Other Wal-Mart stores that have been developed into retail operations. And that again the back of time as well. So Tractor Supply Company so they're split and decided to go over to the Wal-Mart in Litchfield and there is a JC Penney's, Dollar General, Tractor Supply, a Big Lots, Sears. It's all over the area that have come into where Wal-Mart located. So I guess we are asking the Council to stand by our findings and keep this piece of property in commercial property. Do you have any questions?

(Mayor)  Do the Council have any questions about this?
          Dave or Amanda, do you any questions about

(David Edwards)  I don't think we have any.

(Mayor)        Council?

(Zoning Administrator)  You know what though? I just made a note, I'm sorry. I would still like to say a couple more thins. When they were talking about their decision, why they waited so long, did it matter that they came to request rezoning at the particular time that they did. I believe they had a conversation what? a year ago, a year and a half ago, about their rezoning issue. We were told that it could be, that a decision could be made dependent on ownership of this piece of property. So in other words, once they sign the

contract, if it was made in a favor, then it would be rezoned. So, we have had quite a few phone calls come into City Hall about why did the City wait so long to have this rezoned. And it was not our decision. We were first approached in December with the application to rezone this piece of property. As per our Code, we have to advertise before a hearing, not more than thirty days, not less than fifteen days before the hearing. So at the time they presented the application, it fell into place that we would have the hearing in at January meeting. So, the decision was not ours to make. It was theirs in that they applied for their application, the rezoning in December. Amanda Lundeen said something about the City trying to regulate details of church services. And that is not even at all what this issue is about. You know, what kind of services you can have in what kind of building. The issue is should this building be rezoned for religious services or should this building be left retail. And as she mentioned substantial burden, and I don't believe we are placing a substantial burden on this church. They have a facility. Granted they want a larger facility. But we are not kicking them out of a facility, we are just asking that they find another facility.

(Man) We will mention that we do have 16 acres in the City of Carlinville now that is zoned for religious. And it's vacant.

(Woman) Yes, it is vacant.

(Amanda Lundeen) May I ask a question? When was that property annexed and zoned religious?

(Man) After the first of the year. (Laughter) That is when they requested it.

(Amanda Lundeen) Can I ask you another question? I don't know if I mentioned it that someone called to ask why the City waited so long to rezone?

(Zoning Administrator) We had several phone calls as to why . . .

(Amanda Lundeen) From residents or they may not have acknowledged . . .

(Zoning Administrator) I have no idea if they were church members at all.

(Amanda Lundeen) I just wanted to make sure I heard that – for a second I thought you were saying that we were asking why it had not been rezoned.

(Zoning Administrator) No, no, no, no, no.

(Amanda Lundeen) I was just trying to explain that – we were, I think, we were just trying to explain that there is no rule as to when you need to. Request zoning. I, you know, members of the public were confused or misinformed about that, that may have been

(Zoning Administrator) Right, right. What most of the phone calls were about was why did the City wait so long, I mean they're getting ready to sign their contract and the City is just

now having a hearing the week before the contract is due to be signed. That was not our choice; our decision. Had it been ours, I think it probably was just look at all that transpired a year ago and two years ago.

(Amanda Lundeen)  Right, right. Well, and part of the reason waited until they had their ducks in a row, they didn't know – I mean, no closing date was set until 90 days before the new Wal-Mart building would open.

(Zoning Administrator)  It would have been contingent upon the contract being signed. And had you approached the City, I'm sure they would have said, if we rezone that and only .

(Amanda Lundeen)  That . . . been an option. But at the same time, the church wanted to wait and make sure they had financing in line so when they were shot those questions, as we were at the Planning Commission hearing, we were prepared to answer them.

(Zoning Administrator)  It is very unusual. I have only been in this position for five months, and I picked up on that immediately. It is very unusual to look at these kinds of things if you are not the property owner. But for something this important, I think they wouldn't have had an issue with looking at it and giving you a preliminary

(Amanda Lundeen)  It's a difficult judgment call for them to make at the time. And also, not wanting to waste their time and resources or the city's as they are working through getting financing and making sure the closing is going to be solid and all of that.

(Zoning Administrator)  Right.

(Amanda Lundeen)  I mean that was part of the consideration in waiting until they did.

(Zoning Administrator)  I understand that. I just want everybody to know that the City didn't wait to do this. That, you know, we did, we approached it when we were approached. So we took care of it as quickly as we could for you so that you would know the City's stand.

(Amanda Lundeen)  Right.

(Zoning Administrator)  That, you know, and that's just kind of how it worked out.

(Pastor Chad Ozee)  Sir, could I have the opportunity to respond to the 16 acres?

(Mayor)  Yeah.

(Pastor Chad Ozee)  My name is Chad. I am the pastor of the church that owns the 16 acres. 62183 get us in there. (Laughter) Let me just say that we did not come to the City for the annexing. The City came to us based on the new water line that was to be put in, water and sewage line that was going to be put in. So, the comment was made that we came to the City. That's not exactly the way that it happened.

(Mayor)  Well, Chad, you had to - we asked that to get sewer lines out to businesses.

(Pastor Chad Ozee)  Absolutely.  But I just wanted to say that it wasn't something that we had done to come in.  We purchased that outside the City limits and was asked to participate in.  Of course, we are happy to do.  Also, let me say that yes, we are zoned R, but we plan on using it.  So it would not be available.  (Laughter and clapping)

(Mayor)  I think it's the City's way that we do try to consider working churches in and getting them the consideration.  Is there anybody?  Well, Council, questions or anything?  If not, I will ask the body – Norm?

(Norm)  Will, do you know the extent of the 7th Circuit?  The 7th Circuit is that a federal circuit?

(City Attorney)  That's a federal circuit.  I think you're talking about the federal circuit.

(Amanda Lundeen)  Yeah.  That's the circuit that Illinois is a part of.

(Mayor)  Moving along pretty quickly.  Would anyone from the audience like to address the Council?

(Elaine Lee)  Yes, I would.  My name is Elaine Lee and I would just like to say that the church by no means of which I am a member, but I'm also a member of this community and I love both entities.  And it was not the church's intent to cause a rift between the City and the church as it is approaching you for rezoning.  But that fact remains that the church did buy the building and we're just coming to you now – When we went to the Zoning Board, we did not, we had not purchased the building at that time.  It was in the works, but it was not          the contract was not completed.  So now we are the owners, but there is - Beth is saying she would like to keep it as retail, but the church owns the building and the church has voted to keep the building and use it in whatever fashion that we can, but we will not sell it for retail sales purposes.  And so we just come to you and we want to be a member of this community.  We want to see this city flourish.  We do not want to have anything to be a detriment to this city.  This church will not be a detriment.  We have new people coming to town.  They are finding a place, people who are becoming members of the community, who are becoming worthwhile citizens, and I just, I hope you will consider all of those things.  Thank you.

(Mayor)  Ron?

(Ron)  Since the last meeting two weeks ago, one trucking company has moved out of town.  Another one is possibly closing their doors.  Carlinville coal mine is shut down; the Virden Mine is downsizing and eventually, within a couple months I've heard from miners, that they are going to be without a job.  Question Number 1.  I've got two questions.  Question Number 1:  If Carlinville does not get business        within our town.  Is it possible money has to be sought through more real estate taxes?  Number 2:  If the Carlinville Zoning Commission looking after the best interest of Carlinville Community

votes no on an issue and the Carlinville Board votes no on the same issue, then why not vacate the idea and say whatever will be, will be.

(Don Hayes)  The question seems to me to be use of property.  We can guarantee you the property being, will be used.  There is nothing worse than setting and staring at an empty building.  Just take a look at Rural King as a matter of point, of fact.  We can't, obviously, guarantee that it's going to be a money-generating business for the City as everyone would like it to be.  But we can guarantee that it will be used for an excellent purpose and that building will be look ten times better when we get done with it than it looks right now.

(Mayor)  Excuse me.  May we have your name?

(Don Hayes)  My name is Don Hayes.

(Mayor)  Just wanted that for the record.

(Don Hayes)  Yes.

(Mayor)  Now I'm sure that the church would not intentionally do anything to hurt the City.  But we do have - the concept of zoning is to preserve our limited retail property.  It provides the tax revenue, not only to the City but to the county and to the schools.

I will continue the questions.  Does anyone have any further questions?

(Don Konneker)  I'd like to speak.

(Mayor)  Okay, Don.

(Don Konneker)  I'm Don Konneker.  I'm not on any of the committees for the church.  I'm not an alderman and I'm not on the committee for the zoning.  But speaking for the way I feel here in my heart.  As I see this tonight, we're really, really not deciding what this property should be or what it shouldn't be.  We're trying to decide whether the way we voted and the way we set this thing down, this is the way it's going to be.  And if that's the case, then we're not approaching it with an open mind as a group of the church or the City or the zoning.  To me, it looks to me like we need to look at this thing from what is the good of the town ten years from now.  Now I've been in this town since 1947 with an _____ business.  We were in town.  We moved out of town.  No one from the City of Carlinville came to us and said, hey, we'd like to keep you in town because we want your tax money.  They realized that there are lots of taxes generated from farm equipment.  No one came to us.  Now when Curry moved out of town, no one from the City came and said hey, we don't want you moving out of town; we want to keep you here.  Now, if you people look at this thing from the fact that you want to keep retail business in the town, we're going to have to start working on that.  And as I understand, nobody contacted Wal-Mart from the City of Carlinville when it went on the market.  A long time was gone

before we decided to buy it. There was never a contact made by anybody from the City Council. Is that right or wrong?

(Mayor) That's correct. According to the letter we got from Wal-Mart.

(Don Konneker) Yes. So if we're concerned about getting retail business in town, let's all put an effort in all of the plaza out here, all of the IGA buildings and all of the rest of the property that is available for retail and let's quit putting fingers on things and saying this is the way we're going to do it. You've got to keep it retail. It's not going to be retail. The church owns the property and it will never be a retail piece of business. So let's get on with it and put some effort in the thing that will generate the things that you want and then you people watch the church grow. Watch what is generated out there. See what happens and maybe you'll come back five years from now and say, fine, we did make a good decision even if it did ignore the        dream. That's my comment. My pledge to you people is think about the way you're handling this and think about what the future of the town is going to be. I understood here a while ago that you said, sure, you can buy property someplace else. I don't think there is another piece of property that we can buy for $10 a square foot building in this area to put a church on. Now, if somebody here tonight that says, hey, I know where the building is and you can buy it built, ready to move into, if you spend a million and a half you'll have a church here. I don't believe there is another piece of property in town that you could go and buy and have a church for 60,000 square feet, ready for a church. I think nobody's got that answer.

(Mayor) No

(Don Konneker) If anybody knows where there is property for sale that the church can buy. The gentleman here from the church says we got 16 acres but they're not for sale. Is that right?

(Don Konneker) I don't want the answer. But I know that you can set the price and divide the town up day after day, year after year, and keep the City of Carlinville moving forward. That's what the church is all about. If you go out to our old church, you will see cars, you'll see action, you'll see people out there at the church every day. They got to buy gas, they got to buy lunches, they got to spend their money someplace. (Got to buy homes.) And if you take them and say hey, we don't want a church. I never saw a piece of property ever so valuable that you couldn't put a church on it. If anybody's ever seen a piece of property too valuable to build a church on, I'd like to hear it. Now maybe it's valuable        , but church property is pretty valuable, too. {Amen, amen. Clapping}

(Mayor) Okay. I think the City has to look at this as the best use and we have limited retail spaces, limited commercial spaces. We do have an ordinance enacted, not to penalize the homeowner or anything, it's to help the economy of the community. At this time I'd like to entertain a motion to deny the church's appeal to rezone.

(Lea Hudson) I would make the motion that this Council vote to uphold the recommendations from our Planning and Zoning Commission.

.

(Mayor)  We have a motion by Lea Hudson.

(Man)  Motion to deny -- is that the request?

(Lea Hudson)  Yes, yes.

(Mayor)  Is there a second from the Council?

(Randy)  I would second that.

(Mayor)  Second by Randy Ober.

(Woman)  Would you repeat that?

(Mayor)  The motion is to uphold the zoning recommendations and to deny the appeal of the Southern Baptist Church.  Questions or discussion by Council members?  Yes    .

(Alderman Norm Semrock)  I have a question of the attorney.  Are you quite familiar?

(City Attorney)  I'm familiar with the law.  I think you just got to decide what's in the best interests of the City.  You know, I guess if they want to -if you vote against the church, they can challenge when the zoning board meets.  If you vote in favor, it will be a moot issue, but I think you as the Council have to make a decision as to what you think is the in the best interests of the City.  And that is just the decision you got to make and if they want to challenge it on some constitutional basis or some legal basis, if you vote that way, we'll just have to see what happens.  But I think your job here is to make a decision on what you think is the best interest.  What I'm saying is I don't think you make a decision based on fear of litigation.  If you think the church        if you want to do it for them, you do it.  If you disagree with them, you don't do it.

(Mayor)  Any other questions for the zoning, or the Council?

(Man)  The yes vote is we are upholding the Planning Commission?

(Mayor)  A yes vote will uphold the Zoning recommendation and deny the church.  So, no further vote or questions?  Call the roll.

| (Darlene) | Albertine | Aye |
| | Brockmeyer | Aye |
| | Daugherty | Aye |
| | Direso | Aye |
| | Hudson | Aye |
| | Malin | Aye |
| | Mitchell | Aye |
| | Ober | Aye |

|  |  |
|---|---|
| Semrock | Aye |
| Steiner | Aye |

(Mayor)    Ayes are unanimous to deny the appeal by concurring with the Council on this.  I see nothing really great coming out of this, but anyway.  At this time, are there – does the Council have any comments before I ask for the adjournment?  Would anybody like to make a motion to adjourn?

(Woman)  I make a motion to adjourn

(Randy Ober)  I would second that.

(Mayor)  Motion made by Randy Ober.  Darlene call the roll.

(Darlene)    Albertine
Brockmeyer
Daugherty
Direso
Hudson
Malin
Mitchell
Ober
Semrock
Steiner

(Mayor)  We're adjourned.

## Carlinville City Code

## CHAPTER 40

## ZONING CODE

## ARTICLE I - GENERAL PROVISIONS AND SAVING CLAUSES

**40-1-1    PURPOSE.**  In accordance with State law, this Code regulates structures and land uses in order to preserve, protect, and promote the public health, safety and welfare.  More specifically, this Code is intended to assist in achieving the following objectives:

(A)    To encourage the development of buildings and uses on appropriate sites in order to maximize community-wide social and economic benefits while accommodating the particular needs of all residents;

(B)    To discourage development of buildings and uses on sites not suited for development;

(C)    To protect the character and stability of sound existing residential, commercial and industrial areas;

(D)    To conserve and increase the value of taxable property throughout the City;

(E)    To ensure the provision of adequate light, air and privacy to all occupants of all buildings;

(F)    To provide adequate parking and access for all buildings and lots;

(G)    To reduce congestion on the public streets and highways;

(H)    To protect property from damage caused by fire, or by flooding and poorly controlled storm water runoff;

(I)    To guide the provision of water, sewer, storm water, and other utilities and municipal services;

(J)    To reduce the initial costs and future maintenance expenses of public and private improvements and services through thoughtful planning; and

(K)    To gradually eliminate existing structures and uses that impede achievement of the above objectives.

**40-1-2    SCOPE.**  In order the achieve the objectives enumerated in **Section 40-1-1**, this Code:

(A)    Divides this entire Municipality into districts, and permits in each district only those structures and uses that are compatible with the character of such district;

(B)    Regulates lots size, and the bulk, setbacks, lot coverage, and manner of use of structures;

(C)    Imposes supplementary regulations to control certain potentially troublesome structures and uses;

(D)    Sets forth standards for off-street parking areas;

EXHIBIT
6

# *Carlinville City Code*

(E)        Restricts nonconforming lots, structures, and uses that adversely affect the type of development appropriate in each district; and

(F)        Establishes zoning administrative and enforcement procedures.

**40-1-3    JURISDICTION.** This Code shall be applicable within the corporate limits of the City of Carlinville, Macoupin County, Illinois. The City does not exercise the right to Extraterritorial Jurisdictional Area.

**40-1-4    ANNEXED TERRITORY.** Whenever any territory is annexed to the City, the annexed area shall be zoned the same designation as the contiguous territory that is already within the corporate limits unless otherwise designated by appropriate ordinance.

**40-1-5    INTERPRETATION.** Every provision of this Code shall be construed liberally in favor of this Municipality, and every requirement imposed in this Code shall be deemed minimal. Whenever the requirements of this Code differ from the requirements of any other lawfully adopted ordinance, regulation, deed restriction, or covenant, the more stringent requirement shall prevail.

**40-1-6    DISCLAIMER OF LIABILITY.**

(A)        Except as may be provided otherwise by statute or ordinance, no officer, board member, agent or employee of this Municipality shall render himself personally liable for any damage that may accrue to persons or property as a result of any act required or permitted in the discharge of his duties under this Code.

(B)        Any suit brought against any officer, board member, agent, or employee of this Municipality, as a result of any act required or permitted in the discharge of his duties under this Code, shall be defended by the City Attorney until the final determination of the legal proceedings.

**40-1-7    SEPARABILITY.** If any provision of this Code is declared unconstitutional or invalid by a court of competent jurisdiction, that decision shall not affect the validity of the remainder of this Code.

**40-1-8    REPEALER.** All ordinances or parts thereof that conflict with the provision of this Zoning Code are hereby repealed to the extent necessary to give this Code full force and effect.

# *Carlinville City Code*

## ARTICLE II - DEFINITIONS

**40-2-1    CONSTRUCTION OF TERMS.**  In construing the intended meaning of terminology used in this Code, the following rules shall be observed:

(A)        Words and phrases shall have the meanings respectively ascribed to them in **Section 40-2-2** unless the context clearly indicates otherwise; terms not defined in **Section 40-2-2** shall have their standard English meanings.

(B)        Words denoting the masculine gender shall be deemed to include the feminine and neuter genders.

(C)        Words used in the present tense shall include the future tense.

(D)        Words used in the singular number shall include the plural number, and the plural the singular.

(E)        The term "shall" is mandatory.

(F)        The term "may" is discretionary.

(G)        The term "this Municipality" shall mean the City of Carlinville, Illinois.

(H)        The words "lots," "parcel," "tract," and "site" shall be synonymous.

(I)        The phrases "used for," "arranged for," "designed for," "intended for," "maintained for," and "occupied for" shall be synonymous.

## 40-2-2    SELECTED DEFINITIONS.

***Abutting:***  As applied to lots, "abutting" means having a common lot line, or so located in relation to each other that there would be a common lot line but for the existence of a street, alley, or other public right-of-way.

***Access Way:***  A curb cut, ramp, or other means for providing vehicular access to an off-street parking or loading area from a street.

***Accessory Building:***  A subordinate building(s) or structure(s) detached from the main building, located in the rear yard, the use of which is incidental to the use of the principal structure or main building.

***Accessory Use:***  Any structure or use that is:

(A)        Subordinate in size or purpose to the principal use or structure which it serves; and

(B)        Necessary or contributing to the comfort and convenience of the occupants of the principal use or structure served; and

(C)        Located on the same lot as the principal use or structure served.

***Adjacent:***  Next to or adjoining.

# *Carlinville City Code*

*Adult Business:* Any establishment having as a substantial or significant portion of its stock in trade or business activity in a use such as, but not limited to, the following: adults-only bookstores, adults-only motion picture theaters, adult entertainment centers, adults-only massage parlors, rap parlors, or adults-only saunas, where explicit sexual conduct is depicted and/or sexual activity is implicitly or explicitly encouraged or tolerated.

*Adult Entertainment Business:* Synonymous with "adult business," "adults-only massage parlor," and "adults-only sauna" as defined herein.

*Adult Entertainment Center:* An enclosed building or part of an enclosed building which contains one or more coin-operated mechanisms which, when activated, permit a customer to view the human male or female genitalia; pubic hair, buttocks; perineum; anal or pubic regions; or female breast, at or below the areola thereof. In addition, the viewing of a live person, in the above described manner, after paying any admission fee for the viewing of the same activity.

*Adults-Only:* Any items or activities emphasizing, depicting, describing, or relating to nudity, explicit sexual conduct (whether auto-erotic, heterosexual, homosexual, or otherwise), bestiality, or sadomasochistic activity.

*Adults-Only Bookstore:* An adults-only establishment having as a substantial or significant portion of its stock in trade, books, magazines, films for sale or viewing on premises by use of motion picture devices or other coin-operated means, and other periodicals which are distinguished or characterized by their principle emphasis on matters depicting, describing, or relating to nudity, explicit sexual conduct (whether auto-erotic, heterosexual, homosexual, or otherwise), bestiality, or sadomasochistic activity. An establishment having adults-only items as a substantial or significant portion of its stock, that sells or displays adults-only items for sale to patrons therein.

*Adults-Only Cabaret:* An establishment or place primarily in the business of featuring topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers where explicit sexual conduct is depicted and/or sexual activity is explicitly or implicitly encouraged or tolerated.

*Adults-Only Massage Parlor:* An establishment or place primarily in the business of providing massage services where explicit sexual conduct is depicted and/or sexual activity is explicitly or implicitly encouraged or tolerated.

*Adults-Only Motion Picture Theater:* An enclosed building used regularly and routinely for presenting adults-only material distinguished or characterized by an emphasis on matter depicting, describing, or relating to nudity, explicit sexual conduct (whether auto-erotic, heterosexual, homosexual, or otherwise), bestiality, or sadomasochistic activity, for observation by patrons therein.

## *Carlinville City Code*

*Adults-Only Sauna:* An establishment or place primarily in the business of providing a steam bath and/or massage services where explicit sexual conduct is depicted and/or sexual activity is explicitly or implicitly encouraged or tolerated.

*Agriculture:* Any one or any combination of the following: the growing of farm crops, dairying, pasturage, horticulture, floriculture, or animal/poultry husbandry. The term "agriculture" encompasses the farmhouse, and accessory uses and structures customarily incidental to agricultural activities.

*Alley:* A public right-of-way which affords vehicular access to abutting premises that front on a nearby street.

*Alter:* To change, modify or make different the size, shape, elevation or use of a structure.

*Amendment:* A change in the provisions of this Code (including those portions incorporated by reference), and the procedures set forth herein.

*Apartment:* A dwelling unit situated in a multiple-family dwelling.

*Apartment Hotel:* A multiple-family dwelling which furnishes its tenants services customarily provided by hotels, but which does not furnish such services to the transient public.

*Attached:* As applied to buildings, "attached" means having a common wall and/or a common roof (includes breezeways, carports, garages, etc.).

*Auditorium:* A room, hall or building made a part of a church, theater, school, recreation building or other building assigned to the gathering of people.

*Basement:* A story having **one-half (1/2)** or more of its height below the average level of the adjoining ground.

*Bed and Breakfast:* An operator-occupied residence providing accommodations for a charge to the public with no more than **five (5)** guest rooms for rent, in operation for more than **ten (10) nights** in a **twelve (12) month** period. Only breakfast may be provided to the guests. Bed and breakfast establishments shall not include motels, hotels, boarding houses, or food service establishments.

    (A)       "Operator" shall mean the owner of the bed and breakfast establishment, or the owner's agent, who is required to reside in the bed and breakfast establishment or on contiguous property.

    (B)       "Guest Room" shall mean a sleeping room intended to serve no more than **two (2)** transient guests per night.

## Carlinville City Code

*Billboard:* A sign advertising a commodity, business, service, or event not available or conducted upon the premises where such sign is located or to which it is affixed.

*Boarding House:* A building or portion thereof—other than a hotel, motel or apartment hotel—containing lodging rooms for **three (3)** or more persons who are not members of the keeper's family, and where lodging and/or meals are provided by prearrangement and for definite periods.

*Booth:* Any enclosure that is specifically offered to patrons of an adult business for the private viewing of any adults-only item or movie. Said definition does not include enclosures that are used as private offices by any operator, employee, or agent for attending to the tasks of their employment and are not offered for use by the public.

*Building:* Any covered structure permanently affixed to land and designed or used to shelter persons or moveable, personal property.

*Building Height:* The vertical distance measured from the average elevation of the proposed finish grade at the front wall of the building to the highest point of the roof.

*Building Line:* The line nearest the front of and across a lot, delineating the minimum open space required between the front of a structure and the street right-of-way line.

*Bulk:* Any one or any combination of the following:
    (A)        Size or height of structure;
    (B)        Location of exterior walls at all levels in relation to lot lines, streets, or other structures;
    (C)        Floor/area ratio;
    (D)        Yards or setbacks;
    (E)        Lot coverage (see definition).

*Camping Trailer:* A mobile structure designed for temporary occupancy.

*Camping Trailer Park:* A lot developed with facilities for accommodating temporarily occupied camping trailers.

*Certificate of Zoning Compliance, Initial:* A permit issued by the Administrator indicating that proposed construction work is in conformity with the requirements of this Code and may, therefore, proceed.

*Certificate of Zoning Compliance, Final:* A permit issued by the Administrator indicating that a newly completed structure complies with all pertinent requirements of this Code and may, therefore, be occupied or used.

*Church:* A building designed or used for regularly scheduled worship services.

# *Carlinville City Code*

*Club/Lodge:*  A nonprofit association of persons who are bona fide members organized for some purpose(s) and paying regular dues and whose facilities are restricted to members and their guests.

*Commercial Use/Establishment:*  Any use or establishment wherein goods are purchased, converted or sold, whether to the consuming public (retail) or to other businesses (wholesale), but excluding any heavy industrial use.  Operations on commercial property shall be such that they are not noxious or offensive by reason of the emission of smoke, dust, gas, fumes, odors, noise, or other vibrations beyond the confines of the buildings used therefore.

*Community Residence:*  A group home or specialized residential care home serving unrelated persons with handicaps which is licensed, certified or accredited by appropriate local, state or national bodies.  **Community residence does not include a residence which serves persons as an alternative to incarceration for a criminal offense, or persons whose primary reason for placement is substance or alcohol abuse, or for treatment of communicable disease.**

*Community Residence - Large:*  A community residence serving **nine (9)** to **fifteen (15)** persons with handicaps.

*Community Residence - Small:*  A community residence serving **eight (8)** or fewer persons with handicaps in a family-like atmosphere.

*Conforming:*  In compliance with the applicable provisions of this Code.

*Convenience Shop:*  Any retail commercial or service establishment offering goods/services.

*Day Care Center:*  See "Nursery School."

*Deck:*  An open porch which has no roof, is generally open on the sides, is above ground level, and its intended use is for leisure enjoyment.

*Detached:*  As applied to buildings, "detached" means surrounded by yards, parking lots, etc. on the same lot as the building.

*Develop:*  To erect any structure or to install any improvements on a tract of land, or to undertake any activity (such as grading) in preparation therefor.

*District Zoning:*  A portion of the territory of this Municipality wherein certain uniform requirements apply to structures, lots and uses under the terms of this Code.

*Carlinville City Code* _____    **Zoning Code 40-2-2**

*Driveway:* An area established or used for ingress or egress of vehicles from a street or thoroughfare to any point on private or public property.

*Dwelling:* A building or portion thereof designed or used primarily as living quarters for one or more families, but not including hotels, motels, and other accommodations for the transient public. Modular dwellings on permanent foundations shall be treated in the same manner as conventionally constructed dwellings (see definition for modular and permanent foundation).

*Dwelling, Multiple-Family:* A building or portion thereof containing **two (2)** or more dwelling units.

*Dwelling, Single-Family:* A detached dwelling containing one dwelling unit and intended for the occupancy of one family.

*Dwelling, Two-Family/Duplex:* A dwelling containing **two (2) dwelling units.**

*Dwelling Unit:* One or more rooms designed or used as living quarters by one family. A "dwelling unit" always includes a bathroom and a kitchen.

*Education:* The act or process of obtaining knowledge and/or skills by instruction.

*Enlarge:* To increase the size (floor area, height, etc.) of an existing principal structure or accessory use, or to devote more land to an existing use.

*Erect:* To put up by the fitting together of materials or parts such as a building.

*Establishment:* Either of the following:
    (A)    an institutional, business, commercial, or industrial activity that is the sole occupant of one or more buildings; or
    (B)    an institutional, business, commercial, or industrial activity that occupies a portion of a building such that:
        (1)    the activity is a logical and separate entity from the other activities within the building and not a department of the whole; and
        (2)    the activity has either a separate entrance from the exterior of the building, or a separate entrance from a common and clearly defined entryway that has direct access to the exterior of the building.

*Existing:* Existing, constructed, or in operation, on the effective date of this Code.

*Extend:* To increase the amount of floor area or land area devoted to an existing use.

*Carlinville City Code*                                    Zoning Code 40-2-2

*Extraterritorial Jurisdictional Area:* The **Illinois Compiled Statutes, Chapter 65,** Section 5/11-12-6 grants municipalities in the State of Illinois planning and zoning authority **one and one-half (1 ½) miles** beyond their corporate limits.

*Factory-Built Home:* Any residential dwelling that is wholly, or in substantial part, made, fabricated, formed, or assembled in manufacturing facilities for installation on a building site on a permanent foundation (see definition for Permanent Foundation). Factory-built homes shall include, but are not limited to, manufactured homes (A) and modular homes (B):

    (A)     *Manufactured Homes.* A residential dwelling built in accordance with the Federal Manufactured Home Construction and Safety Standards.

    (B)     *Modular Home.* A residential dwelling built in a factory to a residential construction code other than the Federal Manufactured Home and Safety Standards, built and transported in sections or halves. A modular dwelling must have a yellow metal seal, shaped like the State of Illinois, mounted on the interior electrical panel or other approved location. This will distinguish a modular from a mobile home which has a 2-inch by 4-inch metal plate mounted on the taillight (rear) end of the mobile home. Modular housing is similar in many ways to conventionally constructed housing including construction on a permanent foundation (see definition for Permanent Foundation). Modular housing as herein defined shall be considered single-family dwellings.

*Family:* Any number of persons related by blood, marriage, or adoption, living, cooking, and dining together as a single housekeeping unit, and including no more than **two (2)** boarders or lodgers.

*Filling Station:* A building and premises or portion thereof designed and primarily used for the retail sale of gasoline or other motor fuel, oil, and motor vehicle parts, supplies, and accessories. A filling station may include secondary facilities for washing vehicles, for making minor automotive repairs and for other uses normally called a convenience store.

*Floor Area, Gross:* As used in determining floor/area ratios and parking requirements, the sum of the gross horizontal areas of the several floors of a building, measured from the exterior faces of the exterior walls or from the center of the common walls of attached buildings. Gross floor area includes all of the following:  basement floors; attic floor space; halls, closets, stairwells; space devoted to mechanical equipment; and enclosed porches.

*Freight Terminal:* A building to which freight is brought by truck, air or railroad freight cars for later distribution.

*Frontage:* The lineal extent of the front (street-side) of a lot.

## Carlinville City Code

*Garage, Private:* An accessory building or portion of a main building designed or used for the primary purpose of parking and storage of motor vehicles of the occupants of the premises.

*Garage, Public:* Any building or premises, other than a private garage, used for equipping, refueling, servicing, repairing, hiring, selling, or storing of motor vehicles.

*General Commercial:* Area permitting the construction and/or operation of businesses or organizations in categories such as retail and service, day care centers, offices, funeral homes, dining and drinking places, and public utility buildings, as well as motor vehicle services and hotels.

*Governmental:* The agency, machinery, or organization through which a political institution or unit exercises authority and performs duties.

*Grandfathered:* Creating an exemption based on circumstances previously existing to the effective date of this Code.

*Heavy Industrial:* A use engaged in the basic processing, fabricating and/or manufacturing of materials or products, or a use engaged in storing of or manufacturing processes using flammable or explosive materials or storage or manufacturing processes that involve hazardous or commonly recognized offensive conditions or hazardous materials.

*Home Occupation:* A home occupation is an occupation or profession customarily carried on by an occupant of a dwelling unit as a secondary use which is clearly subservient to the use of the dwelling for residential purposes.

*Hospital:* An institution devoted primarily to the maintenance and operation of facilities around-the-clock for the diagnosis, treatment, or care for members of the general public suffering from disease, injury, or other abnormal physical conditions. The term "hospital" as used in this Code does not include institutions operating solely for the treatment of insane persons, drug addicts, and alcoholics, nor does it include convalescent or nursing homes.

*Hotel:* An establishment containing lodging accommodations designed for use by travelers or temporary guests. Facilities provided may include a general kitchen, maid service, desk service, meeting rooms, restaurants, cocktail lounges, and similar ancillary uses, but not cooking facilities in guest rooms.

*Immobilized Mobile Home:* As applied to a mobile home, "immobilize" means to remove the wheels, tongue and hitch and place on a permanent foundation.

*Industrial:* Area developed for, used in, or relating to an industry.

# Carlinville City Code

_Intersection:_  The point at which two or more public rights-of-way (generally streets) meet.

_Junk Yard:_  Any area where waste, discarded or salvaged material are bought, sold, exchanged, baled or packed, disassembled, handled, or stored, but not including areas where such uses are conducted entirely within a completely enclosed building.

_Kennel:_  Any lot or premises on which **three (3) or more dogs**, cats, or other household domestic animals, over **four (4) months** of age, are kept for remuneration.

_Light Industrial:_  The use engaged in the process of the assembly, packaging, storage, and distribution of previously prepared materials but specifically excluding heavy industrial use.   Light industrial use would be such a use that would normally only use light machinery and which activities are carried on entirely within the enclosed, roofed building, which do not use the area around such building for storage of matter or finished product or for loading or unloading operations, and which operations are not noxious or offensive by reason of the emission of smoke, dust, gas, fumes, odors, noise, or other vibrations beyond the confines of the building used therefor.

_Live Adult Entertainment:_  Live, in person performance by individuals.

_Loading Space:_  An off-street space used for the temporary parking of a commercial vehicle while loading or unloading merchandise or materials.

_Lot:_  Land occupied or intended to be occupied by one main building and its accessory buildings and including as a minimum such open spaces exclusive of street areas as are required under this Code and having frontage on a public or private street or road.

_Lot, Corner:_  A lot having at least **two (2)** adjacent sides that abut for their full length upon streets. Both such side lines shall be deemed front lot lines.

_Lot, Through:_  A lot having a pair of approximately parallel lot lines that abut **two (2)** approximately parallel streets.  Both such lot lines shall be deemed front lot lines.

_Lot Area:_  The area of a horizontal plane bounded by the front, side, and rear lines of a lot.

_Lot Coverage:_  The portion of a lot that is occupied by buildings or structures, including accessory buildings or structures.  For residential categories, the main building shall not occupy more than **sixty percent (60%)** of the lot, including porches but excluding decks and patios.  This applies to newly constructed homes and additions to existing structures.

## *Carlinville City Code*

*Lot Depth:* The average horizontal distance between the front lot line and the rear lot line of a lot.

*Lot Line, Front:* The lot boundary abutting the street.

*Lot Line, Rear:* An interior lot line which is most distant from and most nearly parallel to the front lot line. The rear lot line on corner lots shall be defined as the line most distant and most nearly parallel to either of the front lot lines as defined elsewhere in these definitions.

*Lot Line, Side:* Any boundary of a lot which is not a front lot line or a rear lot line.

*Lot of Record:* Any area of land designated as a lot on a plat of subdivision recorded or registered with the Recorder of Deeds of Macoupin County, Illinois, in accordance with State law.

*Lot Size Requirement:* Refers to the lot area, width, and depth requirements of the applicable district.

*Lot Size/Bulk Variance:* A relaxation of the strict application of the lot size and/or bulk requirements applicable to a particular lot or structure.

*Lot Width:* The mean horizontal distance between the side lot lines of a lot measured at right angles to the depth; or the same distance measured at a point midway between the front lot line and the rear lot line; or at the rear line of the required front yard (building lines), especially on irregularly shaped lots.

*Maintenance:* The routine upkeep of a structure, premises, or equipment, including the replacement or modification of structural components to the extent necessary to keep a structure in sound condition.

*Massage Parlor:* An establishment or place primarily in the business of providing massage services.

*Mini-Warehouses:* A building, or part of one, for the storage of goods, merchandise, etc., for rent to individuals for a monthly fee.

*Mobile Home:* A manufactured structure designed to permit its transport on its own wheels, containing complete kitchen and sanitary facilities, and used as a long-term dwelling by one family. A mobile home is built on a permanent chassis that consists of the wheel assembly, undercarriage, and towing hitch assembly. Mobile homes must meet the Federal Mobile Home Construction and Safety Standards. Compliance with this standard can be indicated by a 2-inch by 4-inch metal plate attached to the exterior tail light end of the mobile home.

*Carlinville City Code*                              Zoning Code 40-2-2

*Mobile Home Park:* A parcel not less than **two (2) acres** in area in single ownership/control, developed with facilities for accommodating occupied mobile homes in accordance with the requirements of this Code.

*Mobile Home Stand:* The part of a mobile home extending the full length of the upperside supports of the mobile home constructed of a concrete slab or runners on which the home is placed.

*Modulars (Sectional Houses):* Built and transported in sections or halves. A modular dwelling must have a yellow metal seal, shaped like the State of Illinois, mounted on the interior electrical panel. This will distinguish a modular from a mobile home which has a 2-inch by 4-inch metal plate mounted on the tail light (rear) end of the mobile home. Modular housing is similar in many ways to conventionally constructed housing including construction on a permanent foundation (see definition for permanent foundation). Modular housing as herein defined shall be considered as single family dwellings.

*Motel:* A lodging facility usually with blocks of rooms opening directly onto a parking area. Also called motor court.

*Motor Vehicle Services:* Repairs to any or all motor vehicles including boats. Services to include body work and glass work.

*Multiple-Family Residence:* See "Dwelling, Multi-Family".

*Neighborhood Commercial:* An area permitting the construction and/or operation of businesses or organizations in categories such as retail and service, day care centers, offices, funeral homes, dining and drinking establishments, and public utility buildings.

*Nonconforming:* A use, building or yard which does not, by reason of design, use, or dimensions, conform to the regulations of the district in which it is situated. It is a legal nonconforming use if established prior to the passage of this Code.

*Nudity:* The display of the human male or female genitalia; pubic hair; buttocks; perineum; anal or pubic regions; female breast, at or below the areola thereof, with no covering or with a less than fully opaque covering; or male genitalia, in a discernible turgid state, with or without covering.

*Nursery:* A tract of land on which trees, shrubs, and other plants are raised for transplanting and sale, and including any structure in which said activities are conducted.

*Nursery School:* An establishment for the part-time care and/or instruction (at any time of day) of **four (4)** or more unrelated children of predominantly pre-elementary school age.

## Carlinville City Code

*Nursing Home:* A building used as a medical care facility for persons who need long-term nursing care and medical service, but do not require intensive hospital care.

*Obscene:* Any material or performance is obscene if:

(A)      The average person, applying contemporary adult community standards, would find that, taken as a whole, it appeals to the prurient interest; and

(B)      The average person, applying contemporary adult community standards, would find that it depicts or describes, in a patently offensive way, ultimate sexual acts, whether normal or perverted, actual or simulated, or masturbation, excretory functions, or lewd exhibition of the genitals; and

(C)      Taken as a whole, it lacks serious literary, artistic, political, or scientific value. **(720 ILCS 5/11-20)**

*Office:* Any building, or portion thereof, in which the business of a commercial/service enterprise or professional person is transacted.

*Off-Street Parking Area:* Land that is improved and used primarily for the storage of passenger motor vehicles, free of charge or for compensation. An "off-street parking area," depending on the circumstances of its use, may be either a principal use or an accessory use.

*Off-Street Parking Space:* A space other than a street or alley designed for use for the temporary parking of a motor vehicle.

*Operator:* Any person, (whether said person be an individual, partner, corporation, joint stock company, fiduciary, officer, director, stockholder, employee, or manager), that conducts, maintains, or owns any adult business.

*Park:* A piece of ground for public use, recreation and sports.

*Patio:* An at-grade-paved area without any walls usually adjacent to a building, and which is intended to be used as an outdoor lounging, dining, or entertaining area.

*Patron:* Any customer, patron, or visitor to an adult business who is not employed by an operator of said establishment.

*Permanent Foundation:* A permanent support for buildings that are constructed of conventional foundation materials such as concrete or cement blocks. The foundation footing shall extend below the frost line.

*Permitted Uses:* Any use which is or may be lawfully established in a particular district(s), provided it conforms with all the requirements applicable to said district(s).

*Person:* Any individual, firm, association, organization, or corporate body.

[Supplement No. 12; 07-01-07]

*Carlinville City Code* <span style="float:right">Zoning Code 40-2-2</span>

*Plan:* The geographical and topographical maps, engineering and architectural drawings and specifications, and other information indicating the location and nature of a development.

*Porch:* A structure attached to a building to shelter an entrance or to serve as a semi-enclosed space, usually covered with a roof, generally open-sided, and usually large enough to allow seating devices.

*Premises:* A lot and all the structures and uses thereon.

*Principal Building/Structure/Use:* The main structure erected on or the main use occupying a lot, as distinguished from an accessory (subordinate) structure or use.

*Private Street:* Any street providing access to abutting property that is not maintained by and dedicated to a unit of government.

*Rap Parlor:* An establishment or place primarily in the business of providing nonprofessional conversation or similar services for adults, where explicit sexual conduct is depicted and/or sexual activity is explicitly or implicitly encourages or tolerated.

*Reconstruct:* As applied to nonconforming structures, "reconstruct" means to rebuild after destruction.

*Recreational Vehicle (RV) Park:* See Camping Trailer Park.

*Refuse:* Garbage (food wastes) and trash, but not sewage or industrial wastes.

*Rehabilitation:* The restoration or reestablishment of a condition of health or useful and/or constructive activity.

*Religion:* Relating to the acknowledgement or worship of an ultimate reality or deity.

*Relocate:* To move to another portion of a lot or to a different lot.

*Repair:* To restore to sound condition, but not to reconstruct.

*Retail:* Refers to the sale of goods and services directly to the consumer rather than to another business.

*Right-of-Way, Public:* Land which the owner/subdivider has dedicated to the City or to another unit of government for streets and alleys, or land that has been laid out in the original Plat of the City as a public right-of-way.

# *Carlinville City Code*

*Roof:* An outside structure covering a building including the framework supporting the covering.

*Sadomasochistic Activity:* Flagellation or torture by or upon a nude person, a person clad in undergarments, a mask, or bizarre costume. In addition, the condition of being fettered, bound, or otherwise physically restrained with the intent to stimulate or arouse sexually the initiator and/or the recipient.

*Sanitary Landfill:* A tract of open land used for the permanent disposal of refuse in accordance with the requirements of the Illinois Environmental Protection Agency.

*Satellite Dish:* Any parabolic/dish-type apparatus, external to or attached to the exterior of a building or structure, capable of receiving, for the benefit of the principal use, television or radio signals. Satellite dishes are larger than **thirty-nine (39) inches** are considered an accessory use and require a permit.

*Sauna:* An establishment or place primarily in the business of providing a steam bath and/or massage services.

*Sell:* Includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell.

*Setback:* The distance between the front lot line and the building line; or between a side or rear lot line and the side of the structure which faces such lot line; or between the appropriate lot line and the nearest boundary of the area of operation which is approximately parallel to such lot line.

*Sexual Conduct:* Intimate sex acts (whether auto-erotic, heterosexual, homosexual, or otherwise), bestiality or sadomasochistic activity. In addition, physical contact intended to stimulate or arouse sexually the initiator and/or the recipient.

*Single-Family Residence:* Synonymous with Single-Family Dwelling.

*Skirting:* The covering affixed to the bottom of the exterior walls of a mobile home to conceal the underside thereof.

*Special Use:* A use that has unusual operational, physical, or other characteristics which distinguish it from the permitted uses of a district, but which can be made compatible with the intended overall development within a district. Special uses commonly must meet special standards not necessarily applicable to permitted uses in the district, and are allowed only by permit.

*Stable:* A structure, situated on the same lot as a dwelling, and designed or used for housing horses for the private use of occupants of the dwelling, but not for hire.

# Carlinville City Code

*Stoop:*  A small porch which is usually not covered with a roof and which is primarily used to provide access to the adjoining building.

*Street:*  A public or private way for motor vehicle travel.  The term "street" includes a highway, thoroughfare, parkway, through way, road, pike, avenue, boulevard, lane, place, drive, court, and similar designations, but excludes an alley or a way for pedestrian use only.

*Street Line:*  The street right-of-way line abutting a lot line.

*Structure:*  Anything constructed or erected on the ground, or attached to something having a fixed location on the ground.  All buildings are structures, but not all structures are buildings.

*Structure, Temporary:*  Any structure that is not attached to a permanent foundation.

*Temporary Use Permit:*  A permit issued in accordance with the provisions of this Code and valid for not more than **one (1) year**, which allows the erection/occupation of a temporary structure or the operation of a temporary enterprise.

*Topography:*  The relief features or surface configuration of an area.

*Trailer:*  See "Camping Trailer."

*Underage:*  Any person under **eighteen (18) years** of age, the legally minimum age at which one can purchase or view adults-only items.  **(720 ILCS 5/11-20)**

*Use:*  The purpose or activity for which land or a structure thereon is designed, arranged, intended, occupied, or maintained.

*Utility Substation:*  A secondary utility facility such as an electrical substation, gas regulator station, telephone exchange facility, sewage treatment plant, etc.

*Variance:*  A license or permit to do some act contrary to the usual rule.

*Vending Machine:*  An apparatus for the purpose of selling an item or disposing of an item by sale.

*Wall Sign:*  Any flat sign which is placed against a building or other structure and attached thereto in such a manner that only one side is visible.

*Wholesale:*  Refers to the sale of goods or services by one business to another business.

## *Carlinville City Code*

*Yard:* Open space that is unobstructed except as specifically permitted in this Code and that is located on the same lot as the principal building.

*Yard, Front:* A yard which is bounded by the front lot line and the building line.

*Yard, Rear:* A yard which is bounded by side lot lines, rear lot lines, and the rear yard line.

*Yard, Side:* A yard which is bounded by the rear yard line, front yard line, side yard line, and side lot line.

*Yard Line:* A line in a lot that is parallel to the lot line along which the applicable yard extends and which is not nearer to such lot line at any point than the required depth or width of said yard.

*Zoning District:* A partition of a municipality by Ordinance divided into sections reserved for different purposes and uses.

*Zoning Administrator:* The official appointed by the Mayor with the advice and consent of the City Council to administer this Code.

*Zoning Map:* The map(s) and any amendments thereto designating zoning districts. The zoning map is incorporated into this Code.

*Carlinville City Code*                              Zoning Code 40-3-1

## ARTICLE III – GENERAL ZONING REGULATIONS

**40-3-1**     **ESTABLISHMENT OF DISTRICTS.**   In order to implement this Code, and to achieve the objectives in **Article I**, the entire Municipality is hereby divided into the following zoning districts:

| DISTRICT | DESIGNATION |
|---|---|
| Agricultural | A |
| Single Family Residence | S-1, S-2 |
| Mobile Home Residence | MH |
| Multiple Family Residence | MF |
| Neighborhood Commercial | C-1 |
| General Commercial | C-2 |
| Industrial | I |
| Governmental | G |
| Religion, Rehabilitation, Education | R |
| City Park | P |

Each district is defined in **Section 40-2-2.**  Each district's permitted principal building and accessory uses are listed in **Schedule 40-3-19.**

**40-3-2**     **ZONING MAP AND DISTRICT BOUNDARIES.**  The boundaries of the listed zoning districts are hereby established as shown on the zoning map of Carlinville.  The zoning map, including all notations and other information thereon, is hereby made a part of this Code by reference.  Official copies of the zoning map shall be kept on file in the office of the City Clerk and/or Zoning Administrator.

**40-3-3**     **ANNUAL PUBLICATION.**  In accordance with State Law, the City shall publish the zoning map not later than **March 31st** of each year.  However, no map shall be published for any calendar year during which there have been no changes in zoning districts or regulations.

**40-3-4**     **DETERMINING   TERRITORY   OF   DISTRICTS   WITH PRECISION.**  In determining with precision what territory is actually included within any zoning district, the City shall apply the following rules:

(A)        Where a district boundary as indicated on the zoning map approximately follows the features listed below on the left, the corresponding feature on the right shall be deemed the district boundary:

*Illinois Codification Services*       **[Supplement No. 12; 07-01-07]**        Page ___1018___

*Carlinville City Code*                                        Zoning Code 40-3-4

| | | |
|---|---|---|
| (1) | Center line of any street, alley or highway | Such centerline. |
| (2) | Lot line | Such lot line. |
| (3) | Railroad tracks | Right-of-way line of such track |

(B)        Whenever any street, alley or other public way is legally vacated, the zoning districts adjoining each side of such vacated public way shall automatically extend to the center of such way, and all territory included in the vacated way shall thereafter be subject to all regulations of the extended districts unless otherwise designated in the ordinance vacating the public way or in any other ordinance.

(C)        All territory (including bodies of water) that lies within the zoning jurisdiction of this Municipality, but which is not shown on the zoning map as being located within any district, shall comply with the zoning regulations of the most restrictive adjoining district.

40-3-5        **GENERAL PROHIBITION.**  No structure or part thereof shall be erected, used, occupied, enlarged, altered, relocated or reconstructed except in conformity with the provisions of this Code.  Similarly, no lot or part thereof shall be used, occupied, or developed except in conformity with the provisions of this Code.

(A)        **Agricultural Exemption.**  The provisions of this Code shall not be interpreted or administered so as to restrict the erection, maintenance, alteration, or extension of buildings (including farmhouses) or structures used or intended to be used for agricultural purposes on agricultural land except that such buildings or structures shall be required to conform to applicable setback regulations.  Whenever a portion of a tract of land ceases to be used primarily for agricultural purposes, all pertinent provisions of this Code shall apply to that portion.

40-3-6        **UNLISTED USES PROHIBITED.**  Whenever any use is not specifically listed as permitted or special within a particular zoning district, such use shall be deemed prohibited in that district.  However, if the City Council, following consultation with the Zoning Administrator, finds that the unlisted use is similar to and compatible with the listed uses, they may amend this Code in accordance with **Section 40-10-8** to allow such use.  The Council's decision shall become a permanent public record, and any unlisted use that they approve shall thereafter have the same status as listed uses.

40-3-7        **TEMPORARY USES.**  Except as specifically provided otherwise in this Code, no temporary structure shall be used or occupied for any purpose, and no land shall be used for any temporary enterprise, whether for profit or not-for-profit, unless a temporary use permit has been obtained.  Applications for temporary use permit shall be

## *Carlinville City Code*    Zoning Code 40-3-7

treated in the same way as applications for special use permits. A temporary use permit shall be valid for not more than **one (1) year** unless it is properly renewed (**See** Section 40-10-7).

**40-3-8    ONE BUILDING AND ALL YARDS ON ONE LOT.** Except as specifically provided otherwise:

(A)    Only one principal building or structure shall be permitted on any residential lot; and

(B)    No portion of any minimum area, minimum dimensions, or minimum yards required for any lot, structure, or use shall be counted to satisfy the minimum area, dimensions, or yards requirements for any other lot, structure or use.

**40-3-9    ACCESS REQUIRED.** No building shall be erected on any lot unless such lot abuts, or has permanent easement of access to, a public street or a private street.

**40-3-10    LIMITATIONS.** See Schedules (**Article III, Section 40-3-18 and 40-3-19**) for limitations and schedule listings located at the end of this Code.

**40-3-11    FRONT SETBACKS - CORNER/THROUGH LOTS.** Every lot with multiple frontages (such as corner or through lots) shall meet the front setback requirements of the district in which it is located on every side having frontage.

**40-3-12    FRONT SETBACKS IN CERTAIN BUILT-UP AREAS.** Except as specifically provided otherwise, in the Residential zoning district and in the Community Business district, where lots having **fifty percent (50%)** or more of the frontage on one side of a street between intersections (that is, in one block) are developed with buildings, and the front setbacks of those lots do not differ by more than **ten (10) feet,** the minimum required front setback on that block shall be the average of the existing front setbacks; provided however, that in any built-up area, no front setback shall be less than **fifteen (15) feet,** nor shall any front setback greater than **fifty (50) feet** be required.

**40-3-13    EXCEPTIONS TO HEIGHT LIMITS.**

(A)    **Necessary Appurtenances.**    Chimneys, parapet walls, cooling towers, elevator bulkheads, fire towers, antennas, or other necessary appurtenances commonly constructed above the roof line shall be permitted to exceed the maximum height limitations for the district in which they are located if they comply with all other pertinent ordinances of the City.

# Carlinville City Code

Zoning Code 40-3-13

(B)    _Intersections._  On corner lots, in the triangular portion of land bounded by the street lines that are within **twenty-five (25)** feet from the point of intersection, no obstruction, whether natural or man-made, shall intrude into the air space that exceeds **four (4) feet** above the level of the adjacent street.

**40-3-14    EXCEPTIONS TO SETBACK LINES.**  Certain intrusions into the required setback areas are permitted, to-wit:

(A)    Where principal buildings are commonly attached as in the downtown business area.

(B)    Canopies and roof overhangs up to the extent of **three (3) feet** into the setback area.

**40-3-15    ACCESSORY USES.**  An "accessory use" means any structure or use which is:

(A)    Subordinate in size or purpose to the principal structure or use which it serves; and

(B)    Necessary or contributing to the comfort and convenience of the occupants (whether individuals or a commercial enterprise) of the principal structure or use served; and

(C)    Located on the same lot as the principal structure or use served.

**40-3-16    SPECIFICALLY PROHIBITED ACCESSORY USES.**  The following accessory uses are strictly prohibited unless expressly permitted in particular zoning district(s):

(A)    Use of an accessory structure as a dwelling.

**40-3-17    SEWERS, SEPTIC TANKS.**  In all districts, property owners of all buildings and places where people live, work, or assemble shall provide for the sanitary disposal of all sewage in accordance with the applicable codes and ordinances of this Municipality.

**40-3-18    SCHEDULE; AREA AND BULK REGULATIONS; PARKING REQUIREMENTS.** (See Schedule 40-3-18 located at the end of this Code)

(A)    To facilitate public understanding of this Code and for the better administration and convenience of the use thereof, the regulations limiting the dwelling unit density, the heights, bulk and arrangement of buildings, and requiring minimum off-street parking for each of the districts established by **Section 40-3-1** hereof (or specified

*Carlinville City Code*                    **Zoning Code 40-3-18**

use), are set forth in **Schedule 40-3-18** hereof. Such **Schedule 40-3-18** is hereby adopted and declared to be an integral part of this Code, and it may be amended in the same manner as any other part of this Code.

    **40-3-19**    **SCHEDULE; PERMITTED USES, ACCESSORY USES; SPECIAL USES.** (See Schedule 40-3-19 located at the end of this Code)

    (A)    To facilitate public understanding of this Code and for the better administration and convenience of use thereof, the regulations designating permitted uses, permitted accessory uses, special uses and specifically prohibited uses for each of the districts established by **Section 40-3-1** hereof, are set forth in **Schedule 40-3-19** as part of **Section 40-3-1** hereof. Such **Schedule 40-3-19** is intended and declared to be an integral part of this Code and it may be amended in the same manner as any other part of this Code.

    (B)    Each column refers to a specific district which lists the permitted uses, permitted accessory uses and special uses, and are read vertically under a district column.

    (C)    Limitations and requirements in **Schedule 40-3-19** as used in a column shall mean and include the specific limitations and requirements as set forth in the same column for the district referred to. Where reference is made in **Schedule 40-3-19** to another section or provision of this Code, such section or provision referred to shall thereby be incorporated as an integral part of the requirements including such reference. All provisions of this Code shall apply as integral parts of this Section although not specifically cited as a column.

*Carlinville City Code*        Zoning Code 40-4-1

## ARTICLE IV

## SUPPLEMENTARY ZONING REGULATIONS

**40-4-1**     __APPLICABILITY OF ARTICLE.__ This Article establishes lot and structure requirements, design standards, and use limitations for specific, potentially troublesome structures and uses. These regulations apply in every zoning district where the specific structure or use is permitted or allowed by special use permit. But if more stringent regulations are applicable in any particular district, such regulations shall prevail.

**40-4-2**     __CAMPING TRAILERS.__ The regulations of this Section do not apply to camping trailers or other similar recreational vehicles parked in a permitted camping trailer park. The requirements of paragraphs (A), (C), and (D) do not apply to camping trailers or other similar recreational vehicles parked on a permitted camping trailer sales lot.

     (A)        Only one camping trailer or other similar recreational vehicle can be parked on any one lot of a dwelling. A second camping trailer or similar recreation vehicle can be parked not to exceed **fifteen (15) consecutive days** in length during a **twelve (12) month** period.

     (B)        No camping trailer or other similar recreational vehicle shall be used as living quarters (other than in a camping trailer park).

     (C)        No camping trailer or other similar recreational vehicle shall be used as an office or for any other commercial purpose.

     (D)        No camping trailer or other similar recreational vehicle shall be parked on any front yard, except on a driveway.

**40-4-3**     __FENCES, WALLS.__

     (A)        No barbed wire or electrically charged fence shall be erected or maintained anywhere in the Municipality.

     (B)        No fence, wall or other obstructions shall be erected within any public right-of-way without the written approval of the Zoning Administrator.

     (C)        No fence, wall, or other obstruction shall be erected in violation of the Illinois Drainage Code.

     (D)        Every fence, wall or other obstruction shall conform to the special height restrictions applicable in areas near intersections (**See Section 40-3-13(B)**). No fence, wall or other obstructions in any front yard area shall exceed **six (6) feet** in height or in any rear or side yard exceed **ten (10) feet** in height.

     (E)        Every fence, wall, or other obstruction shall have a minimum **eighteen (18) inch** setback from the property line, except as in (G) below.

     (F)        No fence, wall, or other obstruction should obstruct view at an intersection.

## *Carlinville City Code*                    Zoning Code 40-4-3

(G)        A shared fence on a property line is permitted as long as both parties sign an agreement.


40-4-4    **FILLING STATIONS.**
(A)        All gasoline pumps and other service facilities shall be located at least twenty-five (25) feet from any street right-of-way line, side lot line, or rear lot line.
(B)        Every access way (curb cut) to a filling station shall be located at least two hundred (200) feet from any fire station, school, public library, church, park, or playground.
(C)        All trash receptacles, except minor receptacle adjacent to the gasoline pumps, shall be screened from view.
(D)        All existing filling stations prior to adoption of this Code that do not meet the requirements of **Section 40-4-4**, subsections (A), (B) and (C) will be permitted to operate.


40-4-5    **HOME OCCUPATIONS.** A home occupation is an occupation or profession customarily carried on by an occupant of a dwelling unit as a secondary use which is clearly subservient to the use of the dwelling for residential purposes.
(A)        No home occupation in Residential Districts shall be permitted that:
(1)    Requires exterior building alterations to accommodate the occupation;
(2)    Generates traffic, parking, sewerage or water use in excess of what is normal in the residential neighborhood;
(3)    Creates excessive noise, vibration, glare, fumes, odors, or results in electrical interference or becomes a nuisance;
(4)    Requires parking for customers that cannot be accommodated on the site and/or not exceeding one (1) parking space at curb side of the street;
(5)    Requires the delivery of goods or the visit of customers before 6:00 A.M. or after 9:00 P.M.
(B)        The following are permitted home occupations provided they do not violate any of the provisions of the previous paragraph:
(1)    Dressmaking, sewing or tailoring;
(2)    Painting, sculpturing or writing;
(3)    Telephone answering;
(4)    Home crafts such as, but not limited to, model making, rug weaving, lapidary work, and cabinet making;
(5)    Tutoring, limited to **four (4) students** at a time;
(6)    Home cooking and preserving;
(7)    Office for after hours work or as a base of operations for service provided outside and away from the home;
(8)    Laundering and/or ironing;

*Carlinville City Code*                                    Zoning Code 40-4-5

(9)   Repair of clocks, instruments and other small appliances which do not create a nuisance due to noise, vibration, glare, fumes, odors, or results in electrical interference;

(10)  Barber shops and beauty parlors;

(11)  Babysitting and/or day care services not required to be licensed by the State of Illinois;

(12)  Bed and breakfast establishments.

(C)   The following are prohibited as home occupation:

(1)   Dance and exercise studios;

(2)   Private clubs;

(3)   Repair shops which may create a nuisance due to excessive noise, vibration, glare, fumes, odors or electrical interference;

(4)   Restaurants;

(5)   Stables or kennels and related services;

(6)   Tourist homes;

(7)   Automobile repair or paint shops.

(D)   Any proposed home occupation that is neither specifically permitted by paragraph (B) nor specifically prohibited by paragraph (C) shall be considered a Special Use and granted or denied upon consideration of those standards contained in paragraph (A) and under the procedures specified in **Article X**, Special Uses and Amendments.

(E)   Home occupation businesses shall be limited to the applicant who legally resides in the residence.

(F)   Home occupations requiring a special use permit must have an annual permit issued by the Zoning Administrator. The annual permit fee will be **Ten Dollars ($10.00)**.

40-4-6   <u>HOSPITALS, NURSING HOMES.</u>

(A)   The lot on which any hospital or sanitarium is situated shall have a minimum width and depth of **two hundred (200) feet**, and a minimum area of **five (5)** acres.

(B)   The lot on which any nursing home is situated shall have a minimum width and depth of **two hundred (200) feet**, and a minimum area of **one and one-half (1.5)** acres.

40-4-7   <u>JUNK YARDS.</u>  A junk yard is defined as an open area of land and any accessory structures thereon that are used for buying, selling, exchanging, storing, baling, packing, disassembling, or handling waste or scrap materials. Such scrap materials include vehicles, machinery and equipment not in operable condition, or parts thereof, and metals, glass, paper, plastics, rags and rubber tires. A lot on which **three (3)** or more inoperable vehicles are stored shall be deemed a junk yard. A "junk yard" includes an automobile wrecking yard.

## *Carlinville City Code*

Junk yard shall not be allowed within the corporate limits of this Municipality. Those junk yards in existence prior to the adoption of this Code shall be "Grandfathered". Such yards may be sold so long as it continues to be a junk yard. If the property ceases to be a junk yard after **one (1) year**, it will be re-zoned the same as the district that adjoins or surrounds it.

(A)      All existing junk yards within the City limits of Carlinville prior to the adoption of this Code must be screened by a wall, solid fence, or closely planted shrubbery **eight (8) feet** high and of sufficient density to block the view from adjacent property within **three (3) years** of the adoption of this Code.

40-4-8      **SANITARY LANDFILLS.**  Sanitary landfills are not permitted within the jurisdictional limits of this Zoning Code.

40-4-9      **SCHOOLS.**
(A)      The lot on which any school is situated shall have the minimum area indicated below:

| Type of School | Minimum Lot Area |
|---|---|
| Nursery, Day Care Center | As required by State law for Nursery/Day Care Centers |
| Other (elementary, junior high, senior high) | As required by State law normally **four (4) acres**, plus **one (1)** additional acre for every **one hundred fifty (150) students** in excess of **two hundred (200).** |

(B)      The principal building of any school shall be located at least **twenty-five (25) feet** from all lot lines.

40-4-10      **PRIVATE SWIMMING POOLS.**
(A)      Privately owned artificial basins of water used for swimming or wading (hereinafter "swimming pools") shall be in conformity with the requirements of this Article; provided, however, these requirements shall not be applicable to any such swimming pool less than **twenty-four (24) inches** deep or having a surface area of less than **two hundred fifty (250) square feet.**
(B)      No person shall own, possess, build, construct, install, enlarge or alter a swimming pool as defined in **Section 40-4-10(A)** unless there shall be erected and maintained an adequate enclosure, either surrounding the property upon which the swimming pool is located or the pool area itself, sufficient to make such a body of water inaccessible to small children.

*Carlinville City Code*                    Zoning Code 40-4-10

(C)        All permanent swimming pools, regardless of whether they are constructed in the ground or above the ground, shall be protected by a fenced enclosure with a height of at least **four (4) feet** above the underlying ground level and shall be equipped with a self-latching gate having a latch at least **four and one-half (4.5) feet** over grade.  The gate to the fenced enclosure around each swimming pool shall be located with a lock which can be opened only with a key or combination whenever the swimming pool is not in use or is equipped with and controlled by a self-latching device on the inside of the gate and spring closing hinges.

(D)        The provisions of **Section 40-4-10** shall apply to any swimming pool as herein defined, built, constructed, installed, enlarged, or altered after the effective date of this Code.  Within **three (3) months** of the effective date of this Code existing swimming pools must meet the standards outlined herein.

40-4-11    **UTILITY SUBSTATIONS.** Every electrical substation, gas regulator station, telephone exchange facility, sewage treatment plant, water storage facility, or similar facility shall be deemed a special use, and shall conform to the following regulations:

(A)        New facilities shall meet the minimum area and dimension requirements of the district in which it is located.  Every part of any such facility shall be located at least **twenty-five (25) feet** from all lot lines, or shall meet the district setback requirements, whichever is greater.

(B)        In any residential district, the structure housing any facility shall be designed and constructed to be compatible with the residential character of the area.

(C)        Every such facility shall be screened by close-planted shrubbery at least **ten (10) feet** in height and of sufficient density to block the view from adjacent property. Furthermore, if the Zoning Administrator determines that the facility poses a safety hazard (for example, if there are exposed transformers), he shall require that a secure fence at least **eight (8) feet** in height be installed behind the planting screen.

40-4-12    **(APPROVED) MANUFACTURED HOMES/MODULAR UNITS.** A modular dwelling must have a yellow metal seal, shaped like the State of Illinois, mounted on the interior electrical panel or other approved location.  Modular housing will be considered conventional housing and shall be constructed on a permanent foundation (see definition for Permanent Foundation).  Modular housing as herein defined shall be considered a single-family dwelling. No modular home shall hereafter be brought into this Municipality unless said home conforms to construction/safety standards adopted by the Federal Manufactured Home and Safety Standards.  No modular home shall be installed on any lot in this Municipality that is older than **ten (10) years** from the current date.

## *Carlinville City Code*

**40-4-13    MOBILE HOMES.** The following requirements are supplementary to the Standards in Illinois Mobile Home Safety Act and the Rules and Regulations adopted by the Illinois Department of Public Health pursuant thereto. No mobile home shall hereafter be brought into this Municipality unless said home conforms to construction/safety standards adopted by the Illinois Mobile Home Safety Act. No mobile home shall be installed on any lot in this Municipality that is older than **ten (10) years** from the current date.

**40-4-14    MOBILE HOMES – INDIVIDUAL.**

(A)    After the adoption of this Code mobile homes shall only be located or relocated in the MH Mobile Home Zoning District except as otherwise provided herein.

(B)    After the effective date of this Code, existing mobile homes in Residential Districts and/or in any other district other than in the MH Mobile Home Zoning Districts will be permitted as long as they are used as residences and as long as the mobile home owner and the lot owner are one and the same individual or entity. Said mobile homes may be upgraded or replaced. When the mobile home or the lot on which the mobile home formerly was located is vacant and not occupied for a period of **twelve (12) consecutive months** or for a total of **eighteen (18) months** during any **three (3) year period**, the property will be re-zoned the same as the district that surrounds it and any existing mobile home on the property will have to be removed. In the existing situations where the mobile home owner and the lot owner are different, if the mobile home is removed from the lot and the lot remains vacant for a period of **ninety (90) days**, then the owner of the lot shall lose the right to rent the lot to another different mobile home owner.

(C)    (1)    All mobile homes will be required to be skirted and anchored. Specifically, skirted with fire resistant material to enhance the appearance of the home and to prevent rodent harborage. Skirting shall be equipped with an inspection door at least **twenty-four (24) inches** wide to allow access to the underside of the home; and

(2)    The mobile home shall meet the Manufactured Home Tie Down Code issued by the Illinois Department of Public Health.

(3)    Mobile homes must be located on a mobile home stand extending the full length of the upperside supports of the mobile home. Said stand shall be constructed and located so as to facilitate placement and removal of the mobile home in relation to the abutting roadway. The stand shall sit on a permanent foundation that consists of one of the following: six-inch thick reinforced concrete runners; a four-inch thick reinforced concrete slab; or concrete piers constructed and located so as to facilitate placement and removal of the mobile home in relation to the abutting roadway. The piers shall be constructed of concrete in cylindrical shape not less

## Carlinville City Code

than **sixteen (16) inches** in diameter and to a depth of not less than **thirty (30) inches** below surface grade and shall be located at no greater than **eight (8) foot** intervals extending the full length of the underside supports of the mobile home.

(4) Each mobile home shall have installed appropriate tie-down equipment, namely:

    (a) Frame tie downs **two (2) feet** from each end and a maximum of **twelve (12) feet** spacing on each side of the length of the home.

(5) Each mobile home shall be rendered immobile by removing the wheels, tongue and hitch and placing the mobile home on a permanent foundation.

(D) All mobile homes shall be connected to all available public utilities in accordance with the requirements for any residential structures in the City, shall be appropriately skirted and shall conform to all requirements that are applicable to conventionally constructed dwelling units.

(E) Mobile homes to be placed and occupied after the effective date of this Code can only be allowed by approved license and occupancy permit.

(1) Every applicant for a license shall submit to the City Clerk a written application for mobile license. This application shall be accompanied by an inspection fee of **Fifty Dollars ($50.00)**.

(2) The license application shall be referred to the Zoning Administrator for review and inspection according to the minimum requirements established by this Article and other applicable ordinances, statutes and regulations. The Zoning Administrator will either approve or deny the application.

(3) Issuance of the mobile home license by the Zoning Administrator shall authorize the applicant to proceed with installation, placement and location of the mobile home. Occupancy of the dwelling will not be permitted until the issuance of an occupancy permit.

(4) The holder of a mobile home license must make application for an occupancy permit within **one hundred eighty (180) days**. If no application for an occupancy permit is filed with the Zoning Administrator, the license shall be revoked. Any applicant denied an occupancy permit may reapply for an occupancy permit within **thirty (30) days** of such denial by the Zoning Administrator. If applicant does not reapply for an occupancy permit within such **thirty (30) days**, then the license issued shall be revoked.

# Carlinville City Code

(F)        Existing mobile homes in the (MH) District, but not in a mobile home park or court may be replaced provided the replacement mobile home meets the U.S. Department of Housing and Urban Affairs standards. The replacement mobile home shall be no more than **ten (10) years** of age.

**40-4-15    MOBILE HOME PARKS AND COURTS.**

(A)        After the effective date of this Code, no mobile home park and/or court shall be operated within this City without having first obtained a permit to operate from the Illinois Department of Public Health.

(B)        Mobile home parks and/or courts shall be permitted in the MH District and shall meet the following requirements.

    (1)    Shall be located on a tract of land not less than **two (2) acres.**

    (2)    Shall contain at least **three (3) mobile homes.**

    (3)    **Minimum Lot Size and Setback Requirements.** Individual mobile home spaces shall be considered as lots and shall meet the following requirements:

| | | |
|---|---|---|
| (a) | Minimum lot size | 4,000 square feet |
| (b) | Minimum lot depth | 100 feet |
| (c) | Minimum lot width | 40 feet |
| (d) | Minimum setback requirements | |
| | from front lot line | 20 feet |
| | from rear lot line | 10 feet |
| | from side lot line | 8 feet |

    (4)    Shall be skirted and anchored as per **Section 40-4-13(C).**

    (5)    **Two (2)** off-street parking spaces shall be provided per mobile home.

    (6)    No access way may dead-end except as a cul-de-sac with appropriate turn-around space for emergency vehicles.

**40-4-16    KENNELS.** A kennel means any structure or premises or portion thereof on which more than **three (3) dogs**, cats, or other household domestic animals, over **four (4) months** of age, are kept or on which more than **two (2)** such animals are maintained, boarded, bred, or cared for in return for remuneration or are kept for the purpose of sale.

(A)        The lot on which any kennel is situated shall have a minimum area of **two (2) acres.**

(B)        Every kennel shall be located at least **one hundred (100) feet** from the front, rear and side lot lines of the entire parcel of property on which the kennel is located.

**40-4-17    AGRICULTURAL ACTIVITIES.**

(A)        **Farm Animals.** The rearing, breeding or housing of horses, cattle, swine, poultry, or other farm animals shall not be allowed within the corporate limits of this Municipality except on land located in an existing Agricultural District.

*Carlinville City Code*

## ARTICLE V

## SUPPLEMENTARY OFF-STREET PARKING AND LOADING REGULATIONS

**40-5-1    APPLICABILITY OF ARTICLE.**    Off-street parking and loading shall be provided in accordance with this Article for all structures and uses erected or established after the effective date of this Code.

**40-5-2    EXISTING PARKING/LOADING FACILITIES.**

(A)    Existing off-street parking or loading facilities located on the same lot as the use served shall not be reduced below, or if already less than, shall not be further reduced below the requirements and standards for similar new structures or uses.

(B)    When an existing structure or use is damaged or destroyed and subsequently repaired or rebuilt, additional off-street parking and loading facilities need not be provided, but parking/loading facilities equivalent to any maintained at the time of such damage or destruction shall be restored.

(C)    Whenever the use of any structure or premises is intensified through addition of dwelling units, gross floor area, seating capacity, etc., additional parking and loading facilities commensurate with such increase in use-intensity shall be provided.

(D)    Whenever the existing use of a structure is changed to a different use, parking or loading facilities shall be provided as required herein for such new use.

**40-5-3    PARKING DESIGN AND MAINTENANCE STANDARDS.**

(A)    **Spaces.**

(1)    Each required parking space shall be at least **nine (9) feet** wide and **nineteen (19) feet** long, and shall have at least **seven (7) feet** of vertical clearance.  Every space shall be situated so that no part of any parked vehicle overhangs the public right-of-way.

(2)    For multi-family, business and industrial uses, markings shall be laid and restored as often as necessary to clearly delineate each parking space.

(B)    **Interior Aisles.**  Aisles within parking lots in Business and Industrial Districts shall be sufficiently wide to permit safe and efficient vehicular movement in the aisles and into and out of parking spaces.  Aisles designed for two-way traffic shall be at least **twenty-two (22) feet** wide.  One-way aisles designed for **sixty (60) degree** parking shall be at least **eighteen (18) feet** wide.

(C)    **Access Way.**

(1)    Parking areas in the Business and Industrial Districts shall be designed so that ingress to and egress from a parking space

## *Carlinville City Code*

is from an aisle or driveway, not directly from the public right-of-way.

(2) No access way to any parking area shall be located within **thirty (30) feet** of any corner formed by the intersection of the rights-of-way of **two (2)** or more streets. At intersections where traffic control devices are installed, the Zoning Administrator, after consulting with the Chief of Police, may increase this requirement as necessary to prevent traffic hazards.

(3) The access way to every parking lot located in any business and industrial zoning district shall be at least **twenty-four (24) feet** wide unless **two (2)** one-way drives, each **twelve (12) feet** wide, are provided.

(4) The access way to every parking area located in any residential zoning district shall be at least **ten (10) feet** wide; but if the parking area contains more than **eight (8) parking spaces** or if the access way is longer than **one hundred (100) feet**, access shall be provided either by **one (1)** two-way drive at least **twenty (20) feet** wide or by **two (2)** one-way drives, each at least **ten (10) feet** wide.

(D)      **Lighting.** Any light(s) used to illuminate any parking area shall be arranged or shielded so as to confine direct light rays within the parking area boundary lines to the greatest extent practicable.

40-5-4      **LOCATION OF PARKING.** All off-street parking shall be located in conformity with the following requirements:

(A)      Parking spaces accessory to dwellings located in any residential zoning district shall be located on the same lot as the dwelling. Such parking spaces shall not be located in any front yard except in the driveway, but may be located in the side or rear yards. Each parking space accessory to a multi-family dwelling shall be unobstructed so that no vehicle need be moved in order to allow another vehicle to enter/exit the parking area.

(B)      All parking spaces accessory to permitted non-dwelling uses located in the residential zoning district generally shall be located on the same lot as the use served. However, by special use permit, such parking facilities may be located on another parcel within **two hundred (200) feet** of the use served. No commercial vehicle exceeding **one (1) ton** cargo capacity or exceeding **twenty (20) feet** in length shall be parked anywhere in a residential district (except for normal loading, unloading and service call), unless a special use permit has been obtained. No vehicle repair work shall be permitted on any parking lot located in any residential district.

*Carlinville City Code*                                    Zoning Code 40-5-5

---

**40-5-5    BUSINESS AND INDUSTRIAL DISTRICTS.**

(A)        Parking spaces accessory to any dwelling located in any business district shall be located within **two hundred (200) feet** of the dwelling.  Parking spaces accessory to any other conforming use located in any business or industrial district shall be located within **five hundred (500) feet** of the use served.

(B)        No parking space accessory to any use located in business or industrial district shall be located in any residential district except by special use permit; and in no case shall any such parking areas extend more than **five hundred (500) feet** into a residential district.

(C)        In any business or industrial district, off-street parking facilities for different buildings or uses may be provided collectively if the total number of spaces so located together is not less than the sum of the separate requirements for each use, and if all regulations governing location of parking spaces in relation to the use served are observed.

**40-5-6    PARKING SURFACES.**  All parking areas and parking lots servicing or being used by commercial businesses shall be graded and improved with a surface approved by the Zoning Administrator.  The surface shall be sufficient for the intended use.  The surfaces C-1 and C-2 shall be paved properly for the expected use of such lot.  Any decision by the Zoning Administrator may be appealed to the Planning Commission and they shall have the final decision.

**40-5-7    DESIGN AND LOCATION OF OFF-STREET LOADING FACILITIES.**  All off-street loading facilities shall conform to the minimum standards as indicated:

(A)        **Size Of Space.**  Every required off-street loading space shall be at least **twelve (12)** feet wide and **forty-five (45) feet** long exclusive of aisle and maneuver space, and shall have vertical clearance of at least **fourteen (14) feet.**  In no case shall a vehicle being loaded or unloaded overhang into the public right-of-way.

(B)        **Access Way.**  Every off-street loading space shall have a safe means of vehicular access to a street or alley.  Such access way shall be at least **twelve (12)** feet wide.

(C)        **Location.**  Every off-street loading space, whether required or not, shall be located on the same parcel of land as the use served, and not closer than **fifty (50)** feet to the intersection of the rights-of-way of **two (2)** or more streets, and not on required front yards.

**E-FILED**
Wednesday, 19 March, 2008  03:43:41 PM
Clerk, U.S. District Court, ILCD

# *Carlinville City Code*

Zoning Code 40-6-1

## ARTICLE VI

## NONCONFORMITIES

**40-6-1**    **PURPOSE OF ARTICLE.** The requirements imposed by this Code are designed to guide the use of land by encouraging the development of structures and uses that are compatible with the predominant character of each of the various residential, business and industrial districts.   Lots, structures, and uses of land or structures that do not conform to the requirements of the district in which they are located impede appropriate development.  For example, nonconformities are frequently responsible for heavy traffic on residential streets, the overtaxing of parking facilities, the emission of noxious fumes or excessive noise, and/or the lowering of property values. **The regulations in this Article are intended to alleviate such existing/potential problems by encouraging the gradual elimination of nonconformities.**

**40-6-2**    **NONCONFORMING LOTS.** Any vacant lot that does not conform to one (1) or more of the lot size requirements of the district in which it is located may be used in the manner indicated at **Sections 40-6-3** and **40-6-4** if it:

(A)            Is of record on the date of the adoption or amendment of this Code; and

(B)            Has continuously remained in separate ownership from abutting tracts of land throughout the entire period during which the creation of such lot was prohibited by the applicable zoning code or other ordinances.

**40-6-3**    **RESIDENTIAL.** On any such lot located in any district any permitted structures may be erected, provided all the bulk (see definitions) and setback regulations of the particular district are observed.

**40-6-4**    **OTHER DISTRICTS.** On any such lot located in the business or industrial districts any structure permitted in the particular district may be erected if the bulk and setback requirements of that district are met.

**40-6-5**    **NONCONFORMING STRUCTURES.** Any lawful structure which exists on the effective date of the enactment or amendment of this Code, but which could not be erected under the terms of this Code because of restrictions on the lot size, height, setbacks, lot coverage, or other characteristics of the structure, or its location on the lot, may lawfully remain, be repaired and/or be rebuilt or replaced as long as it does not

# Carlinville City Code

violate the requirements of this Code to a greater extent than it does at the time of the passage of this Code, provided that the maintaining and/or replacement of mobile homes shall be governed by **Section 40-4-13** and **40-4-14** of this Code.

**40-6-6**    **NONCONFORMING USES OCCUPYING A STRUCTURE.**  If any lawful use occupying a structure exists on the date of the enactment or amendment of this Code, but would not be allowed under the terms of this Code, such a use may lawfully continue, subject to the following provisions:

(A)    **Maintenance and Rebuilding.**  Any structure housing a nonconforming use may be maintained through ordinary repairs and/or may be replaced or rebuilt as long as the nonconforming use is authorized herein.  Said repairs or replacements should be completed within **twelve (12) months** of authorization of destruction or improvement.

(B)    **Change of Use.**  A nonconforming use occupying a structure shall not be changed except to a use permitted under the applicable district regulations.

(C)    **Discontinuance of Use.**  When a nonconforming use of a structure, or of a structure and premises in combination, is voluntarily discontinued for **twelve (12)** consecutive months or for **eighteen (18) months** during any **three (3) year** period, the nonconforming use shall not thereafter be resumed.  Any discontinuance caused by government action and without any contributing fault by the nonconforming user shall not be counted in calculating the length of discontinuance.

**40-6-7**    **NONCONFORMING USE OF LAND.**  Any lawful use of land existing on the date of the adoption or amendment of this Code that would not be permitted under the terms of this Code may lawfully continue, subject to the following provisions:

(A)    **Relocation.**  No nonconforming use of land shall be moved, in whole or in part, unless upon relocation such use will conform to all pertinent regulations of the district in which it will be located.

(B)    **Change of Use.**  A nonconforming use of land shall not be changed except to a use that is permitted under the applicable district regulations.

(C)    **Discontinuance.**  When a nonconforming use of land is voluntarily discontinued for a period of **twelve (12)** consecutive months, it shall not thereafter be resumed, and any subsequent use of such land shall conform to the applicable district regulations.  Any voluntary discontinuance caused by government action and without any contributing fault by the owner or operator shall not be counted in calculating the length of discontinuance.

**40-6-8**    **NONCONFORMITIES UNDER PERMIT AUTHORITY.**    The regulations of this Article shall not apply to any change in an existing structure or to any change in the use of a structure or of land for which a permit was issued prior to the enactment of this Code or any pertinent amendment thereto, provided that the work authorized by such permit is carried out and completed with diligence.

# *Carlinville City Code*

## ARTICLE VII

## SIGN CODE

**40-7-1      SIGN PERMIT REQUIRED; FEE.**  Except as otherwise provided in the following sections, no outdoor advertising sign, billboard or structure shall be erected, constructed, altered, rebuilt, or relocated except as provided in this Code and until a permit for the sign has been issued by the City upon application therefore submitted in the form the City may prescribe so as to include any information as may be required by it for a complete understanding of the proposed work.   This application shall be accompanied by a fee according to the permit fee schedule included in **Section 40-9-5**.

**40-7-2      EXEMPTIONS.**  No person will be required under this Code for the following signs:
  (A)          A wall or window sign not exceeding **six (6) square feet** of display surface.
  (B)          A sign not exceeding **three (3) square feet** of display surface on a residence building stating merely the name and profession of an occupant.
  (C)          A ground sign advertising either the sale or rental of the premises upon which it is maintained when the sign does not exceed **twenty-five (25) square feet** of display surface.
  (D)          Street, warning, and other official or non-advertising signs erected by any government or by others where required by or pursuant to legal authority.
  (E)          The exemptions permitted by this Section shall apply only to the requirement of a permit and shall not be construed as relieving the owner of the sign from responsibility for its erection and maintenance in a good and safe condition.

**40-7-3      EXAMINATION OF PLANS; ISSUANCE.**    The  Zoning Administrator, upon the filing of an application for a Temporary Certificate of Zoning Compliance as required by **Section 40-9-4**, shall examine the plans and specifications and other data and the premises upon which it is proposed to erect the sign or other advertising structure.  Applicant must provide additional information on any sign at the request of the Zoning Administrator to show wind loads, calculations, etc.

**40-7-4      WHEN PERMIT BECOMES NULL AND VOID.**  If the work authorized under a Temporary Certificate of Zoning Compliance as required by **Section 40-9-4** has not been completed within **six (6) months** after the date of issuance, the permit shall become null and void.

*Carlinville City Code*                                    Zoning Code 40-7-5

**40-7-5    PAINTING REQUIREMENTS GENERALLY.** The owner of any sign as defined and regulated by this Code shall be required to have the sign properly painted, at least once every **two (2) years**, including all parts and supports of the sign, unless the parts and supports are galvanized or otherwise treated to prevent rust.

**40-7-6    PERMIT NUMBER, DATE OF ERECTION, AND VOLTAGE TO BE PAINTED ON SIGNS.** Every sign or other advertising structure, when erected, shall have painted in a conspicuous place thereon, in letters not less than **one (1) inch** in height, the date of erection, the permit number, and the voltage of any electrical apparatus used in connection therewith.

**40-7-7    REMOVAL OF CERTAIN SIGNS.** Any sign which no longer advertises a bona fide business conducted, or a product sold, shall be taken down and removed by the owner, agent, or person having the beneficial use of the building or structure upon which the sign may be found, within **ten (10) days** after written notification from the City, and upon failure to comply with the notice within the time specified in the order, the City is hereby authorized to cause removal of the sign, and any expense incident thereto shall be paid by the owner of the building or structure to which the sign is attached.

**40-7-8    UNSAFE AND UNLAWFUL SIGNS.** If the City shall find that any sign or other advertising structure regulated by this Code is unsafe or insecure, or is a menace to the public, or has been constructed or erected or is being maintained in violation of the provisions of this Code, he shall give written notice to the permittee thereof. If the permittee fails to remove or alter the structure so as to comply with the standards set forth in this Code within **ten (10) days** after the notice, the sign or other advertising structure may be removed or altered to comply with this Code by the City at the expense of the permittee or owner of the property upon which it is located. The City shall refuse to issue a permit to any permittee or owner who refuses to pay costs so assessed. The City may cause any sign or other advertising structure which is an immediate peril to persons or property to be removed summarily and without notice.

**40-7-9    NOT TO OBSTRUCT FIRE ESCAPES.** No outdoor advertising sign shall be erected, constructed, or maintained so as to obstruct any fire escape, or any window or door or opening used as a means of egress or for fire-fighting purposes, or so as to prevent free passage from one part of a roof to another part thereof. No sign shall be attached in any form, shape, or manner to a fire escape nor be so placed as to interfere with an opening required for legal ventilation.

*Carlinville City Code*

**40-7-10    TO BE MARKED WITH ERECTOR'S NAME.** Every outdoor advertising sign erected under the provisions of this Code shall be plainly marked with the name of the person erecting the sign.

**40-7-11    LOADS AND ALLOWABLE STRESSES.**
(A)        Ground signs shall be designed and constructed to withstand wind pressure of not less than **twenty-five (25) pounds** per square foot of exposed area, but all other signs must be designed and constructed to withstand wind pressure of not less than **fifty (50) pounds** per square foot of exposed area.
(B)        Allowable stresses and materials shall conform to the latest approved specifications of the American Standard Building Code Requirements for Structural Steel, approved by the American Standards Association, and the National Design Specification for Stress Grade Lumber and its Fastenings, recommended by the National Lumber Manufacturers Association. The working stress of chains, wire ropes, and steel guy rods and their fastenings shall not exceed **one-fourth (1/4)** of their ultimate strength.

**40-7-12    GROUND SIGNS.**
(A)        No ground sign for which a permit is required shall be erected to a height of more than **twelve (12) feet** above the ground unless the face is constructed of sheet metal or other noncombustible facing materials.
(B)        The bottom of the facing of every ground sign shall be at least **thirty (30) inches** above the ground, which space may be filled with platform or decorative trim of light wood or metal construction.
(C)        Ground signs shall be adequately supported to resist dead load and the wind load specified in **Section 40-7-11** acting in any direction on the sign.
(D)        Ground signs which do not exceed **twenty-five (25) feet** in height may have supports which consist only of vertical posts driven into or set in the soil, or which consist only of vertical posts rigidly attached to bases embedded in the soil. There shall be **two (2)** or more vertical posts spaced not to exceed a distance equal to **one-half (1/2)** the height of the sign above the ground, except that a sign which does not exceed **fifty (50) square feet** in any area may be supported by a single post.
(E)        The posts, or bases for rigidly attached posts, supporting unbraced ground signs shall be so proportioned that the bearing loads imposed upon the soil in either a horizontal or vertical direction shall not exceed safe values. Braced ground signs shall be anchored to resist the specified wind load acting in any direction. Anchors and support shall be designed for safe bearing loads on the soil and for an effective resistance to pull out amounting to a force **twenty-five percent (25%)** greater than the required resistance to overturning.
(F)        The soil used for backfill for the dug-in type of anchor or post support shall be carefully placed and thoroughly compacted. The anchors and supports shall penetrate to a depth below ground greater than that of the frost line.

*Carlinville City Code*                           Zoning Code 40-7-12

(G)          Portable signs supported by frames or posts rigidly attached to bases shall be so proportioned that the weight and size of the base is adequate to resist the wind pressure specified in **Section 40-7-11**. The sign shall not exceed **six (6) feet** in height.

(H)          Whenever anchors or supports consist of wood embedded in the soil, the wood shall be treated under pressure with creosote or other approved preservation before erection. This requirement shall not apply to temporary signs which will not remain in place for more than **six (6) months**.

(I)          The owner of a lot upon which there is a ground sign or the person occupying the lot or both are hereby required to keep the lot and the ground sign clean, sanitary, inoffensive and free and clear of all obnoxious substances and unsightly conditions.


**40-7-13     ROOF SIGNS.**

(A)          Every roof sign shall be constructed entirely of fire-resistive materials, including the uprights, supports, and braces, except that the ornamental molding, battens, cappings, and nailing strips, platforms, and the decorative trimmings may be constructed of combustible materials.

(B)          No roof sign shall project beyond the exterior wall, but if illuminated, lighting reflectors may project beyond the face of the wall.

(C)          Roof signs shall be so constructed as to leave a clear space, except for the structure supporting the sign, of not less than **four (4) feet** between the roof and the lowest part of the sign.

(D)          Roof signs shall be thoroughly secured and anchored to the building over which they are constructed and erected. The dead and wind loads from the signs shall be distributed to the structural elements of the building in a manner that no element shall be over stressed.

(E)          Uplift due to overturning of roof signs shall be adequately resisted by proper anchorage to the building walls or structure, or by sufficient concrete counterweights to resist uplift. Proper anchorage to the building walls or structure shall include alterations to the building as may be needed to integrate and adequately interconnect sufficient dead load to equal not less than **ten percent (10%)** in excess of the computed uplift applied to the building by the sign. Where uplift is resisted by counterweights, their weight shall exceed the amount of the uplift by **ten percent (10%)**.


**40-7-14     WALL SIGNS.** Wall signs attached to exterior walls of solid masonry or concrete shall be safely and securely attached to the walls by means of metal anchors, bolts, or expansion screws of not less than **three-eighths (3/8) inch** in diameter which shall be embedded at least **five (5) inches**. No wooden blocks or anchorage with wood used in connection with screws or nails shall be considered proper

*Carlinville City Code*  Zoning Code 40-7-14

anchorage, except in the case of wall signs attached to buildings with walls of wood. No wall sign shall be entirely supported by an unbraced parapet wall. Painted advertising shall be considered a wall sign and shall require a permit.

### 40-7-15    PROJECTING SIGNS.

(A)    Signs shall in no case project from a building or structure to any point within **two (2) feet** of a line drawn perpendicularly upward from the curb line. No projecting sign shall at the lowest point be less than **nine (9) feet** above the sidewalk or the ground level. All projecting signs for which a permit is required shall be constructed entirely of fire-resistive materials approved by the City for this purpose.

(B)    Projecting signs shall be securely attached to a building or structure by metal bolts, anchors, supports, chains, wire ropes, or steel rods. No staples or nails shall be used to secure any projecting sign to any building or structure.

(C)    The dead load of projecting signs, not parallel to the building or structure, and the load due to wind pressure shall be supported by structural shapes, chains, wire ropes, or steel guy rods. These supports shall be erected and maintained preferably at an angle of **forty-five (45) degrees** or more with the face of the sign in an approximately horizontal plane to resist wind pressure. The lateral supports shall be spaced not more than **eight (8) feet** apart and shall be secured to a bolt or expansion screw capable of developing the strength of the supporting chain, wire, rope or steel guy rod. The expansive device and details of the anchorage shall be subject to the approval of the City. Turn buckles or other approved means of adjustment shall be placed in all chains, wire ropes, or steel guy rods supporting or bracing projecting signs.

(D)    Chains, wire ropes, or steel guy rods used to support the dead or wind load of projecting signs may be fastened to solid masonry walls with expansion bolts or other devices approved by the City, but no support shall be attached to an unbraced parapet wall. Where the supports must be fastened to walls made of wood, the supporting device must be fastened securely in a manner approved by the City.

(E)    All metal supports and braces for projecting signs shall be galvanized or of corrosive-resistant material or painted at least once annually.

### 40-7-16    MARQUEE SIGNS.
Fire-resistant marquee signs may be attached to or hung from a marquee. When attached to or hung from a marquee, the sign shall be at least **nine (9) feet** at its lowest level above the sidewalk or ground level. No sign shall extend outside the vertical lines of the marquee. All marquee signs shall have a 14 watt per bulb limit.

### 40-7-17    ALLOWABLE SIZES AND LOCATIONS.
Signs requiring a permit per **Section 40-7-1** shall only be erected in the following approved Districts and be subject to the following size restrictions.

*Carlinville City Code*  Zoning Code 40-7-17

   (A)       Maximum **twelve (12) square feet** per side in the Single Family Residential Districts, S-1 and S-2.
   (B)       Maximum **thirty-two (32) square feet** per side in the Neighborhood Commercial District, C-1.
   (C)       Maximum **one hundred (100) square feet** per side in the General Commercial and Industrial Districts, C-2 and I.

*Carlinville City Code*                                    Zoning Code 40-8-1

## ARTICLE VIII – ADULT BUSINESS

**DEFINITIONS.** See Section 40-2-2.

**40-8-1    SPECIAL USE PERMIT REQUIRED.**

(A)         No adult business may operate within the City without first having obtained a special use permit. A separate special use permit must be acquired for each adult business. Adult businesses include but are not limited to adults-only bookstores, adults-only motion picture theaters, adult entertainment centers, adults-only massage parlors, rap parlors, or adults-only saunas. It shall likewise be unlawful for any such business to sell or offer for sale any adults-only items in violation of the terms and conditions of such special use permits.

(B)         A special use permit issued by the City is required for and with respect to any building location and premises, within the City, at or upon which an adult business is to be operated.

(C)         All special use permit procedures and criteria are as noted in the City Zoning Code.

(D)         No special use permit shall be held in existence by the mere payment of fees.

**40-8-2    LOCATION RESTRICTIONS.**

(A)         The use of property for an adult business can have potentially harmful secondary effects on the surrounding areas, and may have a deleterious effect upon the use and enjoyment of adjoining properties.

(B)         Such secondary effects can include, but not be limited to, a tendency to attract an undesirable quantity and quality of transients, to affect property values adversely, to cause an increase in crime, especially prostitution, to contribute to the blighting or down-grading of the surrounding neighborhood/area, and to encourage residents and businesses to move elsewhere.

(C)         As such, all adult businesses must comply with the following location restrictions:

(1)    All adult businesses shall be located within C-2 and I Districts.

(2)    No adult business shall be located within **one thousand (1,000) feet** (excluding streets, alleys and public ways) of another adult business. Said distance shall be measured from property line to property line.

(3)    No adult business shall be located within **two hundred fifty (250) feet** of any residential zone, single- or multiple-family dwelling, church, school, licensed day care facility, or park. Said distance shall be measured from the building or structure itself within which the business is located.

*Carlinville City Code*                    Zoning Code 40-8-3

**40-8-3    PROHIBITED CONDUCT.** The operator of any adult business shall neither participate in nor suffer or permit any of the following prohibited acts to occur on the premises:

(A)    Sexual conduct, including but not limited to any demonstration, dance, performance, or exhibition on the licensed premises by any employee, agent, entertainer, or patron, where said person engages in any of the following conduct:

(1)    Exposure of the genitals, pubic hair, perineum, anal or pubic region; or

(2)    Exposure of any device, costume or covering which gives the appearance of or simulates the genitalia, pubic hair, buttocks, perineum, anal or pubic region; or

(3)    Performance or simulated performance of ultimate sexual acts or explicit sexual conduct (whether auto-erotic, heterosexual, homosexual or otherwise) bestiality or sadomasochistic activity; or

(4)    Fondling of his or her own genitals or the genitalia of another person.

(B)    Employment or use of the services of any person in or upon the premises of the adult business while such person is unclothed or in such attire, costume or clothing so as to result in conduct prohibited in subsection (A) above.

(C)    Admission of any underage patron into or upon the premises of the adult business.

(D)    Patronage, frequenting or loitering of any underage person in any adult business.

(E)    Allowance of any underage person to view, accept or otherwise possess any adults-only item on the licensed premises.

(F)    Employment or use of the services of any underage person in or upon the premises of the adult business.

(G)    Drunkenness, fighting, unlawful games, riotous or disorderly conduct whatsoever, in any premises kept or occupied as an adult business.

(H)    Allowing or permitting the sale, distribution, delivery, or consumption of any controlled substance or illegal drug or narcotic on the premises.

**40-8-4    SALES PRACTICE VIOLATIONS.**

(A)    No operator, agent, or employee shall knowingly sell, deliver or provide, offer or agree to sell, deliver or provide any obscene writing, picture, record, or other representation or embodiment of the obscene. **(720 ILCS 5/11-20)**

(B)    No operator, agent, or employee shall sell, deliver or provide, offer or agree to sell, deliver, or provide any obscene writing, picture, record, or other representation or embodiment of the obscene after recklessly failing to exercise reasonable inspection, which would have disclosed the nature or content thereof. **(720 ILCS 5/22-20)**

# Carlinville City Code

(C)    No operator, agent, or employee shall create, buy, procure, or possess obscene matter or material with intent to disseminate it in violation of this Article or State statute. **(720 ILCS 5/22-20)**

(D)    No operator, agent, or employee shall advertise or otherwise promote the sale of materials represented or held out by him to be obscene, whether or not it is obscene. **(720 ILCS 5/22-20)**

(E)    No operator, agent, or employee shall knowingly sell, deliver, provide, or offer to sell, deliver, or provide any child pornography as defined by State statute. **(720 ILCS 5/22-20)**

(F)    No operator, agent, or employee shall create, buy, procure, or possess any child pornography with intent to disseminate it in violation of this Article or State statute. **(720 ILCS 5/22-20)**

(G)    No operator, agent, or employee shall advertise or otherwise promote the sale of material represented or held out by him to be child pornography, whether or not it is child pornography. **(720 ILCS 5/22-20)**

(H)    If an operator, agent, or employee believes or has reason to believe that a sale, delivery, or viewing of any adults-only item is prohibited because the prospective recipient is underage, said operator, agent, or employee shall, (before making or allowing such sale, gift, delivery, or viewing), demand presentation of some form of positive identification containing proof of age, issued by a public officer in the performance of his official duties.

(I)    An operator, agent, or employee may refuse to sell, deliver, or allow any person to view any adults-only item, where said persons is unable to produce adequate written evidence of identity and age by production of a document issued by the Federal, State, or County government, or subdivision or agent thereof, including, but not limited to, the following documents:

(1)    A motor vehicle operator's license;

(2)    A registration certificate issued under the Federal Selective Act; or

(3)    An identification card issued to a member of the armed forces.

(J)    Proof that the operator, employee, or agent demanded, examined, and reasonably relied upon such written evidence listed in subsection (I) above in any transaction forbidden by this Article is competent evidence that may be offered as an affirmative defense to a violation of this Article.

In order to reasonably relay upon written evidence regarding a patron's identity and age, an operator, agent, or employee shall use the prudent judgment of a reasonable and informed person, and shall scrutinize said written evidence of age and identity by doing the following:

(1)    Determine if the physical description and photograph (if any) on the document presented matches that of the presenting person;

(2)    Determine whether the plastic seal on the identification card is intact or broken; and

# Carlinville City Code

(3)     In the case of an Illinois driver's license, determine whether the seventh and eighth digits in the driver's license number (excluding the beginning initial) match the stated date of birth located elsewhere on the driver's license.

If from the foregoing a reasonable person would or should doubt the authenticity of the identification card, then the person offering the identification must not be sold, delivered, or allowed to view any adults-only items.

(K)     No operator, agent, or employee shall give away or otherwise make available any adults-only item or viewing of any adults-only item for the purpose of evading any provision of this Article when the sale or viewing of said adults-only item is prohibited shall constitute unlawful selling.

(L)     Offers or agreements to sell, deliver, provide, or allow the viewing of any adult-only item at or within any premises when the sale or viewing of said adults-only item is prohibited shall constitute unlawful selling.

(M)     The use of any other shift or device to evade any provision of this Article is prohibited and shall constitute unlawful selling.

40-8-5     HOURS OF OPERATION.     The unlimited operation of an adult business can, by reason of its intended use, facilitate secondary effects including, but limited to: prostitution, disorderly conduct, performance of sexual acts or conduct in public, traffic congestion, and parking problems. Insofar as the City has a substantial government interest in preserving character and preventing deterioration of its neighborhoods, the following limitations on operation times have been propounded:

(A)     Live adult entertainment (performances) shall only allowed during the hours of 9:00 P.M. to 2:00 A.M. the following day. No operator, employee, or agent of an adult business shall allow any type of "live adult entertainment" during any other times. The time referred to be either Central Standard Time or Central Daylight Savings Time, whichever is in effect at the time in the City of Carlinville, Illinois.

40-8-6     SIGNS AND/OR EXTERIOR DISPLAY.     The unregulated use of signs can result in secondary effects that create dangers to the public in periods of high winds or inclement weather, defeat the sign's informational or advertising functions as competitors escalate sign size and expense to attract patrons, reduce the ability of the public to interpret the intended message safety and quickly, and to destroy the aesthetic quality of the community. Insofar as the City has a substantial government interest in these matters, all signs advertising or promoting the sale of adults-only items must meet the following restrictions:

(A)     All signs must be flat wall signs.

(B)     The amount of allowable sign area shall be stated in the Sign Regulations Section 40-7-17.

# *Carlinville City Code*

    (C)      No merchandise or depictions of adults-only items shall be displayed in window areas or any other area that may be viewed from a public street, alley, public way, or sidewalk located in front of the building.

    (D)      A **one (1) square foot** sign may be placed on the door to state the hours of the operation and adults-only admittance.

    (E)      All provisions of the Sign Regulations section of the City's Zoning Code shall control, except as clearly contradicted by this Section. In the event that the provisions conflict, this Section shall prevail.

No adult entertainment establishment shall be maintained or operated in any manner that causes, creates, or allows public viewing of any adult material, or any entertainment depicting, describing, or relating to specified sexual activities or specified anatomical areas from any sidewalks, public or private right-of-way or any property other than the lot on which the licensed premises is located. No portion of the exterior of an adult entertainment establishment shall utilize or contain any flashing lights, search lights or spotlights, or any other similar lighting systems, or any words, lettering, photographs, silhouettes, drawings, or pictorial representations of any manner except to the extent specifically allowed in this Article. This Section shall apply to any advertisement, display, promotional material, decoration or sign to any performance or show, and to any window, door, or other opening.

### 40-8-7    PUBLIC HEALTH STANDARDS.

    (A)      All premises operated as an adult business shall be kept in clean and sanitary condition and shall be kept in full compliance with regulations issued by the County Health Department or the Illinois Department of Public Health.

    (B)      Any adult business shall keep and maintain the premises equipped with running hot and cold water, shall provide separate and adequate toilet facilities for both males and females if they are open to the public, and shall comply with all health, sanitary, zoning, and inspection requirements of the Macoupin County Health Code and the State of Illinois.

### 40-8-8    VICARIOUS LIABILITY.

    (A)      Every act or omission of whatsoever nature constituting a violation of any of the provisions of this Article, by any employee or agent of any operator, shall be deemed and held to be the act of said operator if such act or omission occurs either with the authorization, knowledge, or approval of the operator.

    (B)      Every act or omission of whatsoever nature constituting a violation of any of the provisions of this Article, by any employee or agent of any operator, shall be deemed and held to be the act of said operator if such act or omission occurs as a result of the operator's negligent failure to supervise the conduct of the employee or agent.

    (C)      Such an offense shall be punishable in the same manner as if said act or omission had been done or omitted by the operator personally.

*Carlinville City Code* <span style="float:right">Zoning Code 40-8-9</span>

40-8-9    **PENALTY.**

(A)    In the event that an operator, agent or employee of an adult business is guilty of violating any provision of this Division, said person may be subject to a fine not to exceed **Seven Hundred Fifty Dollars ($750.00)** per violation.

(B)    Any person violating the provisions of this Division shall be subject to an offense for each and every day on which such violation continues, and each day that the offense continues shall be regarded as constituting a separate offense.

(C)    Any prosecution for violation of this Division does not prohibit the City from pursing injunctive relief or the State's Attorney's Office from pursuing criminal charges.



*Carlinville City Code*        Zoning Code 40-9-1

## ARTICLE IX

## ADMINISTRATION AND ENFORCEMENT

**40-9-1**    <u>**ZONING ADMINISTRATOR.**</u> The office of Zoning Administrator of this Municipality, whether it be part-time or full-time, is hereby established. The Zoning Administrator shall be the executive head of this office.

**40-9-2**    <u>**DUTIES.**</u>    The Zoning Administrator is hereby authorized and directed to diligently administer and enforce the provisions of this Code. This broad responsibility encompasses, but is not limited to, the following specific duties:

(A)      To review applications pertaining to land, structures, and the use of land and/or structures;

(B)      To issue or deny temporary and permanent certificates of zoning compliance;

(C)      To supervise inspections of land, structures, and the uses of land and/or structures to determine compliance with this Code, and where there are violations, to initiate appropriate action to secure compliance;

(D)      To receive, file, and forward to the Planning Commission all applications for variances and appeals;

(E)      To receive and file all applications for amendments and special use permits;

(F)      To maintain up-to-date records of this Code including, but not limited to, district maps, certificates of zoning compliance, special-use permits, variances, interpretative decisions of the Planning Commission, amendments, and all applications related to any of these matters;

(G)      To periodically review the provisions of this Code to determine whether revisions are needed, and to make recommendations on these matters to the City Council at least once each year;

(H)      To cause copies of this Code (including the district map) and any amendments thereto to be printed from time to time, as necessary; and

(I)      To provide information to the general public on topics related to this Code.

**40-9-3**    <u>**TEMPORARY CERTIFICATES OF ZONING COMPLIANCE.**</u> After the effective date of this Code, no land shall be developed, no new use or structure shall be established or erected, and no existing use or structure shall be enlarged, extended, altered, relocated or reconstructed until a temporary certificate of zoning compliance has been issued. The Zoning Administrator shall issue no temporary certificate of zoning compliance unless he determines that, when the (proposed) work is completed, the use and/or structure will conform to the applicable provisions of this Code. In addition to the

# *Carlinville City Code*

construction of uses listed in **Schedule 40-3-19** the following projects require the acquisition of temporary certificate of zoning compliance. This list includes but is not limited to: new construction; structure alterations; mobile home and modular home installation; sign installation; fence installation; deck, patio, porch and stoop construction; garage and carport construction; siding installation; satellite dish installation; playhouse construction; kennel and stable construction; roof construction; shed and storage unit construction; pool installation; and vending machine installation. All applicable state codes and regulations will be followed in the construction of all permitted projects.

**40-9-4**    **INFORMATION REQUIRED.** Every applicant for a **Temporary Certificate of Zoning Compliance** shall submit to the Zoning Administrator, in narrative or graphic form, all of the following items of information as required by the Zoning Administrator.

[NOTE: As used below, the term "proposed" refers to "altered," "enlarged," or "extended" as well as "completely new".]

    (A)    Name and address of the applicant;

    (B)    Name and address of the owner or operator of the proposed structure or use, if different from (A);

    (C)    Nature of the proposed use, including type of activity, manner of operations, number of occupants or employees, and similar matters;

    (D)    Location of the proposed use or structures, and its relationship to existing adjacent uses or structures;

    (E)    Area and dimensions of the site for the proposed structure or use;

    (F)    Existing topography of the site (USGS 10-foot contour data is acceptable), and proposed finished grade;

    (G)    Existing and proposed screening, landscaping, and erosion control features on the site, including the parking area;

    (H)    Height, setbacks, and lot coverage of the proposed structures;

    (I)    Number and size of proposed dwelling units, if any;

    (J)    Location and number of proposed parking/loading spaces and access ways;

    (K)    Identification and location of all existing and proposed utilities whether public or private; and/or

    (L)    Location and square footage of existing and proposed signs by type and class.

**40-9-5**    **FEE, DURATION OF CERTIFICATE.** Every applicant for a Temporary Certificates of Zoning Compliance shall pay a filing fee in accordance with the permit fee schedule below. **Temporary Certificates of Zoning Compliance** shall be valid for **one (1) year**. The Zoning Administrator may renew such temporary certificates for successive **one (1) year** periods upon request in writing for an additional fee per the permit fee schedule.

*Carlinville City Code*                     Zoning Code 40-9-5

## PERMIT FEE SCHEDULE

| Type of Permit | Cost |
|---|---|
| Fence/Maintenance/Repair/Roof | $20.00 |
| Deck/Sheds/Playhouses (max 150 sq. ft.) | $30.00 |
| Garage/Carport/Addition | $50.00 |
| Residential New Construction | $100.00 |
| Neighborhood Commercial New Construction | $150.00 |
| General Commercial New Construction | $250.00 |
| Mobile Homes and Mobile Home Parks | $50.00 each |
| Pools-Permanent with Fence | $50.00 |
| Public Hearing | $50.00 plus cost of publication |
| Signs | $10.00 per face for 15 sf or under |
| | $25.00 per face for 17 to 99 sf |
| | $100.00 per face for over 99 sf |
| Special Use Permit (40-8-1) | $50.00 plus cost of publication |
| Variance (if denied) | Refund of permit fee minus $20.00 |
| Vending Machine | $25.00 annual new & existing on City property |
| Reapp. For Projects +1 yr (construction started) | $20.00 minimum or half cost of original permit |
| Reapp. For Projects +1 yr (no construction started) | Same fee as original applicaiton |

   **40-9-6   PERMANENT CERTIFICATES OF ZONING COMPLIANCE.**   No
lot or structure or part thereof that has been created, developed, erected, enlarged,
altered, relocated, or reconstructed after the effective date of this Code shall be used or
occupied until a **Permanent Certificate of Zoning Compliance** has been issued. The
Zoning Administrator shall issue no **Permanent Certificate of Zoning Compliance**
unless he determines, by inspection, that:
   (A)       The development or construction of such lot or structure has been
completed in accordance with plans approved at the time the **Temporary Certificate of
Zoning Compliance** was issued; and
   (B)       The lot or structure as completed, and the proposed use thereof,
conforms to all applicable provisions of this Code.
   **Permanent Certificates of Zoning Compliance** shall be issued free of charge.
Failure to obtain a **Permanent Certificate of Zoning Compliance** shall constitute a
violation of this Code.

   **40-9-7   PROCEDURES FOR VIOLATION.**   Whenever the   Zoning
Administrator determines, by inspection or by other means, that reasonable grounds exist

## *Carlinville City Code*

for believing that any lot, structure, or use is in violation of this Code, he shall so notify the responsible party in writing, and shall institute appropriate measures to secure compliance.

**40-9-8    CORRECTIVE ACTION ORDER.**    To secure compliance with this Code, the Zoning Administrator may issue a corrective action order. Such order shall be deemed properly served upon the owner, occupant, or operator of the offending lot, structure, or use if it is served upon such party personally, sent by registered mail to his last known address, or posted in a conspicuous place on or about the affected premises. Corrective action orders shall include:

| | |
|---|---|
| (A) | A description of the premises sufficient for identification; |
| (B) | A statement of what constitutes the violation; |
| (C) | An outline of the remedial action necessary to effect compliance; |
| (D) | The date by which the violation must be corrected; |
| (E) | The date by which any appeal of the correction order must be filed, and a statement of the procedure for so filing; |
| (F) | A statement that failure to abide by a corrective action order constitutes a separate violation of this Code; and |
| (G) | A statement of the penalties attached to any violation of this Code. |

**40-9-9    STOP WORK ORDER.**    Whenever any land, structure, or use is being developed, erected, or established contrary to plans approved at the time the **Temporary Certificate of Zoning Compliance** was issued, the Zoning Administrator may order that such work be stopped immediately. The Zoning Administrator stop-work order may be served on any person engaged in or responsible for such work, or may be posted in a conspicuous place on or about the affected premises. Failure to abide by a stop-work order shall be deemed a separate violation of this Code.

**40-9-10    EMERGENCY MEASURES.**    Notwithstanding any other provisions of this Code, whenever the Zoning Administrator determines that any violation of this Code poses an imminent peril to life or property, he may institute, without notice or hearing, any necessary proceedings to alleviate the perilous condition. The Zoning Administrator shall take no such action until he has consulted with the City Attorney.

**40-9-11    COMPLAINTS.**    Whenever any violation of this Code occurs, or is alleged to have occurred, any person may file a written complaint on forms provided by the Zoning Administrator. The Zoning Administrator shall record such complaints, immediately investigate, and if necessary, institute appropriate corrective measures.

## Carlinville City Code

40-9-12    **PENALTIES FOR VIOLATION.**

(A)    Failure to comply with any provision of this Code shall constitute a misdemeanor, and each day that such violation continues shall be considered a separate offense.

(B)    Any person who is convicted of a violation of this Code may be fined up to **Five Hundred Dollars ($500.00).**

(C)    Nothing contained in this Section shall prevent this Municipality from taking any other lawful action that may be necessary to secure compliance with this Code.

*Carlinville City Code*

## ARTICLE X

### SPECIAL USES AND AMENDMENTS

**40-10-1    SPECIAL USE PERMITS.** This Code divides this Municipality into various districts and permits in each district only those uses which are clearly compatible with one another. Certain other uses, because of their special operation or physical characteristics, may or may not have a detrimental impact on nearby permitted use, depending upon their precise location, manner of operation, and other factors. Such "special uses" require careful case-by-case review and may be allowed only by a favorable majority vote of all aldermen then holding office after a hearing conducted by the Planning Commission as provided herein. In the event any proposed special use fails to receive the approval of the Planning Commission after the hearing, then the proposed special use shall not be approved by the corporate authorities except by a favorable **two-thirds (2/3) vote** of all aldermen then holding office.

**40-10-2    APPLICANT.** Every applicant for a special use permit shall submit to the Zoning Administrator, in narrative or graphic form, any or all of the items of information enumerated in **Section 40-9-4** that he may require. When the application is complete, the Zoning Administrator shall forward it, together with his recommendation, to the Planning Commission for further consideration.

**40-10-3    HEARING.** The Planning Commission shall hold a public hearing on any application for a special use permit not later than **sixty (60) days** after its filing. At the hearing any interested party may appear and testify, either in person or by duly authorized agent or attorney.

**40-10-4    NOTICE.** Notice of the public hearing shall be given not more than **thirty (30)** nor less than **fifteen (15) days** before the hearing by publication in a newspaper published within the Municipality and by first class mail to the applicant for the variance. The notice to be published shall indicate the time, date and place of the hearing and the location of the property and the nature of the proposed variance.

**40-10-5    FACTORS CONSIDERED.** In making their decision the Planning Commission shall consider the following factors:

(A)        Whether the proposed design, location, and manner of operation of the proposed special use is protective of the public health, safety and welfare;

(B)        The effect the proposal would have on the value of neighboring property;

# Carlinville City Code

(C)    The effect the proposal would have on this Municipality's overall tax base;

(D)    The effect the proposal would have on public utilities and on traffic circulation on nearby streets; and

(E)    Whether there are any facilities nearby that require special protection.

**40-10-6    RECOMMENDATION    BY    PLANNING    COMMISSION, STANDARDS.**    After the holding of a hearing as provided herein, the Planning Commission shall make a recommendation to the City Council to grant or to deny a proposed special use permit.    Thereafter the City Council shall act on the request for a special use permit at a regularly scheduled meeting. Any proposed special use which fails to receive the approval or a favorable recommendation from the Planning Commission shall not be approved by the corporate authorities except by a favorable **two-thirds (2/3) vote** of all aldermen then holding office.

**40-10-7    TEMPORARY USE PERMITS.**    As set forth in **Section 40-3-7**, requests for temporary use permits shall be treated in the same manner as requests for special use permits.    The City Council shall issue no temporary use permit for a period longer than **one (1) year**, but may renew any such permit as they see fit.

**40-10-8    AMENDMENTS.**    In accordance with Illinois law and the provisions of this Section, the City Council may amend the regulations imposed and the districts established in this Code.    Any proposed alteration of district boundaries or proposed change in the status of any use—whether permitted, special, or prohibited—shall be treated as a proposed amendment and dealt with accordingly.    Amendments may be proposed by the City Council, the Zoning Administrator, Planning Commission, or any party of interest.

**40-10-9    FILING.**    Any proposal to amend this Code shall be filed on a prescribed form with the Zoning Administrator who shall forward it, together with his recommendation, to the Planning Commission.

**40-10-10    HEARING.**    The Planning Commission shall hold a public hearing on every amendment proposal not later than **sixty (60) days** after its filing.    At the hearing any interested party may appear and testify, either in person or by duly authorized agent or attorney.

*Carlinville City Code*                    Zoning Code 40-10-11

**40-10-11    NOTICE.** Notice of the public hearing shall be given not more than thirty (30) nor less than **fifteen (15) days** before the hearing by publishing a notice thereof at least once in **one (1)** or more newspapers published in the Municipality. This notice shall indicate the time, date and place of the hearing and the location and the nature of the proposed amendment.

**40-10-12    ADVISORY REPORT/FINDINGS OF FACT.** No later than **ten (10) days** after the public hearing the Planning Commission shall submit their advisory report/findings of fact to the City Council. The Planning Commission shall not recommend the adoption of any amendment unless they find that such amendment is in the public interest and not merely for the benefit of the party proposing it. Where the effect of a proposed amendment is to alter district boundaries or to change the status (permitted, special, or prohibited) of any use, the Planning Commission shall make findings regarding all of the following matters:

    (A)          Existing uses of property in the vicinity of the property in question;

    (B)          The district classification of property in the vicinity of the property in question;

    (C)          The suitability of the property in question for uses already permitted under the existing district classification;

    (D)          The trend of development in the vicinity of property in question, including changes (if any) which may have taken place since that property was placed in its present district classification.

**40-10-13    DECISION BY CITY COUNCIL.** The City Council may act on every proposed amendment at its next regularly scheduled or any other regularly scheduled meeting following submission of the Planning Commission's advisory report. Except as provided in **Section 40-10-14**, the City Council, without further public hearing, may vote upon any proposed amendment or may refer it back to the Planning Commission for further consideration.

**40-10-14    WHEN TWO-THIRDS (2/3) VOTE IS REQUIRED.** The favorable vote of **two-thirds (2/3)** of the aldermen then holding office shall be required to pass an amendment to this Code when the amendment is opposed in writing by the owners of **twenty percent (20%)** of the frontage proposed to be altered, or by the owners of **twenty percent (20%)** of the frontage immediately adjoining or across any alley therefrom, or by the owners of **twenty percent (20%)** of the frontage directly opposite the frontage proposed to be altered as evidenced by a written protest signed by the required **twenty percent (20%)** and filed with the City Clerk.

*Carlinville City Code*

**40-10-15    NOTICE TO APPLICANT OF WRITTEN PROTEST.** In cases of written opposition to an amendment of this Code as prescribed in **Section 40-10-14**, a copy of the written protest shall be served by the protester or protesters on the applicant for the proposed amendment and a copy upon the applicant's attorney, if any, by certified mail at the address of such applicant and attorney shown in the application for the proposed amendment.

*Carlinville City Code*

## ARTICLE XI

## PLANNING COMMISSION AND VARIANCES

**40-11-1    PLANNING COMMISSION ESTABLISHED.**    The Planning Commission established in **Chapter 4** of the Revised Code of Ordinances of the City of Carlinville is hereby authorized to and shall perform the following duties:

(A)            to hear appeals from any zoning-related decision or order made by the Zoning Administrator;

(B)            to hear upon requests for lot-size/bulk variances in accordance with the standards established in this Code; and

(C)            to perform such other duties as the City Council may prescribe.

All meetings of the Planning Commission shall be held at the call of the Chairman and at such times as the Commission may determine. All Commission meetings shall be open to the public. The Commission may adopt their own rules of meeting procedures so long as they do not conflict with this Code or the applicable Illinois Statutes. The Chairman, or in his absence the Acting Chairman, may administer oath and compel the attendance of witnesses. **Four (4) members** of the Commission shall constitute a quorum and the affirmative vote of at least **four (4) members** shall be necessary to authorize any Commission actions.

The Commission shall keep minutes of its proceedings and examinations. These minutes shall indicate the absence of any member, vote or abstention of each member on each question, and any official action taken. A copy of every rule, variance, order or decision of the Commission shall be filed immediately in the City Clerk's office and shall be a public record.

**40-11-2    APPEALS.**   Any person aggrieved by any decision or order of the Zoning Administrator in any matter related to the interpretation or enforcement of any provision of this Code may appeal to the Planning Commission on a prescribed form. Every such appeal shall be made and treated in accordance with Illinois law and the provisions of this Section.

**40-11-3    FILING, RECORD TRANSMITTAL.**   Every appeal shall be made within **forty-five (45) days** of the matter complained of by filing with the Zoning Administrator and the Commission a written notice specifying the grounds for appeal. Not more than **five (5) working days** after the notice of appeal has been filed, the Zoning Administrator shall transmit to the Commission all records pertinent to the case.

**40-11-4    STAY OF FURTHER PROCEEDINGS.**   An appeal stays all further action on the matter being appealed unless the Zoning Administrator certifies to the

# *Carlinville City Code*

Commission, after the notice of appeal has been filed with him, that for reasons stated in the certificate a stay would cause imminent peril to life or property. In such case, further action shall not be stayed unless the Commission or the Circuit Court grants a restraining order for due cause, and so notifies the Zoning Administrator.

**40-11-5    HEARING.** The Commission shall hold a public hearing on every appeal not later than **sixty (60) days** after the filing of the appeal notice. At the hearing any interested party may appear and testify, either in person or by duly authorized agent or attorney.

**40-11-6    NOTICE.** Notice of the hearing shall be given not more than **thirty (30) days** nor less than **fifteen (15) days** before the hearing:
    (A)        By first class mail to the person making the appeal and to the last known owner or owners of property adjoining the premises in question; and
    (B)        By publication in a newspaper published within this Municipality.
    This notice shall indicate the time, date and place of the hearing, the location of the property and the nature of the issue involved.

**40-11-7    DECISION BY THE PLANNING COMMISSION.** The Commission shall be required to decide all appeals within **thirty (30) days** after the final hearing thereon. A certified copy of the Commission's decision shall be transmitted to the applicant or appellant and to the Zoning Administrator. Such decision shall be binding upon the Zoning Administrator and observed by him and he shall be required to incorporate the terms and conditions of the same in the Zoning Certificate to the applicant or appellant whenever a Certificate is authorized by the Commission.

**40-11-8    LOT SIZE/BULK VARIANCE.** A "lot size/bulk variance" means a relaxation of the strict application of the lot and/or bulk requirements applicable to a particular lot or structure.

**40-11-9    APPLICATION.** Every application for a lot size/bulk variance shall be filed with the Zoning Administrator on a prescribed form. The application shall contain sufficient information to allow the Commission to make an informed decision.

**40-11-10    HEARING.** The Commission shall hold a public hearing on any variance application not later than **sixty (60) days** after its filing. At the hearing any interested party may appear and testify, either in person or by duly authorized agent or attorney.

## *Carlinville City Code*      Zoning Code 40-11-11

**40-11-11   NOTICE.** Notice of the public hearing shall be given not more than thirty **(30)** nor less than **fifteen (15) days** before the hearing;

   (A)        By first class mail to the applicant and to every owner of property adjacent to the premises for which the variance is requested; and

   (B)        By publication in a newspaper published within this Municipality.

    The notice shall indicate the time, date and place of the hearing, the particular location for which the variance is requested, and the nature of the proposed variance.

**40-11-12   STANDARDS FOR VARIANCES.** The Commission shall not recommend, nor shall the City Council grant, any lot size/bulk variance unless they find that the proposed variance is consistent with the general purposes of this Code, and that the strict application of the district requirements would result in great practical difficulties or hardship to the applicant. More specifically, the Commission shall not recommend, nor shall the City Council decide upon, a variance unless they determine, based upon the evidence presented to them, that:

   (A)        The property in question cannot yield a reasonable return if the district regulations are strictly applied; and

   (B)        The plight of the applicant is due to peculiar circumstances not of his own making; and

   (C)        The variance, if granted, will not be detrimental to the public health, safety, and welfare.

**40-11-13   RECOMMENDATION BY PLANNING COMMISSION.** After the holding of a hearing as provided herein the Planning Commission shall make a recommendation to the City Council to grant or to deny a proposed variance. Thereafter the corporate authorities at a regularly scheduled City Council meeting may act on any proposed variation or may refer it back to the Planning Commission for further consideration. Any proposed variation which fails to receive the recommendation of the Planning Commission shall not be passed by the corporate authorities except by the favorable vote of **two-thirds (2/3)** of all aldermen of the Municipality. A certified copy of the City Council's decision shall be transmitted to the applicant and to the Zoning Administrator. Such decision shall be binding upon the Zoning Administrator and observed by him and he shall be required to incorporate the terms and conditions of the same in the Zoning Certificate to the applicant or appellant whenever a Certificate is authorized by the Commission. The City Council shall specify the terms of relief granted (if any) in one statement and their findings of fact in another statement. The findings of fact shall clearly indicate the Council's reasons for granting or denying any requested variance.

## Carlinville City Code

**40-11-14** <u>UNAUTHORIZED VARIANCES (USE VARIANCE).</u>  Under no circumstances shall the Planning Commission grant a variance to allow any use that is specifically or by implication prohibited in the district involved.  A "use variance" constitutes an amendment to this Code and may be obtained only in the manner set forth in **Section 40-10-8**.  Any previously approved "use variance" shall become void upon the discontinuance of the use.

**40-11-15** <u>FILING FEES.</u>  By resolution, the City Council shall establish (and may periodically amend) a schedule of filing fees for the various permits and procedures listed in this Code.  Said fees are intended to defray the administrative costs connected with the processing/conducting of such permits or procedures; the fees do not constitute a tax or revenue-raising device.  All such fees shall be paid by the applicant to the City and are non-refundable.  A current schedule of filing fees shall be maintained in the Zoning Administrator's office and on file with the City Clerk.

**(Ord. No. 1524; 04-03-06)**

CITY OF CARLINVILLE, ILLINOIS

SCHEDULE 40-3-19: PERMITTED USES AND ACCESSORY USES, SPECIAL USES

| Zoning District | Permitted Principal Uses and Accessory Uses | Special Uses |
|---|---|---|
| A Agriculture | Agriculture Uses<br>Single Family Dwellings<br>Non-Commercial Recreational Uses<br>Non-Commercial Clubs and Lodges | Commercial Recreational Uses<br>Extraction of Minerals<br>Cemeteries |
| S-1 & S-2 Single Family Residence | Single Family Dwellings<br>Modulars (Sectional Houses) | Two-Family Dwellings<br>Public Utility Buildings<br>Licensed Day Care |
| MH Mobile Home Residence | Mobile Homes - Single & Double-Wide | None |
| MF Multi-Family Residence | Two-Family Dwellings<br>Multiple Family Dwellings<br>Boarding Houses | Public Utility Buildings |
| C-1 Neighborhood Commercial | Retail and Service Uses<br>Day Care Center<br>Auditoriums<br>Storage Facilities<br>Eating and Drinking Places | Filling Station<br>Office Uses<br>Mini-Warehouses<br>Funeral Homes<br>Public Utility Buildings | Multiple-Family Residence |
| C-2 General Commercial | Motor Vehicle Services<br>Hotels | Junk Yards |
| G Government | City, County, State and Federal Properties<br>Any permitted uses in the "C-1" District | Neighborhood Commercial |
| R Rehabilitation, Religion, Education | Hospitals<br>Schools<br>Rehabilitation Facilities<br>Community Residences<br>Auditoriums | Churches<br>Extended Care<br>Nursing Homes<br>Assisted Living Facilities | Neighborhood Commercial |
| P City Park | Playgrounds<br>Walk Trails<br>Recreational Uses | Skate Parks<br>Sporting Fields | Recreational Vehicle (RV) Park |
| I Industrial | Manufacturing<br>Junk Yards<br>Public Utility Buildings<br>Wholesale Business Laboratories | Truck or Freight Terminals<br>Warehousing<br>Landfills<br>Airports and Support Services | Commercial Uses |

EXHIBIT

1



## GIFFIN, WINNING, COHEN & BODEWES, P.C.

ATTORNEYS AT LAW

SUITE 600 · MYERS BUILDING
ONE WEST OLD STATE CAPITOL PLAZA
SPRINGFIELD, ILLINOIS 62701

TELEPHONE 217.525.1571
Fax 217.525.1710
www.giffinwinning.com

David O. Edwards
WRITER'S E-MAIL
davidoedwards@giffinwinning.com

HERMAN G. BODEWES
JOHN L. SWARTZ
R. MARK MIFFLIN
DAVID A. HERMAN
MICHAEL J. MANNION
DAVID O. EDWARDS
CREIGHTON R. CASTLE
CAROLYN TAFT GROSBOLL
PAULETTE F. DOVE

PHILIP C. KAUPMANN
CHRISTOPHER E. SHERER
AMANDA M. LUNDEEN
COLIN M. HALEY

JAMES M. WINNING
ROBERT S. COHEN
RONALD W. PERIARD
OF COUNSEL

January 4, 2008

William S. Hebron
Hebron & Hebron
516 N. Side Square
Carlinville, IL 62626

RE: Carlinville Southern Baptist Church

Dear Mr. Hebron:

I write to follow up on our recent meeting regarding the Carlinville Southern Baptist Church's ("CSBC") application for rezoning of the old Wal-Mart property for use as a new church facility. I appreciate your help in arranging our December 13th meeting with the key city officials involved in the zoning process and was happy to meet with everyone involved to open the lines of communication as we begin the rezoning process. I want to again emphasize to you that I have been retained by CSBC to help facilitate their interaction with the City and protect their interests throughout this process. It is important to me and to CSBC that we make clear to all involved that CSBC is absolutely committed to moving its church operations into the old Wal-Mart building. CSBC feels that obtaining and using this particular building is central to their mission and their growth and CSBC will pursue their vision for that growth to the fullest extent necessary.

As we stated during our meeting, the CSBC's leaders have perceived some resistance to the possibility of their obtaining and using the old Wal-Mart building and came to us with concern that this resistance might lead the City to refuse them rezoning. Because they are committed to moving into that particular property, they have asked us to and we have explored possible courses of action should rezoning of the property be denied.

To that end we have examined the City of Carlinville's zoning ordinance as it relates to religious uses and have determined that there are some avenues through which CSBC may challenge a denial of rezoning. While we stress that CSBC wishes to maintain a positive relationship with the City, CSBC is prepared to challenge an improper denial in federal court if necessary. In the interest of open communication and to demonstrate CSBC's commitment to maintaining a good relationship with the City, we wish, by this letter, to share with you some of



EXHIBIT
8



## STATE CAPITAL
GLOBAL LAW FIRM GROUP

Member firms of the State Capital Global Law Firm Group practice independently and not in a relationship for the joint practice of law.

Hebron
January 4, 2008
Page 2

our thoughts about the City's treatment of religious uses under its zoning ordinances in conjunction with the requirements Religious Land Use and Institutionalized Persons Act.

The Religious Land Use and Institutionalized Persons Act is a federal statute which limits the City's ability to impose restrictions on land use that would interfere with or discriminate against religious uses or particular religious denominations. RLUIPA prohibits multiple types of land use regulations and actions by local governments. In particular, RLUIPA prohibits actions that (1) impose a substantial burden on the religious exercise of a religious assembly or institution, (2) treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, (3) discriminates against any assembly or institution on the basis of religion or religious denomination, or (4) excludes or unreasonably limits religious assemblies, institutions or structures within a jurisdiction. 42 U.S.C. § 2000cc. In order for the substantial burden provision to apply, one of three jurisdictional requirements must be satisfied. Either the burden must be imposed in a program or activity receiving federal funding, the burden must affect foreign or interstate commerce, or the burden must be imposed through implementation of a land use regulation or system under which a government makes or may make individualized assessments of the proposed uses for the property in question. 42 U.S.C. § 2000cc(a)(2). Further, RLUIPA states that it is to be "construed in favor of a broad protection of religious exercise." 42 U.S.C. §2000cc-3(g).

RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and explains that the term specifically includes the "use, building or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7). Further, the statute explains that a land use regulation includes "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership . . . interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5). Thus, it is clear that, CSBC's contract for purchase of the Wal-Mart building for use as a new church to accommodate its growing congregation gives rise to the protections of RLUIPA.

We want to first point out that the Seventh Circuit has recently ruled on a very similar challenge to a zoning ordinance in Indianapolis. *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 212 (7th Cir. 2007). In that case, a church challenged a zoning ordinance that prohibited religious uses in commercial districts and only allowed such uses within one district of the City. The church argued that the regulation violated RLUIPA by "impos[ing] . . . a land use regulation in a manner that . . . treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." In that case, a district judge ruled that the church was unlikely to succeed on its claim of unequal treatment under RLUIPA because religious use was defined as including residential use as an accessory use, while the other similar uses allowed in the district did not include such accessory use. The Seventh Circuit disagreed and found that the Plaintiff's discrimination claim had merit.

We hold that the zoning scheme as enacted and enforced by the City of Carlinville, violates RLUIPA in that it imposes a substantial burden upon the religious exercise of CSBC and other religious institutions and it treats religious and nonreligious assemblies and institutions on

Hebron
January 4, 2008
Page 3

unequal terms. We also believe that the zoning ordinance and map constitute an unreasonable limit on religious assemblies and institutions.

The City's zoning ordinance establishes a separate district classification for Rehabilitation, Religious and Educational uses and churches are permitted only on parcels with this designation. However, very few areas within the City have been given this particular zoning designation. As a result, any time a church wishes to establish a new location not already used as a church, school or rehabilitative facility, the church will be required to apply for rezoning of the property in question. The rezoning process requires City officials to examine the proposed use of the property as the site of a religious assembly or institution and, therefore, clearly requires individualized assessment of the use of the property, thus, bringing the system under Section 2000cc(a) of RLUIPA. Further, as stated above, religious exercise expressly includes use of real property for the purpose of religious exercise "whether or not compelled by or central to" the particular belief system of the institution in question. Denial of CSBC's rezoning application would prevent the church from moving into a facility with the characteristics it needs to accommodate its growing congregation, provide needed services to its members and fulfill its evangelical mission. If CSBC's application for rezoning is denied, the City will have violated RLUIPA by implementing a land use regulation in a way that imposes a substantial burden on CSBC's religious exercise.

Further, the current zoning classification scheme, both on its face and in its application, treats religious assemblies and institutions on unequal terms with similar non-religious assemblies and institutions. Religious assemblies and institutions are permitted only within the R district described above. Also permitted within that district are hospitals, schools, extended care, rehabilitation facilities, nursing homes, community residences, assisted living facilities and auditoriums. Permitted uses within the C-1 District, in which the property CSBC has contracted to purchase lies, include retail and services uses, filling stations, daycare, office uses, auditoriums, mini-warehouses, storage facilities, funeral homes, eating and drinking establishments, public utility buildings. The C-2 General Commercial district also incorporates all of these uses and, in addition, permits hotels and motor vehicle services. Further, uses such as non-commercial clubs and lodges are permitted within the Agricultural district. On its face, the ordinance treats religious assemblies differently from nonreligious assemblies by allowing similar types of nonreligious assemblies to locate within the C-1 and C-2 districts.

Uses such as auditoriums and funeral homes are similar in nature to the church proposed by CSBC. These uses serve as gathering places where people come together for a purpose, whether it be to watch or participate in some performance or presentation, celebrate life events, or to honor and remember those who have departed. Further, although funeral homes and auditoriums can be commercial, for-profit enterprises, the zoning ordinance does not require that they be so in order to be permitted within the C-1 and C-2 districts. Other uses permitted in the district, including offices and day care centers provide services similar to those CSBC will provide to its members and staff. Again, while offices and day care centers may be operated as for-profit enterprises, it is equally likely that nonprofit entities will occupy and operate such spaces within the Commercial district. Because the zoning designations established by the City allow for other assemblies and institutions to locate within the Commercial districts, while prohibiting similarly situated churches from doing so, the ordinance on its face violates the equal terms requirement of RLUIPA.

Further, in practice the City has implemented the zoning classification system in a way that treats religious assemblies and institutions on less than equal terms with nonreligious assemblies and institutions. Although non-commercial clubs and lodges are permitted under the ordinance only in Agricultural districts, a review of the zoning map reveals that numerous such private clubs are located within commercial districts, including the Moose lodge, Elks lodge, Knights of Columbus Hall and Masonic Lodge. These entities cannot be meaningfully distinguished from the CSBC as assemblies or institutions. These are non-profit entities that use the properties in question to gather for a common purpose. Simply because that purpose is secular rather than religious does not give the City authority to give these institutions preferential treatment. Allowing the location of such entities within commercial districts without granting the same rights to churches constitutes failure to treat religious and nonreligious assemblies and institutions on equal terms, and therefore constitutes a violation of RLUIPA.

The City's zoning classification system unreasonably limits religious assemblies and institutions within the City. The City allows for religious uses only in one district and has zoned very few parcels within the City under that particular designation. This system prevents a church from locating or relocating anywhere within the City without seeking amendment of the zoning ordinance. Further, none of the parcels zoned for religious use are available or appropriate for the use needed by CSBC. Religious institutions share characteristics with many of the permitted uses allowed within other districts of the City and their exclusion from those districts and limitation to a case-by case determination as to where they can locate constitutes an unreasonable limitation on their ability to locate and exercise within the City of Carlinville.

In addition to the RLUIPA provisions at issue, certain constitutional protections may also be at issue if CSBC's rezoning is denied. Like the equal terms provision of RLUIPA, the Equal Protection Clause of the Fourteenth Amendment to the Constitution requires that religious uses be treated equally with nonreligious uses and that different religious denominations be treated equally. Further, the Free Exercise Clause of the First Amendment prohibits a governmental entity from imposing regulations that burden an individual or institution's free exercise of religion.

We hope that we can resolve all of the City's concerns about CSBC's use of the old Wal-Mart property through amicable communication and that we need not pursue any action outside of the City's rezoning process. We want the City to know, above all, that CSBC considers itself a member of the Carlinville community and is seeking to do what it thinks is best for that community. CSBC will work with the City to ensure that CSBC's use of the old Wal-Mart building will provide the greatest benefit possible to the City of Carlinville. If there are specific accommodations to the site or the structures that would alleviate some of the City's concerns, we would be happy to hear about them and try to work with the City to reach an agreement about this property. However, CSBC has already contracted to purchase the building and obtained the financing necessary to proceed with that purchase and is both legally and morally obligated to follow through on that commitment.

Further, we wish to again note that there are certain restrictions within the sales contract, standard in contracts for the sale of Wal-Mart properties, which narrowly limit the types of uses that can be made of a former Wal-Mart store. Although the contract terms are confidential, and

Hebron
January 4, 2008
Page 5

therefore CSBC is not free to share the details of those restrictions with the City, the limitations make it very likely that the building could remain vacant for a substantial period of time. This reality should certainly be a factor the City weighs in considering whether to rezone the property to allow CSBC's use of the old Wal-Mart building as a church.

We hope that the information we have provided will be helpful to you as you advise the City Council and the Planning Commission in preparation for the upcoming Planning Commission meeting and both entities' consideration of CSBC's application for rezoning. We look forward to seeing you again at the Planning Commission meeting on January 16. If you have any questions about the information in this letter or the application for rezoning, please feel free to call me at (217) 525-1571.

Very truly yours,
GIFFIN, WINNING, COHEN
& BODEWES, P.C.

David O. Edwards

DOE/sjg
Cc: Tim Rhodus

Schedule 40-3:19

# CITY OF CARLINVILLE, ILLINOIS
## SCHEDULE: PERMITTED USES AND ACCESSORY USES, SPECIAL USES

| ZONING DISTRICT | PERMITTED USES AND ACCESSORY USES | SPECIAL USES |
|---|---|---|
| A AGRICULTURE | AGRICULTURE USES, SINGLE FAMILY DWELLINGS NON-COMMERCIAL RECREATIONAL USES NON-COMMERCIAL CLUBS AND LODGES | COMMERCIAL USES, GENERAL RECREATIONAL USES EXTRACTION OF MINERALS, CEMETERIES ANYTHING IN "R" DISTRICT |
| S-1 & S-2 SINGLE FAMILY RESIDENCE | SINGLE FAMILY DWELLINGS MODULARS (SECTIONAL HOUSES) | TWO-FAMILY DWELLINGS PUBLIC UTILITY BUILDINGS LICENSED DAY CARE |
| M.H. MOBILE HOME RESIDENCE | MOBILE HOMES-SINGLE & DOUBLE WIDE | NONE |
| M.F. MULTI-FAMILY RESIDENCE | TWO-FAMILY DWELLINGS MULTIPLE FAMILY DWELLINGS BOARDING HOUSES | PUBLIC UTILITY BUILDINGS |
| C-1 NEIGHBORHOOD COMMERCIAL | RETAIL AND SERVICE USES, FILLING STATION, DAY CARE CENTER OFFICE USES, MINI-WAREHOUSES, STORAGE FACILITIES FUNERAL HOMES, EATING AND DRINKING PLACES, PUBLIC UTILITY BUILDINGS MOTOR VEHICLE SERVICES | NON-COMMERCIAL CLUBS & LODGES AUDITORIUMS MULTIPLE FAMILY RESIDENCE |
| C-2 GENERAL COMMERCIAL | HOTELS ANY PERMITTED USES IN THE "C-1" DISTRICT | NONE |
| G GOVERNMENT | CITY, COUNTY, STATE AND FEDERAL PROPERTIES | NEIGHBORHOOD COMMERCIAL |
| R REHABILITATION, RELIGION EDUCATION | HOSPITALS, CHURCHES, SHOOLS, EXTENDED CARE, REHABILITATION FACILITIES, NURSING HOMES, COMMUNITY RESIDENCES, ASSISTED LIVING FACILITIES AND AUDITORIUMS | NEIGHBORHOOD COMMERCIAL MULTI-FAMILY |
| P CITY PARK | PLAYGROUNDS, SKATE PARKS, WALK TRAILS SPORTING FIELDS, RECREATIONAL USES | RECREATIONAL VEHICLE (RV) PARK |
| I INDUSTRIAL | MANUFACTURING, TRUCK OR FREIGHT TERMINALS, WAREHOUSING, PUBLIC UTILITY BUILDINGS,WHOLESALE BUSINESS, LABORATORIES, AIRPORTS & SUPPORT SERVICES | COMMERCIAL USES |

EXHIBIT
9

ROBERT SCHWAB
*Mayor*

RAYMOND RHOADS
*Treasurer*

WILL HEBRON
*City Attorney*

MARY BETH BELLM
*Director of Public Works*

# CITY OF CARLINVILLE

550 North Broad
Carlinville, Illinois 62626
[217] 854-4076
Fax [217] 854-4398



*ALDERMEN*
ROBERT ALBERTINE
ELAINE BROCKMEIER
DON DAUGHERTY
JOE DIRESO
LEA HUDSON
JOHN MALIN
BRIAN MITCHELL
RANDY OBER
NORMAN SEMROCK
DAVID STEINER

February 20, 2008

Southern Baptist Church
Attention: Mr. Scott Rhoads
610 Harrington St.
Carlinville, IL 62626

Re: Old Wal-Mart Store

Dear Scott:

The City of Carlinville wants to preserve the old Wal-Mart store as a commercial site. The City Council has directed me to contact you to inquire if Southern Baptist Church would be willing to sell the site to the City.

If Southern Baptist Church is interested in selling the site to the City, please contact me so we can discuss it.

I await your reply.

Very truly yours,

CITY OF CARLINVILLE

Robert Schwab
Mayor

**EXHIBIT**
tabbies
10

# City seeks to block church from taking over old Wal-Mart

By TOM BOTT
March 4, 2008 - 3:47PM
CARLINVILLE — The city will file an injunction against the Carlinville Southern Baptist Church to prevent it from opening a religious center in the old Wal-Mart building.

The Carlinville Southern Baptist Church is proceeding with plans to turn the commercial building into a religious facility, even though the city has rejected attempts to rezone the property for religious use. The church recently refused an offer by the city to buy the building; now, both sides are relying on attorneys to settle the dispute.

Aldermen placed a letter (dated Feb. 28) from the church's attorney, David Edwards with the legal firm of Giffin, Winning, Cohen and Bodewes, on file Monday. The letter to the city treasurer advises the city that the church will apply for property tax-exempt status with the Macoupin County supervisor of assessments.

Zoning Administrator Beth Toon asked that the city be placed on file as an "intervenor," meaning the city objects to granting the property tax-exempt status, because it is still zoned "neighborhood commercial."

"We will oppose that, also," Carlinville Mayor Robert Schwab said. "We are contacting the county, asking that they keep us informed. Zoning has said that we do not want a church there."

Schwab was sent as a delegate from the city last month to negotiate an offer to purchase the store, located at 1030 W. Main St., back from the church. The Carlinville City Council received a letter in response, stating the Southern Baptist Church would not sell the property to the city. Schwab said the city would like to keep the site as a retail business in order to provide property and sales tax revenue. In the future, all correspondence with the church will be through the city's attorney.

The city is filing an injunction against the church to keep it from proceeding with plans to renovate the interior of the building. The city learned that bid requests to renovate the interior have been sent out by the church to contractors around the country. The church also has put up a banner on the building declaring it a church without securing a permit to hang the sign, in violation of the city's zoning code. The city hopes to stop the construction project before the church spends any more money on the project.

"The council instructed the attorney to file an injunction to stop them from building a church there, basically," Schwab said Tuesday. "There is no need for them to spend a whole lot of money and find out that they can't use the property like they want to."

Schwab pointed out that the building is the only one in the retail district with more than 50,000 square feet of space. City officials hope a store can be located at the site to provide tax money not only to the city but to local schools and the county. Rezoning the property from C-1 commercial to R, religious use, also could mean a loss of jobs, Schwab warned.

"That property is six acres. We're limited on the amount of commercial property that is available in the retail district," the mayor said. "I checked a couple of years ago, and the

**EXHIBIT**

11

property brought in $38,000 in property taxes. The city would end up with about 22 percent. That's money the schools and the county would also lose. Besides, we're losing a lot of jobs out there. We have to do something to keep the retail business viable in this town."

The Carlinville Zoning Commission denied the church's request to rezone the property on Jan. 16, and the church appealed the decision to the City Council. On Feb. 4, the council denied the church's appeal.

In other business Monday, the chairman of the council's Public Lands Committee, Dave Steiner, will contact Lake Williamson to find out whether it is willing to take over Carlinville Lake Road. Monterey Coal Co. has offered to deed its road (near Lake Road) to the city. Because the city does not want to maintain two roads in the same area, it has offered to deed Lake Road to Lake Williamson.

Carlinville Regional Chamber of Commerce Minutes
March 13, 2008

Present: Suzanne Boston, Alyssa Gibbel, Connie LeVora, Katie Ashworth, Rosalind Bloome, Justin Enrietta, Jessica Barton

Absent: Joyce Atteberry, Suzanne Boston, Pat Callahan, Steve Evans, Tracy Koster, Deborah Starr, Kelly Taylor, Lea Hudson,

Introductions
- Board introduced themselves
- Jason from Benjamin Franklin Pluming
- Scott Behn & Randy Williams from Frontier Communications
- Mayor Bob Schwab

Minutes
- Not able to approve minutes because we did not have a quorum

Frontier Communications
- Discussed Community Assistance Program, which is a proposed partnership between Frontier & chamber members. Each business the chamber can get to open or renew their high speed service the chamber receives $50.
- Will discuss this program in better detail when we have a quorum. Board members that were not at this meeting can get more information from Jessica

Mayor
- Discussed a possible hotel and glass factory coming to town. The city told the hotel they would like them to go on the North side of town where the hospital is going.
- The mayor would like the chamber's "written support or whatever we can provide as a board or individuals" to deny Carlinville Southern to move into their new building. The mayor said that the city is against the church moving to their new building simply due to economics.

Executive Director's report
- Pointed out new members
- Discussed the Regional Chamber Summit—April 23. Noon-7/8 PM at Best Western. $12 to register. Will discuss top trends & how to strengthen local chambers.
- New meeting date—Jessica will send out a survey to find out a better day/time for the board to meet
- "Our Town Hospitality" would like to update the Chamber's information to put in their new businesses & organizations booklet. The cost is $30. Rosalind approved this.

Committee Reports
- Annual event—looking for sponsors.



EXHIBIT

12

**AFFIDAVIT OF REV. TIMOTHY RHODUS**

STATE OF ILLINIOS      }
                            }ss.
COUNTY OF SANGAMON }

       Rev. Timothy Rhodus, first being duly sworn deposes and says:

       1.     I am the Senior Pastor of Carlinville Southern Baptist Church. If called at trial, I will testify to the following facts.

       2.     Carlinville Southern Baptist Church is a congregation of Christians that is a member church of the Illinois Baptist State Association, which is affiliated with the Southern Baptist Convention, which appeals exclusively to the scriptures of the Holy Bible for its authority and means of governance.  It is a religious body formed for the promotion of the message of the Christian gospel, instruction and righteous conduct, fellowship of its members and outreach to the community.

       3.     The Church sincerely believes that the foregoing ministries are duties owed to God by Christians and by the Church corporately.

       4.     Carlinville Southern Baptist Church's theological position is that to love those in need is to love Christ himself. As such, the Church provides a number of charitable services for the community and its membership. These services are substantially burdened by the City of Carlinville's denial of the use of its property. Specifically, the Church cannot offer its ministry of preaching, teaching or spreading the Gospel and serving youth, the elderly and all segments of society by providing for and nurturing their religious needs.

       5.     In accordance with its beliefs, the Church regularly assembles on Sunday mornings and Wednesday evenings to worship publicly Almighty God. The Church



EXHIBIT

B

conducts said religious services and activities in pursuit of is mission and responsibilities as a church. The Church finds 380 to 450 persons in regular attendance at its Sunday morning worship services.

6.    The church currently holds its worship services and generally operates out of a building owned by the Church outside the city limits of the City of Carlinville.

7.    Since 2000, the Church has experienced steady and substantial growth in membership and in participation in its ministries and programs such that continued operation of the Church and all of its programs at its existing site has become impracticable.

8.    To accommodate its growing membership and in furtherance of and to facilitate the foregoing purposes, on or about January 28, 2008 the Church purchased property located at 1030 West Main Street, Carlinville, Illinois. (the "Premises"). The premises were formally a home to Wal-Mart retail store.

9.    The Church desires and intends to occupy and use the premises for the primary purpose of gathering corporately to engage in the public worship of God, including the public preaching of doctrines of the Christian faith. The Church also intends to use the premises for other activities that pertain to its primary purpose, including classes of bible instruction, fellowship gatherings, administrative functions, and various ministries of outreach to the community.

10.    On December 13, 2007, I applied to the City of Carlinville for re-zoning of the premises Carlinville Southern Baptist Church purchased at 1030 West Main Street, Carlinville, Illinois. I requested the City rezone the premises from the C-1 commercial

zoning designation to the R zoning designation to allow the use of the property for religious purposes.

11.    The adjacent land uses are as follows: to the North is agricultural land; to the East is retail/office center, single family residential developments, a bank, and a trucking facility; to the South is a vacant restaurant, single family residential developments and the Carlinville High School, and to the West is an assisted living facility and undeveloped land.

12.    The City of Carlinville neither had an internal planning department or an outside professional consultant review the application to rezone the premises prior to the Carlinville Planning/Zoning Commission holding a public hearing and making an advisory report to the City Council on the rezoning application.

13.    The Carlinville Planning/Zoning Commission held a public hearing on January 16, 2008 and recommended denial of the rezoning, concluding that (a) the existing uses of the premises in the vicinity of the property were all commercial, (b) the zoning district classification to the east, south and west were all commercial, (c) the suitability of the property to remain in retail use "seemed excellent" with no compelling evidence to the contrary, (d) the area was stable in terms of development and most importantly, (e) the City would lose potential sales tax revenues and real estate taxes.

14.    On February 4, 2008 the City Council voted unanimously to deny the application for rezoning.

15.    Subsequent to the decision, the City has publicly said that the sole reason for denying the rezoning is the loss of potential tax revenues that would result from religious use of the property.

16.    The Church desires to occupy and use the premises as a church, and to do so immediately.

17.    There is no available land within the City of Carlinville that is reasonably suitable for Carlinville Southern Baptist Church to build or use for religious purposes.

18.    After denying the rezoning request, the City of Carlinville, through its Mayor, requested that the Church sell the premises to the City.

19.    The Church has refused to sell the property to the City.

20.    The Mayor of the City of Carlinville acknowledged in a television interview that the sole reason for the denial of the rezoning was its objection to the loss of real property tax and sales tax if the Church purchased the property.

21.    The City of Carlinville acknowledged in a newspaper article of March 4, 2008 that the sole reason for the denial of the rezoning was its objection to the loss of real property tax and sales tax if the Church purchased the property.

22.    On March 13, 2008, the Mayor of Carlinville confirmed that the reason for the City denying rezoning is the loss of tax revenue when he addressed the Carlinville Chamber of Commerce. The Mayor further asked for support from the business community to deny Carlinville Southern Baptist Church's move into its building.  The Carlinville Zoning Administrator has informed Church representatives that the City cannot prevent the Church from remodeling and undertaking construction of the interior of the property.

23.    The City has threatened to take action to prevent the Church from undertaking any work or renovation within the premises and to prevent any religious use

of the property, regardless of whether such use might otherwise be consistent with the permitted uses of the C-1 zoning designation.

24.    The City's attempt to prevent even lawful uses of construction on the property is based solely on the religious nature of the Church and its mission.

25.    The Church has a contingent of contractors and volunteers ready to commence work on the building, but cannot do so with the threatened zoning enforcement action.

26.    If the Church is not permitted to use its building, and begin work on interior renovations, it will loose the volunteer construction crews, which, will result in a substantial increased development cost of the premises.

I declare under the penalty of perjury that the statements contained above are true to the best of my knowledge, information and belief.

Executed this __18__ day of March, 2008.

_Timothy Rhodus_
By: Timothy Rhodus, Senior Pastor
Carlinville Baptist Church

Subscribed and sworn to before me this
__18__ day of March, 2008

_Michelle D. Jondrigan_
Notary Public, Sangamon County, Il.
Acting in Sangamon County, Il.
My Commission Expires:  __10-3-2011__

OFFICIAL SEAL
MICHELLE D. JONDRIGAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-3-2011

### AFFIDAVIT OF REV. TIMOTHY RHODUS

STATE OF ILLINIOS          }
                           }ss.
COUNTY OF SANGAMON }

Rev. Timothy Rhodus, first being duly sworn deposes and says:

1.    I am the Senior Pastor of Carlinville Southern Baptist Church. If called at trial, I will testify to the following facts.

2.    Carlinville Southern Baptist Church is a congregation of Christians that is a member church of the Illinois Baptist State Association, which is affiliated with the Southern Baptist Convention, which appeals exclusively to the scriptures of the Holy Bible for its authority and means of governance.  It is a religious body formed for the promotion of the message of the Christian gospel, instruction and righteous conduct, fellowship of its members and outreach to the community.

3.    The Church sincerely believes that the foregoing ministries are duties owed to God by Christians and by the Church corporately.

4.    Carlinville Southern Baptist Church's theological position is that to love those in need is to love Christ himself. As such, the Church provides a number of charitable services for the community and its membership. These services are substantially burdened by the City of Carlinville's denial of the use of its property. Specifically, the Church cannot offer its ministry of preaching, teaching or spreading the Gospel and serving youth, the elderly and all segments of society by providing for and nurturing their religious needs.

5.    In accordance with its beliefs, the Church regularly assembles on Sunday mornings and Wednesday evenings to worship publicly Almighty God. The Church



EXHIBIT

B

conducts said religious services and activities in pursuit of is mission and responsibilities as a church. The Church finds 380 to 450 persons in regular attendance at its Sunday morning worship services.

6.     The church currently holds its worship services and generally operates out of a building owned by the Church outside the city limits of the City of Carlinville.

7.     Since 2000, the Church has experienced steady and substantial growth in membership and in participation in its ministries and programs such that continued operation of the Church and all of its programs at its existing site has become impracticable.

8.     To accommodate its growing membership and in furtherance of and to facilitate the foregoing purposes, on or about January 28, 2008 the Church purchased property located at 1030 West Main Street, Carlinville, Illinois. (the "Premises"). The premises were formally a home to Wal-Mart retail store.

9.     The Church desires and intends to occupy and use the premises for the primary purpose of gathering corporately to engage in the public worship of God, including the public preaching of doctrines of the Christian faith. The Church also intends to use the premises for other activities that pertain to its primary purpose, including classes of bible instruction, fellowship gatherings, administrative functions, and various ministries of outreach to the community.

10.     On December 13, 2007, I applied to the City of Carlinville for re-zoning of the premises Carlinville Southern Baptist Church purchased at 1030 West Main Street, Carlinville, Illinois. I requested the City rezone the premises from the C-1 commercial

zoning designation to the R zoning designation to allow the use of the property for religious purposes.

11. The adjacent land uses are as follows: to the North is agricultural land; to the East is retail/office center, single family residential developments, a bank, and a trucking facility; to the South is a vacant restaurant, single family residential developments and the Carlinville High School, and to the West is an assisted living facility and undeveloped land.

12. The City of Carlinville neither had an internal planning department or an outside professional consultant review the application to rezone the premises prior to the Carlinville Planning/Zoning Commission holding a public hearing and making an advisory report to the City Council on the rezoning application.

13. The Carlinville Planning/Zoning Commission held a public hearing on January 16, 2008 and recommended denial of the rezoning, concluding that (a) the existing uses of the premises in the vicinity of the property were all commercial, (b) the zoning district classification to the east, south and west were all commercial, (c) the suitability of the property to remain in retail use "seemed excellent" with no compelling evidence to the contrary, (d) the area was stable in terms of development and most importantly, (e) the City would lose potential sales tax revenues and real estate taxes.

14. On February 4, 2008 the City Council voted unanimously to deny the application for rezoning.

15. Subsequent to the decision, the City has publicly said that the sole reason for denying the rezoning is the loss of potential tax revenues that would result from religious use of the property.

16.    The Church desires to occupy and use the premises as a church, and to do so immediately.

17.    There is no available land within the City of Carlinville that is reasonably suitable for Carlinville Southern Baptist Church to build or use for religious purposes.

18.    After denying the rezoning request, the City of Carlinville, through its Mayor, requested that the Church sell the premises to the City.

19.    The Church has refused to sell the property to the City.

20.    The Mayor of the City of Carlinville acknowledged in a television interview that the sole reason for the denial of the rezoning was its objection to the loss of real property tax and sales tax if the Church purchased the property.

21.    The City of Carlinville acknowledged in a newspaper article of March 4, 2008 that the sole reason for the denial of the rezoning was its objection to the loss of real property tax and sales tax if the Church purchased the property.

22.    On March 13, 2008, the Mayor of Carlinville confirmed that the reason for the City denying rezoning is the loss of tax revenue when he addressed the Carlinville Chamber of Commerce. The Mayor further asked for support from the business community to deny Carlinville Southern Baptist Church's move into its building.  The Carlinville Zoning Administrator has informed Church representatives that the City cannot prevent the Church from remodeling and undertaking construction of the interior of the property.

23.    The City has threatened to take action to prevent the Church from undertaking any work or renovation within the premises and to prevent any religious use

of the property, regardless of whether such use might otherwise be consistent with the permitted uses of the C-1 zoning designation.

24.    The City's attempt to prevent even lawful uses of construction on the property is based solely on the religious nature of the Church and its mission.

25.    The Church has a contingent of contractors and volunteers ready to commence work on the building, but cannot do so with the threatened zoning enforcement action.

26.    If the Church is not permitted to use its building, and begin work on interior renovations, it will loose the volunteer construction crews, which, will result in a substantial increased development cost of the premises.

I declare under the penalty of perjury that the statements contained above are true to the best of my knowledge, information and belief.

Executed this __18__ day of March, 2008.

By: Timothy Rhodus, Senior Pastor
Carlinville Baptist Church

Subscribed and sworn to before me this
18 day of March, 2008

Notary Public, Sangamon County, Il.
Acting in Sangamon County, Il.
My Commission Expires: __10-3-2011__